1                    IN THE UNITED STATES DISTRICT COURT

2                          DISTRICT OF ARIZONA

3

   UNITED STATES OF AMERICA,      )
4                                 )
               Plaintiff,         )
5                                 )
                                  )
6     vs.                         )      CR-10-0239-TUC-DCB
                                  )
7                                 )
   ADRIAN COOPER,                 )
8                                 )
               Defendant.         )      Tucson, Arizona
9     _____)      May 23, 2012

10

11

12                    BEFORE HONORABLE DAVID C. BURY
                      UNITED STATES DISTRICT JUDGE
13                          405 W. CONGRESS
                        TUCSON, ARIZONA 85701
14

15                        JURY TRIAL - DAY 2

16

17                      A P P E A R A N C E S

18   ON BEHALF OF THE GOVERNMENT:      MR. JESSE FIGUEROA
                                       ASSISTANT U.S. ATTORNEY
19
                                       MS. KAREN ROLLEY
20                                     ASSISTANT U.S. ATTORNEY

21   ON BEHALF OF THE DEFENDANT:       MR. STEVEN D. WEST
                                       ATTORNEY AT LAW
22

23                    CHRIS WALLACE, RPR, CRR
                      405 W. CONGRESS, SUITE 1500
24                      TUCSON, ARIZONA 85701
                          (520)205-4268
25
        Proceedings prepared by computerized realtime translation.

I N D E X

EVIDENCE ON BEHALF OF THE GOVERNMENT

Page

Testimony of DIANE ELIE
    REDIRECT EXAMINATION BY MS. ROLLEY .................. 11

Testimony of JOAN RENE HARMON
    DIRECT EXAMINATION BY MS.ROLLEY ...................... 13
    CROSS EXAMINATION BY MR. WEST ........................ 46
    REDIRECT EXAMINATION BY MS. ROLLEY .................. 71

Testimony of LANI VICTORIA GONZALES
    DIRECT EXAMINATION BY MR. FIGUEROA .................. 73
    CROSS EXAMINATION BY MR. WEST ........................ 87
    REDIRECT EXAMINATION BY MR. FIGUEROA ................ 90

Testimony of CLINT CRANFORD
    DIRECT EXAMINATION BY MR. FIGUEROA .................. 91
    CROSS EXAMINATION BY MR. WEST ........................ 102
    VOIR DIRE EXAMINATION BY MR. FIGUEROA ............... 104
    CROSS EXAMINATION (RESUMED) BY MR. WEST ............. 105

Testimony of CURTIS KEVIN CAMPBELL
    DIRECT EXAMINATION BY MR. FIGUEROA .................. 114
    CROSS EXAMINATION BY MR. WEST ........................ 119

Testimony of HOLLY SCHULTZ
    DIRECT EXAMINATION BY MS. ROLLEY .................... 127
    CROSS EXAMINATION BY MR. WEST ........................ 143

Testimony of LAWRENCE J. GASKIN
    DIRECT EXAMINATION BY MS. ROLLEY .................... 152
    CROSS EXAMINATION BY MR. WEST ........................ 164

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Back on the record in United States
 3      versus Cooper.  There was a juror issue.  It doesn't seem like
 4      much of an issue, but I should bring it to your attention
 5      regarding Juror 17, who is in seat 8, front row, second from
 6      the right.
 7              She mentioned to Cathy yesterday after selection that
 8      the name Haroldson -- and by the way 17 is from Safford -- that
 9      the name Haroldson meant something to her.  So Cathy inquired
10      further that -- and I mentioned Witness Holly Haroldson
11      Schultz.  Come to find out that Juror 17's mother is a friend
12      of her --
13              THE CLERK:  Juror 17 is acquainted with the mother of
14      a Holly Haroldson.
15              THE COURT:  That's what I meant to say.
16              Juror 17 does not know Holly Haroldson, but knows her
17      mother.  Apparently has never met Holly Haroldson, but has
18      served with the mother on some committees.
19              THE CLERK:  Yes.
20              MR. FIGUEROA:  Doesn't bother me, Your Honor.
21              THE COURT:  So we could do a couple of things here.
22      We could bring her in and inquire further regarding this
23      relationship or replace her with an alternate, which I am not
24      inclined to do at this point.  But if further conversation with
25      her led to that, that's the other choice, I guess.
```

1         MR. WEST:  Another alternative, Judge, we could
2    designate her as the alternate.
3         THE COURT:  I won't do that without further inquiry,
4    because I'm just thinking, you know, if we had discussed this
5    with her during voir dire, I don't think it would have made any
6    difference to her.
7         MR. WEST:  We don't know that unless we can inquire
8    further.
9         That's the option I would request.
10        THE COURT:  Was there another juror issue?
11        MS. ROLLEY:  Just briefly, and I don't know her
12   number, but it is the juror who I think is from -- grew up in
13   India.
14        THE COURT:  Who would be Number 18, which is the
15   third one on the front row from the right?
16        MS. ROLLEY:  She walked into the courtroom foyer
17   earlier today asking me -- I was standing there -- is this the
18   9:30?  I put up my hand up, and I wasn't going to talk to her,
19   and our next witness, Joan Harmon, was in the doorway, and she
20   didn't apparently know who the person was and said, "Good
21   morning, may I help you?"  And I said to Joan, "Don't talk to
22   her," put up my hand and we came to get Cathy.
23        THE COURT:  Any problem with that?
24        MR. WEST:  No, Your Honor.
25        THE COURT:  Why don't you ask 17 to come in and take

1    a seat there in the end seat in the jury box.

2              (Thereupon, Juror 17, entered the courtroom and took

3    a seat in the jury box, afterwhich the proceedings resumed as

4    follows:)

5              THE COURT:  Good morning, Number 17.

6              Sorry to single you out.

7              JUROR 17:  That's fine.

8              THE COURT:  You mentioned something to Cathy about a

9    potential witness in this case.  I had asked the jury yesterday

10   if anyone knew Holly Haroldson-Schultz.  I didn't get any

11   hands, and then you mentioned something to Cathy about that

12   witness' mother.

13             JUROR 17:  When you said the name it didn't register

14   anything at all, and I was thinking -- because there are a lot

15   of Haroldsons in our town, and I had gone through thinking do I

16   know Holly.  But as the trial was going on, something clicked

17   and it was just a conversation that I had with a Barbara

18   Haroldson, and she mentioned that her daughter worked at the

19   prison.

20             THE COURT:  How much time had you spent with Barbara

21   Haroldson?

22             JUROR 17:  It's a small town, and we are on the same

23   voluntary committee, so I served on Helping Hands with her,

24   Rotary with her, and -- I haven't been in the volunteering

25   committee this year because coaching has taken most of my time,

1     so it has been a year.  But last year I spent a lot of time

2     with Barbara.

3              THE COURT:  Did you socialize with her outside the

4     committee function?

5              JUROR 17:  No.  We ended up in Hawaii on vacation at

6     the same time one time, and that was it.  I said, hi, and had

7     dinner.  We were at the same luau.

8              THE COURT:  Do you know any other family members of

9     the Haroldson family?

10             JUROR 17:  Her father, Harold.  I would know him just

11    by acquaintance, also.

12             THE COURT:  But you never met Holly Haroldson

13    personally?

14             JUROR 17:  No, I have not.

15             THE COURT:  Had her mother talked with you about

16    Holly's work at the prison or anything?

17             JUROR 17:  The only conversation we had is while we

18    were painting a house for Helping Hands, and she said that -- I

19    asked about her kids, to get to know her a little, and she said

20    she had a daughter that was working at the prison, and was

21    trying to get another job.  She was a nurse and trying to get a

22    different job.

23             THE COURT:  Now, do you think since bells were

24    ringing in your mind yesterday, and that you do know this

25    witness' mother, do you think that would affect your ability to

1  serve fairly and impartially on this jury?

2          JUROR 17:  I think I can be fair.  I will say that I

3  respect Barbara.  She is a well-known person in our community,

4  and I would hope that her daughter would be that, so I would

5  probably think highly of her testimony.

6          THE COURT:  Of the daughter's testimony?

7          JUROR 17:  If she is anything like her mother.

8          THE COURT:  As a juror, you can accept all of the

9  testimony of a witness?  Part of it?  Or none of it?

10         In any given circumstance in applying that standard

11  of credibility, would you be able to reject all of her

12  testimony if that was called for?

13         JUROR 17:  Yes.

14         THE COURT:  Would that embarrass you with her mother?

15         JUROR 17:  I don't think she would -- Holly wouldn't

16  even know.

17         THE COURT:  Counsel, do you want to have any

18  questions of Juror 17?

19         MS. ROLLEY:  I don't, Your Honor.

20         MR. WEST:  If I may, Your Honor.

21         Good morning.

22         When we were talking about looking at a witness and

23  evaluating them, when you tell the court that you would think

24  highly of her, that would suggest that you are not on an even

25  keel, or you know how the measures are for justice, the blind

1    lady holding the scales in her hands.

2             JUROR 17:  Yes.

3             MR. WEST:  If you think highly of her, doesn't that

4    make it more difficult for you to accept that there might be

5    something not correct about what she's saying?

6             In other words, when you are weighing that out, other

7    witnesses you don't know, you're on an even scale?

8             JUROR 17:  Right.  I don't know the background.

9             MR. WEST:  Right.  Now you have a family that you

10   respect, and you would expect her to be just like her mother;

11   right?

12            JUROR 17:  Yes.

13            MR. WEST:  And that expectation changes that level

14   playing field; does it not?

15            JUROR 17:  Yes.

16            MR. WEST:  And if you were seated over here at the

17   defense table, and you knew your mind and this uneven playing

18   field now, do you think that you would want yourself then to be

19   a juror if you were in our position over here?

20            JUROR 17:  If I was trying to weigh my case, probably

21   not.

22            MR. WEST:  And that's based upon what you know of

23   your relationships and how you think?

24            JUROR 17:  Just like what I am thinking you would

25   think.  My relationship with Holly; I don't know Holly.

1    Barbara, I do have a good relationship.  She is well-known in
2    our community.
3                MR. WEST:  And, therefore, she is well respected, you
4    have a lot of respect for the family, and therefore, that goes
5    to Holly when she testifies.
6                JUROR 17:  But as a mother -- I have four children, I
7    would hope people don't judge my kids based on me either.
8                MR. WEST:  I understand that.
9                The only question is really when it comes down to it
10   is can you be completely fair and impartial or is your
11   impartiality going to be slightly skewed because of the
12   relationship with the Haroldson mother?
13               JUROR 17:  To be completely honest, I have never been
14   in this situation so I cannot really answer that fairly, but I
15   will say that I feel that I am fair because I am a teacher, I
16   am a coach, I have to be fair, but I still say that I have high
17   respect for Barbara.
18               MR. WEST:  Is that something you can't set aside when
19   you deliberate?
20               JUROR 17:  I can set that aside.
21               MR. WEST:  Nothing further.
22               THE COURT:  Number 17, if you would go back in the
23   jury room, we will talk about you behind your back.
24               JUROR 17:  I'm used to that.
25               MR. WEST:  May I have just a moment?

1          THE COURT:  Sure.

2          Mr. West, anything further with respect to that

3     juror?

4          MR. WEST:  I am satisfied.  I think from her point

5     she can be fair and impartial.  If something else comes up, we

6     will address it.

7          THE COURT:  Anything from the government?  Any

8     problem with Number 17?

9          MS. ROLLEY:  No, Your Honor.

10          THE COURT:  Any other problems?

11          We have witness Diane Elie.

12          (The jury panel entered the courtroom to commence

13     proceedings at 10:04 A.M.)

14          THE COURT:  Now on the record with our jury.

15          Ladies and gentlemen, I apologize for the delay.  It

16     is entirely my fault.  It has nothing to do with the lawyers.

17     I had these hearings -- that is why we start at 9:30.  And I

18     had a couple of hearings before that and sometimes lawyers just

19     want to talk for a while and I hate to cut them off, and

20     sometimes the matters go a little long, so I apologize.  I try

21     not to keep you waiting.  I will try not to waste your time.

22          So we have a witness on the stand subject to the

23     government's redirect examination.

24          MS. ROLLEY:  Thank you.

25                         DIANE ELIE,

```
 1        called as a witness for and on behalf of the government, having
 2        been previously duly sworn, was examined and testified as
 3        follows:
 4                     REDIRECT EXAMINATION (Resumed)
 5        BY MS. ROLLEY:
 6             Q    Good morning.
 7                  Ms. Elie, yesterday you answered questions regarding
 8        the routine or the one problem visit routine that the clinic
 9        has.
10                  How is that one problem per visit applied to
11        emergency situations?
12             A    In an emergency, a full assessment would be done.
13                  MR. WEST:  I object to relevance of this question.
14                  There is no emergency.
15                  THE COURT:  It isn't, but you brought it up, so it
16        was relevant when you brought it up, and it still is, so I will
17        allow the question.
18                  You may answer.
19                  THE WITNESS:  Thank you.
20                  In an emergency, the patient may not have an
21        opportunity to explain their issue, they are not bringing it
22        up, so we would be more in depth for an assessment at this
23        time.
24                  BY MS. ROLLEY:
25             Q    If a person comes in with an emergency like a broken
```

UNITED STATES  DISTRICT COURT

1       arm and broken leg, you wouldn't just treat the broken arm?

2           A       Absolutely not.

3           Q       You treat the whole person in the emergency

4       situation?

5           A       Yes.

6           Q       And how many times have you used handcuffs in your

7       job as a nurse with Bureau of Prisons?

8           A       I would say less than two; two or less.

9           Q       And you started at Safford in 2008.  At the time of

10      this incident how many times had you used handcuffs at Safford?

11          A       Zero.

12          Q       So when was the last time you had used handcuffs?

13          A       Approximately 2004.

14          Q       Are you issued a set of handcuffs as a nurse at

15      Safford?

16          A       No.

17          Q       Do you carry handcuffs with you on a daily basis?

18          A       No.

19                  MS. ROLLEY:  I have no further questions, Your

20      Honor.

21                  THE COURT:  You may step down and be excused.

22                  Thank you.

23                  (Witness left the stand)

24                  THE WITNESS:  Thank you.

25                  THE COURT:  The government's next witness, please.

1          MS. ROLLEY:  The government calls Joan Harmon.

2          May the witness be excused?

3          They are traveling from out of Tucson.

4          THE COURT:  Any reason?

5          MR. WEST:  I have no objection.

6          MS. ROLLEY:  Thank you.

7                        JOAN RENE HARMON,

8    called as a witness for and on behalf of the Government, having

9    been first duly sworn, was examined and testified as follows:

10          THE CLERK:  State your full name for the record and

11    spell your last.

12          THE WITNESS:  Joan Rene Harmon, H-A-R-M-O-N.

13                      DIRECT EXAMINATION

14    BY MS. ROLLEY:

15      Q    Good morning.  Tell us, Ms. Harmon, what do you do

16    for work?

17      A    I am a correctional officer at FCI Safford.

18      Q    And how long have you work at FCI Safford?

19      A    Since 2009.

20      Q    When did you start in 2009?

21      A    January 5th.

22      Q    And when you started at FCI Safford, what was your

23    position?

24      A    Medical secretary.

25      Q    And what did that include as far as duties and

1     responsibilities?

2          A     Receiving inmates into the clinic for daily

3     appointments, filing records, typing reports.

4          Q     And are you still in that position?

5          A     No, ma'am.

6          Q     How long were you in that position?

7          A     Three years.

8          Q     What do you do now?

9          A     I am a correctional officer.

10         Q     Where are you assigned?

11         A     Various posts.

12         Q     So as a medical secretary, were you still considered

13    a federal officer?

14         A     Yes, ma'am.

15         Q     And as a federal officer at Safford, did you have any

16    particular additional duties or responsibilities in addition to

17    the work that you did in the medical clinic?

18         A     Yes, ma'am.

19         Q     What were those?

20         A     I am a correctional officer first no matter what my

21    position is.  My responsibilities were to uphold and maintain

22    the security of the institution.

23         Q     Now, do you know the person by the name of Adrian

24    Cooper?

25         A     Yes.

1          Q     And how do you know him?

2          A     He was an inmate at FCI Safford.

3          Q     And do you see Mr. Cooper in the courtroom today?

4          A     Yes.

5          Q     Can you please identify him in terms of what he is

6     wearing?

7          A     He is wearing a suit, unbuttoned top collar.

8                MS. ROLLEY:  May the record reflect that the witness

9     has identified the defendant?

10               MR. WEST:  No objection, Your Honor.

11               THE COURT:  Yes.

12               BY MS. ROLLEY:

13         Q     Do you know a person by the name of Diane Elie?

14         A     Yes, ma'am.

15         Q     Who is Diane Elie?

16         A     She is a registered nurse at FCI Safford.

17         Q     Did you work with her as a medical secretary?

18         A     Yes, ma'am.

19         Q     How often did you work with her?

20         A     Daily.

21         Q     And did you also work with Lieutenant Campbell and

22     Officer Cranford?

23         A     Yes, ma'am.

24         Q     How often did you work with them?

25         A     Daily.

```
 1          Q    I want to direct your attention to July the 6th of

 2     2009.  Were you working as a medical secretary at the health

 3     services clinic in Safford that day?

 4          A    Yes, ma'am.

 5          Q    And was it a normal business day as far as normal

 6     business hours for you?

 7          A    Yes, ma'am.

 8          Q    What were your hours?

 9          A    7:00 to 3:30.

10          Q    Did you have an office?

11          A    I did.

12          Q    Where was that located?

13          A    It was located to the right of the lobby.

14          Q    This is Exhibit 1.

15               Do you recognize this?

16          A    I do.

17          Q    Does this depict where your office was at that time?

18          A    It does.

19          Q    Can you point to it for us?

20          A    Yes, ma'am.

21          Q    Where it says "secretary"?

22          A    Yes, ma'am.

23          Q    And your office -- how is it structured?  Are there

24     walls and a door, or do you have windows or what?

25          A    I have two windows, three walls and two doors.
```

1     Q     And the windows, in what direction do the windows

2     face?

3     A     I have one window that faces the waiting room and I

4     have one window that faces the hallway.

5     Q     Now, at around 10:20, 10:25 that morning, did

6     something attract your attention?

7     A     Yes, ma'am.

8     Q     What was it?

9     A     Loud voices in the hallway.

10     Q     And in the hallway, looking at this diagram, where in

11     the hallway could you tell those voices were coming from?

12     A     In the hallway near the clinical lab.

13     Q     And did you put a red dot right outside the dental

14     laboratory in that hallway?

15     A     Yes, ma'am.

16     Q     And so upon hearing that, what, if anything, did you

17     do?

18     A     I stepped out of my office.

19     Q     And then what did you do?

20     A     I stepped into the hallway where I heard the voices.

21     Q     Did you recognize those voices?

22     A     I recognized one voice.

23     Q     Whose voice?

24     A     Nurse Elie.

25     Q     And what do you recall hearing at that point?

1          A     I recall hearing Nurse Elie say, "Don't raise your
2     voice at me."
3          Q     And can you describe for us how her voice was?
4          A     Her voice was calm, yet firm.
5          Q     But loud enough that you could hear it?
6          A     Yes, ma'am.
7          Q     Did you hear another voice in addition to Nurse
8     Elie's voice?
9          A     Yes, ma'am.
10          Q     What did you hear?
11          A     I heard a male voice say, "Don't you yell at me."
12          Q     And can you tell us about the tone, the volume, or
13     anything about that voice?
14          A     It was deep and loud.
15          Q     So what did you do?
16          A     I remained where I was standing to observe the
17     situation.
18          Q     So on this diagram which is Exhibit 1, can you show
19     us then where you remained to stand to observe the situation?
20          A     Yes, ma'am.
21          Q     Can you put an X.
22          A     (Witness complies)
23          Q     Which is in front of the double doors that lead into
24     the waiting room; is that correct?
25          A     Yes, ma'am.

1       Q    But closer to the dental office?

2       A    It was actually closer to the inmate restroom.

3       Q    Where it says lab.

4            Is that the restroom?

5       A    No, ma'am.

6       Q    Where?

7       A    Can I point to the screen?

8       Q    Sure.

9       A    Right there.

10      Q    So you are at that point.

11           Do you make any observations?

12      A    Yes, ma'am.

13      Q    What do you see?

14      A    I see inmate Cooper standing in the hallway facing

15   the clinical lab doorway.

16      Q    Do you see anyone else?

17      A    I see Nurse Elie standing in the doorway of the lab.

18      Q    And how far apart, if you know or remember, were

19   these two people from each other?

20      A    I don't know exactly.

21      Q    Were they close, were they farther down the hallway

22   from each other?

23      A    I would say the inmate was standing in the middle of

24   the hallway which was approximately 3 feet from where Nurse

25   Elie was standing.

1        Q     And in your observation, tell us in terms of -- in
2   relation to one another, how did these two individuals look?
3              Which person was taller?
4        A     Inmate Cooper was considerably taller than Nurse
5   Elie.
6        Q     And so making that observation, do you hear anything
7   at that point?
8        A     Yes, ma'am.
9        Q     What do you hear?
10       A     I hear Nurse Elie say to the inmate, "I am giving you
11   a direct order to calm down and stop yelling."
12       Q     And the inmate defendant, what does he say in
13   response?
14       A     Inmate Cooper said in response, "I don't have to do
15   anything you say."
16       Q     What was your reaction?
17       A     My reaction is to continue standing where I am at and
18   observe what inmate Cooper's demeanor was.
19       Q     So what happens from there?
20             What do you observe?
21       A     Inmate Cooper turned and began walking toward where I
22   was standing mumbling something under his breath.
23       Q     Could you hear it?
24       A     I could hear the mumble, but I would not make out
25   what he was saying.

```
 1          Q     How would you describe his demeanor at that point?
 2          A     Very angry.
 3          Q     Why do you say that?
 4          A     Because of the tone in which he was mumbling under
 5     his breath.  His shoulders were hunched over and he was not
 6     walking, he was stomping.
 7          Q     Did you do anything at that point?
 8          A     Yes.
 9          Q     What did you do?
10          A     As inmate Cooper approached me, I told him to step to
11     the side and have a seat.
12          Q     Is there a chair there?
13          A     Yes, ma'am.
14          Q     Where is the chair?
15                Can you show us on the diagram?
16          A     (Witness complies.)
17          Q     And you put a dot in front of what?
18          A     In front of the window facing the hallway to my
19     office.
20          Q     So he has then, the defendant, has moved down the
21     hallway and you have encountered him and you have him sit in
22     that chair by your office?
23          A     Yes, ma'am.
24          Q     Why did you do that?
25          A     As I explained to inmate Cooper, I wanted him to calm
```

```
 1    down.
 2         Q    What is his action?
 3         A    Inmate Cooper complied.
 4         Q    Now, at that point do you notice Nurse Elie?
 5         A    No, I do not.
 6         Q    So as the defendant inmate is sitting in the chair,
 7    what takes place between the two of you?
 8         A    I am standing, inmate Cooper is sitting, inmate
 9    Cooper begins to explain the situation.
10         Q    What did he tell you?
11         A    I don't recall what he told me.
12         Q    He is explaining his situation and you are doing
13    what?
14         A    I am listening.
15         Q    How does that stop or end?
16         A    Nurse Elie stepped around the corner to where we
17    were.
18         Q    Does she say anything?
19         A    Yes.
20         Q    What?
21         A    She said, "Why are you still here?"
22         Q    And how is her tone or her voice?
23         A    Her voice was very firm.
24         Q    And who was she addressing?
25         A    She was addressing inmate Cooper.
```

1          Q      Did he respond?

2          A      He did not respond verbally.

3          Q      What did he do?

4          A      Inmate Cooper stepped up and faced Nurse Elie.

5          Q      Where are you as the defendant stands up and faces

6      Nurse Elie?

7          A      I am to his left side and behind him.

8          Q      What are you doing?

9          A      I am observing the situation.

10          Q      So what do you see?

11          A      I see inmate Cooper immediately take an aggressive

12      demeanor.

13          Q      Describe for us what you mean by "aggressive

14      demeanor."

15          A      Inmate Cooper immediately stood up from his chair,

16      faced Nurse Elie and, as I said before, hunched his shoulders

17      forward towards Ms. Elie.

18          Q      And what do you do when you see this?

19          A      I attempted to deescalate the situation.

20          Q      How?

21          A      I advised inmate Cooper to calm down, turn around and

22      cuff up.

23          Q      And how was your voice as you advised him to do that?

24          A      Calm.

25          Q      What is his reaction?

1        A      Inmate Cooper said, "Your cuffs will not fit, you
2    need a larger set of cuffs."
3        Q      And as he tells you that, tell us what his voice was
4    like.
5               What was his tone?  What was his demeanor?
6        A      His tone of voice was irritated.
7        Q      And his demeanor?
8        A      He was in a defensive, aggressive demeanor.
9        Q      Why do you say that?
10       A      Inmate Cooper had a loud tone to his voice.
11       Q      So he tells you your cuffs will not fit.
12              What do you do?
13       A      I told inmate Cooper, "let's try."
14       Q      So what happens at that point?
15       A      Inmate Cooper turned around, placed his hands behind
16   his back.
17       Q      Then what happened?
18       A      I applied a restraint to his left wrist -- I'm sorry,
19   I attempted to apply.
20       Q      Now, you say you attempted to apply the restraint.
21              He is facing the wall, what, if anything, does he
22   have on his person or with him?
23       A      Inmate Cooper has a newspaper in his right hand.
24       Q      And does he hold onto that paper during this attempt
25   on your part?

1      A      Yes, ma'am.

2      Q      And so what do you do?

3      A      I am attempting to apply the cuff to his left hand.

4      Q      So how do you attempt to apply the cuff to his left

5      hand?

6      A      I place the cuff around his wrist and I close the

7      handcuff to one click.

8      Q      And then what happens?

9      A      Nurse Elie ordered inmate Cooper to drop the

10     newspaper.

11     Q      What does he do?

12     A      Inmate Cooper replied to Nurse Elie, "Do you want my

13     pencil, too?"

14     Q      What is his tone of voice as he interacts with Nurse

15     Elie?

16     A      Irritated and aggressive.

17     Q      What does he do with the paper?

18     A      He held onto it.

19     Q      You have the cuff around his left wrist with one

20     click; correct?

21     A      Yes.

22     Q      What is the next thing that you do?

23     A      I look at Ms. Elie and I mouth the words to her:  "It

24     doesn't fit."

25     Q      So what were you thinking?

1          A     Oh my goodness, the cuff does not fit.

2          Q     And you are a medical secretary at that time;

3     correct?

4          A     Yes, ma'am.

5          Q     What about your past experience with handcuffs?

6                Do you have any prior to that?

7          A     Yes, ma'am.

8          Q     What was your past experience?

9          A     I was an inmate systems officer in the receiving and

10    discharge area of the institution, and I processed inmates

11    coming into the institution and departing the institution.

12         Q     Did you have an opportunity doing that position to

13    handcuff inmates?

14         A     Yes, ma'am.

15         Q     What is your experience in terms of the handcuffs

16    that you would have?

17         A     I removed restraints on a regular basis; I applied

18    restraints on a regular basis.

19         Q     And so handcuffs -- do they come in one size, one

20    size fits all or what?

21         A     No, ma'am.

22         Q     Tell us about that.

23         A     You have what we call a standard set of handcuffs,

24    and then you have what we call a larger cuff that has an

25    extended chain between the bracelets, it is larger, and then

1     you have what we call big boy cuffs, it has an extended chain,

2     but it also has larger bracelets.

3          Q    And so on July the 6th, 2009, as you placed the cuff

4     on the defendant's left hand, what size cuffs did you have with

5     you that you used?

6          A    Standard.

7          Q    So when you realized that the cuff did not fit, what

8     did you do after you mouth to Nurse Elie?

9          A    Inmate Cooper still had the newspaper in his hand.  I

10    ordered inmate Cooper to drop the newspaper.

11         Q    Why did you do that?

12         A    I realized that I did not look at his right hand to

13    see if he was holding anything.

14         Q    So you told him to drop the newspaper at that point.

15              Does he do it?

16         A    Yes, ma'am.

17         Q    Does he say anything?

18         A    As the restraint was on his left wrist and he dropped

19    the newspaper on the floor, he turned around to the side and

20    said to me, "I told you it wasn't going to fit."

21         Q    And so tell us about the tone, the demeanor of his

22    voice as he is telling you, I told you it wasn't going to fit?

23         A    Very matter of fact.

24         Q    What do you do?

25         A    I told inmate Cooper, "Turn around so I can remove

UNITED STATES  DISTRICT COURT

1    the restraint."

2         Q    And what is your voice like when you tell him that?

3         A    Calm.

4         Q    What does he do in reply?

5         A    Inmate Cooper said to me very firmly, "Which way?"

6         Q    So what do you do?

7         A    I told inmate Cooper, "Turn around so I can remove

8    the restraint."

9         Q    What does he do?

10        A    Inmate Cooper repeated his question:  "Which way?"

11        Q    And what is his voice like?

12        A    Louder; stronger.

13        Q    What happens after that?

14        A    For the third time I told inmate Cooper, "Turn around

15   and face me."

16        Q    What does he do in reply?

17        A    Inmate Cooper jerked his hand, restrained hand out of

18   my hands; he turned around swinging the handcuff and faced me.

19        Q    You said he was swinging the handcuff.

20             How far were you from him when he was doing that?

21        A    I was close enough that if I had not taken a step

22   back, I believe I would have been hit by the handcuff.

23        Q    How are you feeling at that point?

24        A    Nervous.

25        Q    Why did you have him turn around to remove that

1  handcuff that was on his left arm?  Why didn't you just do it
2  at that point?
3       A    Inmate Cooper is so muscular and he was so large, in
4  order for me to remove the restraint with his hand behind his
5  back, he would have had to bend over slightly and lift his arm
6  further behind his back, which was very difficult for a man of
7  his stature.
8       Q    So you made the decision to have him turn and face
9  you so you could remove it?
10      A    Yes, ma'am.
11      Q    And as he turns and he faces you, does anything
12  happen at that point other than you stepping back?
13      A    Inmate Cooper presented his wrist so that I could
14  remove the restraint.
15      Q    Did you do it?
16      A    Yes, ma'am.
17      Q    Is he saying anything at that point?
18      A    Not that I recall.
19      Q    What happens next?
20      A    I removed the restraint and I told inmate Cooper,
21  "Turn and face the wall."
22      Q    How was your voice?
23      A    Steady.
24      Q    What does he do?
25      A    Inmate Cooper said, "which wall?"

1      Q     How is his voice?

2      A     Very irritated.

3      Q     What are you feeling at that point?

4      A     That this situation is getting out of hand.

5      Q     Why do you say that?

6      A     Because the restraints obviously did not work.  My

7   thinking was if I place inmate Cooper against the wall, I can

8   at least take control of the situation by having him in a

9   submissive position.

10           Does that make sense?

11     Q     Okay.  And then does he face the wall?

12     A     No, ma'am.

13     Q     What happens?

14     A     Inmate Cooper said, "which wall?"

15     Q     Describe his voice for us?

16     A     Irritated and loud.

17     Q     What do you do in response?

18     A     I had repeated the order to inmate Cooper two more

19   times.

20     Q     So by repeating the order, you are telling him to

21   turn around and face the wall?

22     A     Yes, ma'am.

23     Q     Do you make any gesture to him?

24     A     I pointed toward the wall I wanted him to face.

25     Q     And I think you said two more times you had to say

1       that?

2              A     Yes, ma'am.

3              Q     How was your voice in those two times?

4              A     Firm and steady.

5              Q     And how was his reaction?

6              A     Inmate Cooper was standing very close to me, very

7       loud and looking down at me.

8              Q     Does he say anything?

9              A     Well, the last thing that he said was, "Which wall?"

10             Q     And how are you feeling the last time that he says

11      that?

12             A     Intimidated.

13             Q     Do you do anything?

14             A     Yes.

15             Q     What do you do?

16             A     I pointed -- I was pointing to the wall and I told

17      inmate Cooper, "Turn around and face the fucking wall."

18             Q     Why did you use that language?

19             A     Obviously instructions I was giving, the direct order

20      I was giving inmate Cooper was not working, so sometimes it may

21      call -- the situation may call for a stronger language.  Some

22      inmates may comply to a stronger language.  The order I was

23      giving was not working.

24             Q     And what was his reaction when you say what you did?

25             A     Inmate Cooper bent closer to my face enough so that I

1     could not see his eyes and but I could feel the heat of his

2     breath on my face and said, "don't you cuss at me."

3          Q     And what is the tone of his voice at that point?

4          A     Yelling.

5          Q     How are you feeling?

6          A     Scared.

7          Q     What do you do?

8          A     I hit my body alarm.

9          Q     What is the size of the defendant in relation to you?

10         A     He is a mountain of a man.

11         Q     So you press your body alarm.

12               Does the defendant respond at all to that?

13         A     Yes, ma'am.

14         Q     What does he do?

15         A     He said, "Go ahead, hit your body alarm, see what

16    happens."

17         Q     And how is his voice when he is telling you to go

18    ahead and hit your body alarm?

19         A     He is yelling.

20         Q     I'm sorry?

21         A     He is yelling.

22         Q     Where is he in relation to you?

23         A     He is still standing over me.

24         Q     So you two are face to face; correct?

25         A     Yes, ma'am.

1          Q     Where is Nurse Elie?

2          A     I don't know at this point.

3          Q     What happens next?

4          A     Lieutenant Campbell and Officer Cranford entered the

5     clinic through the front lobby doors.

6          Q     And you and the defendant are standing still in the

7     area near the window to your office?

8          A     Yes, ma'am.

9          Q     In the hallway?

10         A     Yes, ma'am.

11         Q     And Officer Cranford and Lieutenant Campbell, are

12    they dressed in their uniforms?

13         A     Yes, ma'am.

14         Q     And what is their size in relation to the defendant?

15         A     Can you rephrase that question?

16         Q     How big are they in relation to the defendant?

17         A     Considerably smaller.

18         Q     And what is the first thing that they do when they

19    arrive?

20         A     They immediately assess the situation -- in my mind,

21    they immediately assess the situation and order inmate Cooper

22    to get on the ground.

23         Q     Now, he is facing you at that point; is that correct?

24         A     No, ma'am.

25         Q     What is he doing?

1          A       Inmate Cooper had turned and placed his body against
2     the wall slash window of my office.
3          Q       What happens next?
4          A       Officer Cranford ran to inmate Cooper's left side;
5     Lieutenant Campbell ran to inmate Cooper's right side.
6                  MS. ROLLEY:  Can we have Exhibit 10, please.
7          Q       I am showing you what has been admitted as Exhibit
8     10.
9                  Do you recognize this?
10         A       Yes, ma'am.
11         Q       What is this?
12         A       This is hallway leading to my office.  The corner on
13    the right is the double doors leading to and from the lobby of
14    the clinic.
15         Q       Is this the wall that inmate Cooper was facing when
16    Officer Cranford and Officer Campbell were there?
17         A       I recall that inmate Cooper was facing the wall
18    section between my office door and the window.
19         Q       Okay.  So is it on here?  Can you point to it where
20    it is on here?
21         A       Yes, ma'am.
22         Q       Can you put a dot on there for us now?
23         A       Yes, ma'am.
24         Q       So he is facing that wall?
25         A       Yes, ma'am.

1          Q     And then Officer Cranford and Lieutenant Campbell
2     approach him; correct?
3          A     Yes, ma'am.
4          Q     Where do they go in relation to him?
5          A     Officer Cranford was on inmate Cooper's left side;
6     Lieutenant Campbell was on inmate Cooper's right side.
7          Q     And what happens at that point?
8          A     As I said, inmate Cooper had pressed his body against
9     the wall slash window.  Officer Cranford had ahold of inmate
10    Cooper's left arm and Lieutenant Campbell had ahold of inmate
11    Cooper's right shoulder and right arm.
12         Q     What are you doing?
13         A     I am standing back against the wall.
14         Q     Which wall?  Where?
15         A     Can I point to it?
16         Q     Make a mark.
17         A     That doesn't look like --
18         Q     Is that a little dot over to here to the left side of
19    this photograph?
20         A     Yes, ma'am, but I don't think it is where I meant to
21    put it.
22               I am closer to the double doors.
23         Q     Can you just mark it?
24         A     I am closer to this area right here.
25         Q     What do you see?

1          A     I see Lieutenant Campbell and Officer Cranford apply

2     controlling techniques to inmate Cooper.

3          Q     What happens?

4          A     Inmate Cooper is defiant and noncompliant.

5          Q     And what makes you say that?

6                What do you see as far as the defendant inmate?

7          A     Inmate Cooper raised his left arm -- I'm sorry.  Can

8     I backtrack?

9          Q     Sure.

10               What do you see in relation --

11         A     Inmate Cooper is pressing his body against the window

12    with his right hand and arm and he is not budging.  He is

13    pressing the left side of his body against the wall and they

14    are trying to pull him off the wall and they are unable to.

15         Q     So what happens?

16               Does the defendant do anything?

17         A     Yes, ma'am.

18         Q     What does he do?

19         A     Inmate Cooper raised his left arm, raised it up to

20    the side and back throwing Officer Cranford up in the air and

21    against the opposite wall.

22         Q     Can you tell on this photograph, Exhibit 10, where

23    Officer Cranford landed?

24         A     Yes, ma'am.

25         Q     Show us, please.

1          A      (Witness complies.)

2          Q      On the photograph, that dot is closer to the exit

3    door; is that correct?

4          A      Yes, ma'am.

5          Q      Is there a corner in that area?

6          A      I don't know what that is.  I am not sure.

7                 THE COURT:  How does she make something other than a

8    dot?

9                 BY MS. ROLLEY:

10         Q      So that X that you put on the photograph is where you

11   see Officer Cranford land?

12         A      Yes, ma'am.

13         Q      And what is the position of his body when he lands,

14   if you recall?

15         A      His head and shoulders are against the wall, his

16   hands are on the floor, he is laying on the floor.

17         Q      What do you feel or what do you think at that point?

18         A      Absolute terror.

19         Q      So what do you do?

20         A      I observe Officer Cranford jump up and assume the

21   same position he was in before on inmate Cooper's left side.

22         Q      What is going on with Lieutenant Campbell and the

23   defendant, if you know?

24         A      Lieutenant Campbell is continuing to order inmate

25   Cooper to get down on the ground while he is trying to apply

1    control techniques.

2         Q    What happens between the defendant and Lieutenant

3    Campbell?

4         A    Can you rephrase that question?

5         Q    What does the defendant do?

6         A    May I see my notes?

7         Q    Is it fair to say that you don't remember?

8         A    Yes.

9         Q    And something would help you --

10        A    Yes, ma'am.

11        Q    -- to remember.

12             What would that be?

13             Did you write a memo?

14        A    I wrote a memo in 2009.  I believe, July 10th, 2009.

15        Q    Was it an incident report or was it a regular memo?

16        A    Regular memo.

17             MS. ROLLEY:  May I approach, Your Honor?

18             THE COURT:  Yes.

19             MS. ROLLEY:

20        Q    I am showing you what has been marked for

21    identification as Exhibit 75, a two-page document.

22             Do you recognize that?

23        A    Yes, ma'am.

24        Q    Is that what you are referring to as your notes?

25        A    Yes, ma'am.

```
 1        Q    Can you then read that portion to yourself and let us
 2   know when you are finished?
 3        A    Yes, ma'am.
 4        Q    Are you finished?
 5        A    Yes, ma'am.
 6        Q    Is your memory refreshed?
 7        A    Yes, ma'am.
 8        Q    So tell us with respect to the defendant and
 9   Lieutenant Campbell, what is going on?
10             What happens?
11        A    Inmate Cooper pushed Lieutenant Campbell with his
12   right hand.
13        Q    With the defendant's right hand he pushes --
14        A    I don't remember if it was a push with his hand or
15   his arm.
16        Q    So what do you see then when he does that?
17        A    I see Lieutenant Campbell pushed backwards.
18        Q    And where does he go in relation to the wall?
19        A    Lieutenant Campbell is pushed away from the wall and
20   away from where inmate Cooper is standing.
21        Q    And what are you thinking at that point?
22        A    I have to do something to get in there and help.
23        Q    So what do you do?
24        A    After Lieutenant Campbell reassumes his position on
25   inmate Cooper's right side, I think to myself, okay, he has two
```

```
 1    open knees and an open hand pressed against that glass, I can
 2    go for one or the other.
 3            Q    What do you do?
 4            A    I go for the right hand.
 5            Q    And what do you do?
 6            A    I stepped forward where the three of them were, I
 7    grabbed his right hand and realized this guy is huge and all I
 8    can do is grab both hands around his thumb.
 9            Q    Both of your hands?
10            A    Both of my hands around his thumb.
11            Q    Do you do that?
12            A    Yes, ma'am.
13            Q    What happens?
14            A    My attempt to was to put his thumb back towards his
15    arm to bring his hand around behind his back so that we can
16    handcuff him.
17            Q    Were you successful?
18            A    Absolutely not.
19            Q    What happened?
20            A    Inmate Cooper moved his shoulder and elbow toward the
21    glass throwing me into the window.
22            Q    So what part of the window did you hit?
23            A    I hit the window sill.
24            Q    What part of your body hit the window sill?
25            A    My right forearm.
```

```
1        Q     How did that feel?

2        A     It stung.

3        Q     Stung?

4        A     Yes, ma'am.

5        Q     As in pain?

6        A     Yes, ma'am.

7        Q     So what do you do then?

8        A     I stepped back, I realized it was taking longer than

9    we needed, and for staff to respond, so I realized I needed to

10   open the door at the end of the hallway which we are looking at

11   right now, the darkest door, I needed to open that for other

12   staff to respond through that entrance.

13       Q     Your arm hits the window sill, what is the defendant

14   doing?

15       A     He is still resisting.

16       Q     Where is he?

17       A     He is still against the wall.

18       Q     So you go around the defendant and Officer Cranford

19   and Lieutenant Campbell and you go to that door; is that

20   correct?

21       A     I stepped back against the wall before I went to the

22   door.

23       Q     And do you hear the defendant at all during this?

24       A     No.

25       Q     Were you able to open that door?
```

```
 1          A     Yes, ma'am.

 2          Q     And did anyone come to help?

 3          A     Yes, ma'am.

 4          Q     How many people, if you know?

 5          A     Three that I know of.

 6          Q     Did you stay in the area to assist or watch what was

 7     going on?

 8          A     I did for a matter of just a few seconds.

 9          Q     What did you see?

10          A     I saw Dr. Gaskin come from around the corner.

11          Q     And on this photograph, does this show us the corner

12     he came around?

13          A     Yes, ma'am.

14          Q     Put an arrow, if you can draw an arrow?

15          A     (Witness complies)

16          Q     So he came from that direction around to assist?

17          A     Yes, ma'am.

18          Q     Did you watch what he did?

19          A     Yes, ma'am.

20          Q     What did you see?

21          A     I saw Dr. Gaskin approach inmate Cooper on Lieutenant

22     Campbell's side, inmate Cooper's right side.

23          Q     Did you watch what Dr. Gaskin was doing?

24          A     No, ma'am.

25          Q     What did you do then?
```

1          A     I immediately went into my office.

2          Q     Why did you do that?

3          A     I was scared to death.

4          Q     At some point, Ms. Harmon, did you have an

5     opportunity to be medically assessed or have a medical

6     examination?

7          A     Yes, ma'am.

8          Q     When did that occur?

9          A     Sometime after the incident.

10         Q     And during that assessment, what took place?

11         A     I was assessed by Nurse Elie, and she made notation

12    of what my statement was that occurred.

13               She looked at my forearm and made notation of what

14    she observed.

15         Q     Did you get an opportunity to look at your forearm?

16         A     Yes, ma'am.

17         Q     What did you see?

18         A     I saw a bruise.

19         Q     And at any point, either during the medical

20    assessment, after or before it, did anyone take any photographs

21    of you?

22         A     Yes, ma'am.

23         Q     And where did that occur?

24         A     I believe it occurred in the lieutenant's office.

25         Q     And I am showing you then what is marked as Exhibit 5

1    for identification.

2              Do you recognize that photograph?

3         A    Yes, ma'am.

4         Q    And what is that a photograph of?

5         A    It is a photograph of me providing a statement of the

6    incident standing in front of the lieutenant's office.

7         Q    Is it a fair and accurate depiction of yourself

8    shortly after the incident?

9         A    Yes, ma'am.

10             MS. ROLLEY:  I would offer that as Government's

11   Exhibit 5.

12             MR. WEST:  No objection, Your Honor.

13             THE COURT:  5 may be admitted.

14             MS. ROLLEY:  And published?

15             THE COURT:  Yes.

16             MS. ROLLEY:  Thank you.

17             (Exhibit published.)

18             BY MS. ROLLEY:

19        Q    And how are you feeling in this photograph?

20        A    Traumatized.

21        Q    And now I am showing you what has been marked for

22   identification at this point as Number 7, Exhibit 7.

23             Do you recognize that?

24        A    Yes, ma'am.

25        Q    What is it?

1          A     It is the bruise on my forearm.

2          Q     Is that a fair and accurate depiction of the bruise

3     on your forearm from this incident?

4          A     Yes, it is.

5                MS. ROLLEY:  Your Honor, I offer this into evidence.

6                MR. WEST:  No objection.

7                THE COURT:  May be admitted.

8                BY MS. ROLLEY:

9          Q     And tell the jury what you are pointing to in that

10    photograph?

11         A     I am pointing to the bruise on my forearm.

12         Q     And how did that feel; your arm?

13         A     At that point the pain had gone away.

14               MS. ROLLEY:  I have no further questions for this

15    witness, Your Honor.

16               THE COURT:  Will you folks mind if we have a ten

17    minute recess.  We have not had much of a recess this morning,

18    even if it is not all right, we will take one.

19               Ten minutes if you would be in the jury room ready to

20    go.

21               MS. ROLLEY:  Thank you.

22               (Thereupon the jury exited the courtroom at 10:57

23    A.M. for a brief recess.)

24               THE COURT:  Be seated.  We have our jurors, counsel

25    and the defendant.

1              Mr. West, go ahead.

2                          CROSS EXAMINATION

3      BY MR. WEST:

4         Q     Good morning.

5         A     Good morning, sir.

6         Q     You told us a little bit about your training.

7               That was at the academy for corrections officers?

8         A     Yes, sir.

9         Q     And where did that occur?

10        A     In Glynco, Georgia.

11        Q     So that is like the main place they send all you

12     folks for training?

13        A     Yes, sir.

14        Q     And do you feel like you had adequate training over

15     there?

16        A     Yes, sir.

17        Q     And when you became a corrections officer, did you

18     then get some extra training to become a secretary or are those

19     skills you had before you became a correction officer?

20        A     Skills I had before I became a correctional officer.

21        Q     So you just kind of gravitate in that direction.

22              Fair statement?

23              MS. ROLLEY:  Objection.

24              THE COURT:  Overruled.  She may answer.

25              BY MR. WEST:

```
 1        Q     What was your statement?
 2        A     No, sir.
 3        Q     How did you end up being a secretary?
 4        A     It was the only job open at the time that I applied.
 5        Q     There you go.  Okay.
 6              And you have the correctional officer's training and
 7    you had the secretary skills?
 8        A     Yes, sir.
 9        Q     Now, when you were being trained, isn't it true that
10    what they are trying to pound into everybody's heads is safety?
11              You want to be safe in these facilities; right?
12        A     Yes, sir.
13        Q     So they teach you everything imaginable to help you
14    stay safe; correct?
15        A     Yes, sir.
16        Q     And help you maintain safety for others as well;
17    correct?
18        A     Yes, sir.
19        Q     And that goes for other people that work there with
20    you; correct?
21        A     Yes, sir.
22        Q     And the inmates?
23        A     Yes, sir.
24        Q     And obviously the circumstance deals with a situation
25    where trying to gain control of an inmate, that is what we are
```

1     here talking about today; right?

2          A     Yes, sir.

3          Q     So you were taught how to put handcuffs on people?

4          A     Yes.

5          Q     It wasn't something you knew before you went to the

6     academy, was it?

7          A     No, sir.

8          Q     So the basic principles are to, number one, tell the

9     person you are going to cuff to get them in the position you

10    want them in; right?

11         A     Yes, sir.

12         Q     And then you ask them to put their hands behind their

13    back; right?

14         A     It depends.

15         Q     Well, depends whether you are going to cuff them in

16    front or in back?

17         A     Yes, sir.

18         Q     So let's just stick to what our circumstances

19    surround, okay.

20               When you are putting handcuffs on somebody to the

21    rear behind their back, is that the most secure position you

22    can put that inmate in for your safety?

23         A     No, sir.

24         Q     Well, if the handcuff is in front, can't he move them

25    and still be a potential threat?

UNITED STATES  DISTRICT COURT

```
 1          A     Yes, sir.
 2          Q     So it is safer if you put the handcuffs behind his
 3     back.  His movement is really limited that way; is it not?
 4                MS. ROLLEY:  Objection, asked and answered.
 5                THE COURT:  Overruled.
 6                BY MR. WEST:
 7          Q     His movement is limited if you put the handcuffs on
 8     behind him; correct?
 9          A     Yes, sir.
10          Q     And so therefore, it is a safer position for you to
11     be able to control that person; correct?
12          A     Yes, sir.
13          Q     You mentioned the injuries you received.
14                Do you remember the way you reported it to Nurse
15     Elie?
16          A     Nurse Elie?
17          Q     Elie, I'm sorry.  Yes, Elie.
18          A     Can you rephrase that question, please.
19          Q     Do you remember her asking if you were still in pain?
20          A     Yes.
21          Q     And do you recall her saying on a scale of one to ten
22     how does it feel?
23          A     Yes.
24          Q     Do you recall that your response was zero?
25          A     Yes.
```

UNITED STATES  DISTRICT COURT

1          Q    You indicated that Mr. Cooper is a, quote, unquote,
2     mountain of a man; right?
3          A    Yes, sir.
4          Q    Do you think if he intended to hurt you, the pain
5     would go away that quick?
6               MS. ROLLEY:  Objection, speculative.
7               THE COURT:  Overruled.
8               BY MR. WEST:
9          Q    Do you think if he intended to hurt you, that that
10    would be the only injury you would have had?
11         A    I don't know.
12         Q    You really don't know?
13         A    No, sir.
14         Q    Can you use your imagination?
15              MS. ROLLEY:  Objection, speculative.
16              THE COURT:  Sustained.
17              BY MR. WEST:
18         Q    So with your training and experience, you don't think
19    that a man, this mountain of a man, could have hurt you more
20    than the injury that occurred to you, you just don't know if
21    that could have happened?
22              MS. ROLLEY:  Objection, argumentative.
23              THE COURT:  Overruled.
24              THE WITNESS:  Can you rephrase that question, please?
25              BY MR. WEST:

1          Q     What is the problem with the question?

2                I don't know what you don't understand.

3                MS. ROLLEY:  Objection.

4                He is arguing with the witness at this point.

5                THE COURT:  Let's see if the witness can answer the

6     question that was posed.

7                So the question is:  With your training and

8     experience you don't think that a mountain of a man could have

9     hurt you more than the injury that occurred to you?

10               You just don't know if that could have happened?

11               That was the question.

12               THE WITNESS:  Yes, sir, that's correct.  I don't know

13    that that could have happened.

14               THE COURT:  Okay.

15               BY MR. WEST:

16         Q     Did they teach you at the academy about weapons

17    within the facilities?

18         A     Yes, sir.

19         Q     Do you know what a shank is?

20         A     Yes, sir.

21         Q     What is it?

22         A     It is a homemade device used to cause bodily injury.

23         Q     What is it shaped like?

24         A     It varies.

25         Q     Does it have a blunt end like the end of my fist or

1     is it a pointed end like the tip of my pen?

2          A     It varies.

3          Q     A shank varies as far as whether it has a pointy tip

4     or a blunt flat end?

5          A     Yes, sir.

6          Q     Can you describe to me a shank that you have seen

7     that has a big blunt end to it?

8          A     Yes, sir.

9          Q     Please do?

10         A     A shank that is not completed in the making; does not

11    have a pointed tip.

12         Q     So okay.  Aside from the non-existent shanks, a shank

13    that is made, does it have a pointy tip to it?

14         A     Typically.

15         Q     Because it is for stabbing; right?

16         A     Most generally.

17         Q     Same kind of tip as a pencil would have; correct?

18         A     Most generally.

19         Q     So when we talk about weapons, he had a wad of paper

20    in his hand; correct, a newspaper rolled up?

21         A     Yes, sir.

22         Q     Could that be used as a weapon?

23         A     Anything can be used as a weapon, sir.

24         Q     Was there anything inside the paper that could have

25    been used as a weapon?

1          A     I don't know.

2          Q     You knew he had a pencil.  Could that be used as a

3     weapon?

4          A     I did not know that he had a pencil.

5          Q     Don't you remember the conversation about, do you

6     want me to throw the pencil down, too?

7               MS. ROLLEY:  Objection, not in evidence.

8               THE COURT:  Overruled.

9               THE WITNESS:  I do not know that he had a pencil.

10              BY MR. WEST:

11         Q     So during this encounter, you never heard any

12    reference to the fact that when Mr. Cooper was being asked to

13    throw the paper down on the ground, that he spoke loudly:  "Do

14    you want the pencil too?"

15              You don't recall that?

16         A     Yes, sir, I do.

17         Q     Okay.  So he had a pencil?

18         A     I don't know.

19         Q     Did he throw the pencil on the ground?

20         A     I don't remember.

21         Q     Was there a pencil on the ground when this was all

22    finished with?

23         A     I don't know.

24         Q     Did the lieutenant take pictures of the hallway when

25    this was finished with?

1          A    I don't know.

2          Q    Who took the picture of you in front of the

3     lieutenant's office?

4          A    I don't recall.

5          Q    Was it Lieutenant Elie?

6          A    I don't recall.

7          Q    Was he involved in all of this?

8          A    I don't recall.

9          Q    Do you remember seeing Lieutenant Elie that day at

10    all?

11         A    I don't remember.

12         Q    Do you remember him asking you questions about your

13    injuries?

14         A    I don't recall.

15         Q    Handcuffs:  A single handcuff dangling on somebody's

16    wrist could be used as a weapon; could it not?

17         A    Yes, sir.

18         Q    Why would you enable somebody to have a weapon to use

19    against you?

20         A    I did not enable anyone to have a weapon against me.

21         Q    Really.  Okay.

22              This thumb hold that you were applying.  Where did

23    you learn how to use that?

24         A    I don't know that I was ever taught to use that.

25         Q    Were you taught to use restraints, physical

```
 1        restraints, against people, inmates while you were being
 2        trained at the academy?
 3             A     Yes, sir.
 4             Q     And was one of those restraints that you were taught
 5        this thumb hold?
 6             A     Can you rephrase that question, please?
 7             Q     Was one of the restraints that you were taught this
 8        thumb hold that you used and applied to Mr. Cooper?
 9             A     I don't know.
10             Q     Is it a correct statement that if you have a large
11        individual that needs to be physically restrained that you try
12        to gain control -- sometimes a number of people -- arms and
13        legs?
14             A     Can you please rephrase that question?
15             Q     Sure.
16             When you try to restrain somebody, a big person, and
17        you need help, you can't do it by yourself, okay, do -- and you
18        have a group of people that are going to be coming along.
19             Do you go for their arms and legs, is that how you
20        restrain them?
21             A     It depends on the situation, sir.
22             Q     This situation.  Were his arms and legs restrained
23        when this group of folks came in and took him down to the
24        ground?
25             A     No, sir.
```

UNITED STATES  DISTRICT COURT

1          Q    Are you telling this jury that when he was on the

2     ground that nobody was controlling either of his legs or either

3     of his arms?

4               MS. ROLLEY:  Objection, argumentative.

5               THE COURT:  Overruled.

6               THE WITNESS:  I don't know what was controlled, sir.

7               May I ask a question?

8               What does he mean by restrained or controlled?

9               THE COURT:  Just respond to the question the best you

10    can.

11              BY MR. WEST:

12         Q    Am I confusing you?  I apologize if I am.

13              MS. ROLLEY:  Move to strike.

14              THE COURT:  Go ahead.

15              Did you ask a question?

16              MR. WEST:  No, she just moved to strike something.

17              THE COURT:  Ask a question.

18              BY MR. WEST:

19         Q    When Cranford and Campbell came in, what did they

20    grab to restrain and gain control of Mr. Cooper?

21         A    Officer Cranford assumed a position on inmate

22    Cooper's left side.  I recall that Officer Cranford attempted

23    to control inmate Cooper's left arm.  Lieutenant Campbell

24    assumed inmate Cooper's right side, and I recall Lieutenant

25    Campbell had -- was attempting to control inmate Cooper's right

```
1    arm.
2         Q    And at that time they were doing this, Mr. Cooper is
3    facing the wall; correct?
4         A    Yes, sir.
5         Q    When you were testifying on direct, you testified
6    that what you saw was Cranford and Campbell using control
7    techniques.
8              Do you remember that statement?
9         A    Yes, sir.
10        Q    And you are testifying today that the techniques that
11   they used were just -- I mean, hanging onto his arms?
12        A    Yes, sir.
13        Q    Did either of them put their arm around Mr. Cooper's
14   neck?
15        A    No, sir.
16        Q    That never happened?
17        A    No, sir.
18        Q    So let's talk about July 6th, 2009 a little bit.
19             You were just there on your regular duty; correct?
20        A    Yes, sir.
21        Q    Do you carry your handcuffs on your belt?
22        A    Yes, sir.
23        Q    You are sitting in the office; correct?
24        A    Yes, sir.
25        Q    Your office?
```

1          A      Yes, sir.

2          Q      And correct me if I am wrong, but when inmates come

3     into the waiting room, are you the one they approach and give

4     their ID to?

5          A      Sometimes.

6          Q      I mean, is that the window they go to, the window in

7     your office?

8          A      Not necessarily.

9          Q      Who collects the IDs?

10          A      Both the health information technician and I.

11          Q      And where are the IDs kept after they are taken from

12     the inmate?

13          A      They are given to whoever is going to do the triage

14     on the inmate.

15          Q      So it follows through with their chart, so to speak?

16          A      Yes, sir.

17          Q      And inmates can't leave that facility, that medical

18     unit, until they get their ID back; correct?

19          A      In theory.

20          Q      They could.  Certainly they could leave?

21          A      Yes, sir.

22          Q      And they also have a sheet they sign in on; correct?

23          A      We sign them in.  The inmates don't sign themselves

24     in.

25          Q      And you put down on that form what their complaint

1     is?

2           A     No, sir.

3           Q     You don't?

4                 Again, you are sitting in your office, you hear this

5     noise down the hallway, and the way we have seen this building,

6     it is kind of in a T-shape; right?

7                 You have a waiting room, a hallway right outside of

8     it that runs up and down, and then you have a long hallway that

9     runs the other direction; correct?

10          A     Yes, sir.

11          Q     And it Ts right where the double doors are that go

12    into the reception room; right?

13          A     Yes, sir.

14          Q     So when you come out of your office, it is because

15    you have heard some loud talking in the hallway?

16          A     Yes, sir.

17          Q     And you discovered that that was Nurse Elie whose

18    voice you recognized; correct?

19          A     Yes, sir.

20          Q     And then you saw Mr. Cooper; correct?

21          A     Yes.

22          Q     And you recognized who it was?

23                I mean, did you know who he was before that point in

24    time?

25          A     I don't recall.

```
 1        Q    Do you recall whether you are the one that signed him
 2   in that morning when he came?
 3        A    I don't recall.
 4        Q    Do you recall then having to wait a long time before
 5   the doctor showed up?
 6        A    I don't recall.
 7        Q    Okay.  And it sounded to me from your testimony that
 8   voices were getting kind of loud between Nurse Elie and
 9   Mr. Cooper; right?
10        A    Yes, sir.
11        Q    And you tried to take the calm, kind of rational
12   approach; right?
13        A    Yes.
14        Q    Let's just settle down here, and that is what you
15   were trying to do; right?
16        A    Yes, sir.
17        Q    And that is what your training says to do; calm the
18   situation, calm everything down and then we don't have
19   problems; right?
20        A    Yes, sir.
21        Q    And that is a safety issue; right?
22        A    Yes, sir.
23        Q    And during the process of you talking to him, I got a
24   little bit confused because you said something about sitting
25   him down on a chair; right?
```

UNITED STATES  DISTRICT COURT

1          A     Yes, sir.

2          Q     And I guess you have actually been interviewed twice

3     by the FBI; right?

4          A     I believe that's correct.

5          Q     Pardon me?

6          A     I believe that's correct.

7          Q     And you wrote two statements of your own; correct?

8          A     Yes.

9          Q     And the first report that you wrote, was on, looks

10    like July 6, 2009; is that right?

11         A     I believe that's correct.

12         Q     And was that the one you looked at this morning when

13    you were shown the exhibit?

14         A     No, sir.

15               MR. WEST:  May I approach, Your Honor?

16               THE COURT:  Sure.

17               BY MR. WEST:

18         Q     Is that the report that you refreshed your memory

19    with this morning?

20         A     Can I look at the second page?

21         Q     You certainly may.

22               MR. WEST:  And for the record that is Exhibit 74 and

23    it is not in evidence.

24         Q     Is that the one that you refreshed your memory with

25    this morning?

```
1          A     Yes, sir.

2          Q     Thank you.

3                And then there is a second typed version that was

4      prepared -- looks like there might be five documents.

5                I am showing you what has now been marked as Exhibit

6      75.

7                Do you recognize that as something else you prepared?

8          A     Yes, sir.

9          Q     And I am also showing you Exhibit number 76.

10                Is that a document you prepared?

11          A     Yes, sir.

12          Q     Were these all documents that you prepared right

13      around the date of July 6th?

14          A     Yes, sir.

15          Q     And then on July 9th, the FBI came out and

16      interviewed you; correct?

17          A     I believe that's correct.

18          Q     And did you ever see the one that they did; the

19      report that they did?

20          A     Yes, sir.

21          Q     And reviewed it?

22          A     Yes, sir.

23          Q     So I am going to show you what has been marked as

24      Exhibit 74.

25                Does that look like the report that you reviewed?
```

```
 1          A    Yes, sir.
 2          Q    And doesn't it say there on like the second paragraph
 3     about, "Do you want my pencil on the ground, too?"
 4          A    In the second paragraph?
 5               Yes, sir.
 6          Q    Do you see it there?
 7          A    Yes, sir.
 8          Q    So does that refresh your memory now?
 9               Do you now remember that he had a pencil with him?
10          A    Sir, I never saw the pencil.
11          Q    I see.  All right.
12               You were interviewed again on April 5th, 2011, again
13     by somebody from the FBI; correct?
14          A    Yes, sir.
15          Q    And can you explain to the jury why at no time did
16     you ever mention this chair in the hallway until you were
17     interviewed on April 5th, 2011?
18          A    Yes, sir.
19          Q    That is the first time you brought it up, the chair
20     in the hallway?
21          A    Yes, sir.
22          Q    Why did you tell everybody in your other reports
23     about sitting him down on the chair in the hallway?
24          A    My initial memorandum and incident report were
25     written immediately, and, I mean, immediately after the
```

```
1     incident, and I had not had time to reflect on what happened.
2          Q    I see.  So once you were able to reflect a little --
3     almost two years later, then you were able to remember that
4     that chair was there?
5          A    Yes, sir.
6          Q    Now, will you tell the jury in this circumstance --
7     let me back up a second.
8               It seemed to me that once you got him sitting down in
9     that chair, that everything was getting safer, it was
10    deescalating; right?
11         A    It was beginning to.
12         Q    Okay.  And then when Nurse Elie came over, she's
13    getting upset with Mr. Cooper for still being there; isn't that
14    right?
15         A    I wouldn't say that she is getting upset.
16         Q    When Nurse Elie comes over and wants to know why he
17    is still in the hallway, why don't you tell her, I asked him to
18    sit down?
19         A    Because inmate Cooper stood up in an aggressive
20    demeanor before I could answer.
21              I was more concerned about his actions than her
22    question.
23         Q    You are trying to calm the situation down; right?
24         A    Yes, sir.
25         Q    And here she comes, and she is building up the fire
```

65

```
 1    again.
 2              MS. ROLLEY:  Objection, argumentative.
 3              THE COURT:  Sustained.
 4              BY MR. WEST:
 5         Q    The statement that she made to Mr. Cooper -- wasn't
 6    it like kind of a command, "why are you still here?"
 7         A    I did not take it that way.
 8         Q    You just don't know it was casual and calm as your
 9    demeanor was?
10              MS. ROLLEY:  Objection, argumentative.
11              THE COURT:  Overruled.
12              THE WITNESS:  I didn't take it that way either.
13              BY MR. WEST:
14         Q    Well, what was the demeanor of Nurse Elie when she
15    questioned why he was sitting in that chair?
16         A    Her demeanor was firm, steady.  I did not take it
17    that she was angry.
18         Q    Okay.  But you gave him an order to sit on that
19    chair; correct?
20         A    Yes.
21         Q    And he complied?
22         A    Yes.
23         Q    And then Nurse Elie, as I understand what you have
24    told us, came and questioned why he was there?
25         A    Yes, sir.
```

1     Q     And you just didn't say, I told him to?

2     A     No, sir.

3     Q     Because everything happened so fast you couldn't; is

4  that right?

5           MS. ROLLEY:  Objection.  Argumentative.

6           THE COURT:  Overruled.

7           THE WITNESS:  It is not that it happened so fast,

8  sir; it is that his actions of standing concerned me more than

9  answering her question.

10           BY MR. WEST:

11     Q     If you're trying to calm what is going on between the

12  two people that are arguing, you got control; right?

13           He is sitting down and you told him to sit down and

14  he sat down, so you have control; right?

15     A     Yes, sir.

16     Q     Is it your training and experience to let someone

17  else interfere with your ability to control that person?

18     A     That has nothing to do with my training or my

19  experience, sir.

20     Q     Why did you let it happen?

21           THE COURT:  Mr. West, move on to another topic.

22           BY MR. WEST:

23     Q     After he sat in the chair, got up, you tried to take

24  control again and in your calm demeanor?

25     A     Rephrase that question, please.  I'm sorry.

1      Q    After he stood up from the chair, you again took on
2    your calm demeanor and tried to gain control again; correct?
3      A    Yes, sir.
4      Q    And at that point in time you gave him directions to
5    get handcuffed; correct?
6      A    Yes, sir.
7      Q    You told him to face the wall; correct?
8      A    No, sir, not at that point.
9      Q    Was he facing the wall when you were putting the
10   handcuffs on?
11     A    He was facing between the wall and Ms. Elie.
12     Q    Was he in a position that you thought you wouldn't be
13   able to apply the handcuffs because he was being noncompliant
14   with you?
15     A    No, sir.
16     Q    So he was being compliant in your effort to put
17   handcuffs on him?
18     A    Yes, sir.
19     Q    And you told him to put his hands behind his back;
20   correct?
21     A    Yes, sir.
22     Q    And he did that?
23     A    Not immediately.
24     Q    Was he compliant with putting his hands behind his
25   back?

UNITED STATES  DISTRICT COURT

```
 1          A     Eventually.
 2          Q     And you put a cuff on; correct?
 3          A     I did.
 4          Q     And then -- and you hear it click?
 5          A     One click.
 6          Q     And that is adequate to be secured on the wrist;
 7    correct?
 8          A     No, sir.
 9          Q     Why not?  Was it going to come off?
10          A     It can; it can be compromised easily.
11          Q     It can be compromised if the person's wrist is thin,
12    you can put a couple of fingers between the wrist and the cuff?
13          A     That is not what I am referring to.
14          Q     Can you explain what you are referring to?
15          A     If you only have one tooth engaged on a handcuff,
16    someone of strength can slam that handcuff down and that cuff
17    will open.
18          Q     And you have experienced that?
19          A     Yes, I have.
20          Q     But that person would have to make some sort of an
21    aggressive movement with the cuff locked onto their wrist for
22    that to happen; correct?
23          A     When you say "lock," you mean just closed, the tooth?
24          Q     I understand, it is a two phase thing, you actually
25    have a key that you can lock after it is in place?
```

1           A     Yes, sir.

2           Q     So technically when it clicks it is closed and it is

3     secure on the wrist, but for turning that little lock so

4     nothing else -- and that lock -- let me back up.

5                 I am getting too many questions in one statement

6     here.

7                 The purpose of the lock is to keep it from getting

8     tighter; correct?

9           A     Yes, sir.

10          Q     But the handcuff, once it is closed and clicked, it

11    is on; correct?

12          A     Yes.

13          Q     And then the only way to get it off is either to use

14    a key and take it off or this thing that you said where

15    somebody could bang it and somehow get it off.  Are those the

16    only two ways you know to get it off?

17          A     No, sir.

18          Q     Is there another way that handcuff can come off?

19          A     Yes, sir.

20          Q     How would that be?

21          A     An inmate even of a large wrist, can still manipulate

22    their hands if they have that ability and slip that cuff.

23          Q     Most people's wrists are smaller than their hands;

24    aren't they?

25          A     Yes.

1      Q    Now, you heard the cuff click and then you decided

2   not to cuff the other wrist; right?

3      A    Yes, sir.

4      Q    Can you explain why?

5      A    Yes, sir.

6      Q    Please.

7      A    I did not feel that that handcuff was secure, and not

8   only did I believe it wasn't secure, but inmate Cooper is so

9   large -- was at the time -- was at the time -- that he could

10  not bring his right arm behind his back, bring his wrists close

11  enough for the standard size handcuff to be secured on both

12  wrists.

13     Q    So you are saying that he couldn't put his hands

14  behind his back like this?

15     A    No, he could not.

16     Q    I didn't see that in your report anywhere, in any of

17  the reports.

18          Is there a reason for that?

19     A    Are you referring to just the fact that he couldn't

20  get both wrists behind his back?

21     Q    That you couldn't cuff him because his wrists did not

22  meet up behind his back?

23     A    May I see my report?

24          THE COURT:  No need, move on to another topic,

25  Mr. West.

```
 1              BY MR. WEST:
 2        Q    Now, when the two officers came in initially,
 3   Cranford and Campbell, they immediately went to physical
 4   restraint with Mr. Cooper; correct?
 5        A    Yes.
 6        Q    And according to your statement, you never saw
 7   Cranford put a chokehold on him; correct?
 8        A    Correct.
 9        Q    And you never saw Campbell put a chokehold on him?
10        A    Correct.
11        Q    Did you ever see anybody put their arm or anything
12   around his throat at any time during this incident?
13        A    No, sir.
14             MR. WEST:  Those are all the questions I have, Judge.
15             Thank you.
16             THE COURT:  Any redirect?
17             MS. ROLLEY:  Just briefly.
18                         REDIRECT EXAMINATION
19   BY MS. ROLLEY:
20        Q    So Ms. Harmon, why did you do the thumb hold?
21             Why did you use it on the defendant?
22        A    To try to gain control of his right hand.
23        Q    And I think you testified that his arms and legs were
24   not restrained.
25             Do you know why that was?
```

1          A     When you say restrain, do you mean handcuffs or do
2      you mean physical contact?
3          Q     I think the question on cross was that his arms and
4      legs were not restrained.
5                Were they restrained by handcuffs?
6          A     No, ma'am.
7          Q     And were they restrained by physical contact?
8          A     Can you repeat the question, please?
9          Q     Were they restrained, was the defendant's arms and
10     legs restrained by physical contact?
11         A     When he was on the ground?
12         Q     When he was facing the wall?
13         A     No.
14         Q     It happened when he was on the ground; is that
15     correct?
16         A     I believe that's correct.
17               MS. ROLLEY:  I have nothing further for this witness.
18               THE COURT:  You may step down and be excused.
19               Thank you.
20               THE WITNESS:  Thank you, sir.
21               (The witness left the stand)
22               MR. FIGUEROA:  May she be excused from the subpoena?
23               THE COURT:  Yes.
24                        LANI VICTORIA GONZALES,
25     called as a witness for and on behalf of the Government, having

```
 1     been first duly sworn, was examined and testified as follows:
 2               THE CLERK:  State your full name and spell your last
 3     name for the record.
 4               THE WITNESS:  Lani Victoria Gonzales,
 5     G-O-N-Z-A-L-E-S.
 6               THE CLERK:  Can you spell your first name, please.
 7               THE WITNESS:  Lani, L-A-N-I.
 8                         DIRECT EXAMINATION
 9     BY MR. FIGUEROA:
10         Q    Good morning.
11         A    Good morning.
12         Q    Have you ever testified before?
13         A    No.
14         Q    Are you nervous?
15         A    Yes.
16         Q    Now, Ms. Gonzales, what is your occupation?
17         A    My current occupation is an accounting technician.
18     At the time of the incident I was in medical records.
19         Q    And where were you employed at the time of the
20     incident?
21         A    FCI Safford.
22         Q    And you are an employee of the United States?
23         A    Correct.
24         Q    Now, how long have you been employed in this
25     capacity?
```

UNITED STATES  DISTRICT COURT

1          A      It will be five years in June.

2          Q      Now, Safford is what is called a low security Federal

3     Correctional Institution?

4          A      Correct.

5          Q      Can you describe the facility for the jury?

6          A      We have three housing units.  There is a medical

7     facility, a clinic; we have -- there is a commissary, a store,

8     there is food service like cafeteria type.

9          Q      All for the inmates?

10         A      Yes.

11         Q      Are there cabanas there?

12         A      Yes.

13         Q      Televisions?

14         A      Televisions, there is an auditorium, recreation area,

15     softball fields, basketball courts.

16         Q      Now, you already mentioned there was a medical

17     facility in there.

18                So the inmates receive healthcare?

19         A      Correct.

20         Q      And they receive dental care?

21         A      Correct.

22         Q      What does it cost them to receive that care?

23         A      When they initiate a visit, there is a $2 co-pay they

24     are charged.

25         Q      And where do they receive that care?

1          A     They receive the care in the health services
2     department.
3          Q     Are there doctors and dentists employed there?
4          A     Yes.
5          Q     Can you explain to the jury what the procedure is for
6     a person getting into the medical facility to see a doctor?
7          A     If they initiate a sick call visit, they come in in
8     the morning, we have a sick call sign up from 6:30 to 7:00,
9     they come to the window, present with their identification, put
10    their name on the list.  I ask if they are being seen for
11    medical or dental care.  We have two separate lists and we put
12    them on the list and they are told to have a seat.
13         Q     Are you also a corrections officer?
14         A     Yes.
15         Q     And did you receive training at Glynco, Georgia?
16         A     Yes, I did.
17               MR. FIGUEROA:  Can we go to Exhibit 1, please?
18         Q     I am showing you Exhibit 1.
19               Do you recognize this as a diagram of the medical
20    facility?
21         A     Yes.
22         Q     Can you point out with an X where your office was?
23         A     Right here, this is my office.
24         Q     Now, were you there on July 6th at about 6:30 in the
25    morning?

```
 1          A     Yes.

 2          Q     Did you have occasion on that date and time to come

 3    into contact with a person who later became known to you as

 4    Adrian Cooper?

 5          A     Yes, I did.

 6          Q     Is Mr. Cooper in court?

 7          A     Yes.

 8          Q     Would you please point him out and tell us where he

 9    is and what he is wearing?

10          A     He is sitting there with the black coat and gray

11    shirt.

12                MR. FIGUEROA:  May the record reflect --

13                THE WITNESS:  Gray shirt, blue shirt.

14                MR. FIGUEROA:  May the record reflect the

15    identification?

16                THE COURT:  Yes.

17                BY MR. FIGUEROA:

18          Q     Now, how did you come into contact with him?

19          A     He came to the window to sign up for sick call that

20    morning.

21          Q     Was there a wait to see a doctor?

22          A     Yes, there were inmates that were on the list ahead

23    of him when he came in.

24          Q     Is it unusual for there to be a wait?

25          A     No, there is usually a wait everyday.
```

UNITED STATES  DISTRICT COURT

```
 1        Q    Had he been to sick call before?
 2        A    I had seen him in the clinic before.
 3        Q    And was he polite to you?
 4        A    Yes, he was.
 5        Q    I want to draw your attention to about 10:30 in the
 6   morning on that date.
 7             Did anything unusual happen?
 8        A    That morning, yes.  I was sitting at my desk working,
 9   and we heard -- I heard some loud noises in the hallway, I hear
10   some loud voices.
11        Q    Did you hear a voice that you recognized?
12        A    Yes, I recognized Ms. Elie's voice.
13        Q    What did you hear her say?
14        A    I hear her telling someone to go have a seat in the
15   lobby, to calm down.
16        Q    And did you hear a response?
17        A    I did hear a response saying, "I don't have to calm
18   down."
19        Q    And was that response from a male voice?
20        A    Yes.
21        Q    What was the tone of that voice?
22        A    It was loud.  They were both speaking loudly, enough
23   for me to hear in my office.
24        Q    Now, you know Joan Harmon?
25        A    Yes.
```

UNITED STATES  DISTRICT COURT

1      Q      She is the corrections officer that just left?

2      A      Yes.

3      Q      Was she near you in the medical facility?

4      A      Yes, her office is right next to mine.

5      Q      What did she do after you hear this voice?

6      A      She got up from her desk and stepped out into hallway

7      to see what was going on.

8      Q      And what did you do?

9      A      I stayed at my desk.

10     Q      Did there come a time when you, in fact, left your

11     desk?

12     A      I attempted -- I got up to leave my office, but at

13     that time Ms. Elie was coming into my office, so I never left.

14     Q      And did she give you any instructions?

15     A      She asked me to call the lieutenant's office.

16     Q      And did she say why?

17     A      I knew what was going on because I heard the argument

18     in hallway, so I knew what was going on.  Not exactly, but I

19     knew we needed assistance.

20     Q      So beyond these first words that you told us about,

21     you heard other words after?

22     A      I heard her telling him have a seat, "I am giving you

23     a direct order, go have a seat in the lobby."

24     Q      And did that mean to you there was some type of a

25     problem in the facility?

1       A       Yes.

2       Q       And did you, in fact, call the Lieutenant's office?

3       A       I did.

4       Q       Did you talk to anyone in particular there?

5       A       Officer Campbell answered the phone -- excuse me,

6   Officer Cranford answered the phone, and I asked him to grab a

7   lieutenant and come down to the clinic, we need some

8   assistance.

9       Q       And then what did you do after you made this call?

10      A       I hung up the phone, I have a sliding thing that goes

11  over my window, I secured my window, locked my window, closed

12  the sliding panel down and got up to go out into the hallway.

13      Q       Can you show us with perhaps a circle where you went

14  when you walked into the hallway?

15      A       I was standing right about there (indicating).

16      Q       And did you see any other people in the hallway near

17  you at this time?

18      A       Inmate Cooper was there, Ms. Elie and Ms. Harmon was

19  there.

20      Q       Can you, with a star or whatever, show us where they

21  were?

22      A       They were standing right about -- Ms. Harmon and

23  inmate Cooper were right about there; Ms. Elie, I think, was

24  standing closer to the door, I think.

25      Q       But pretty close to one another?

1     A     Yes, it is a small area.

2     Q     Did you hear Joan Harmon say anything to Cooper?

3     A     She was instructing Cooper to stand against the wall.

4     Q     And did you hear Cooper have any reply?

5     A     He told her, "which wall?"

6     Q     Can you describe for the jury his tone?

7     A     He was very loud; he was angry.  She told him several
8  times to stand against the wall.  He was standing bending
9  forward in her face, leaning down.  He is much taller than her,
10 leaning down in her face yelling "which wall, which wall?"  And
11 she told him, "Stand against the wall," three times.

12    Q     How did you feel at this time?

13    A     I was afraid for Ms. Harmon.  Inmate Cooper was very
14 angry; he was inches from her face, towering over her, and I
15 was very scared.

16    Q     Then what happened?

17    A     I attempted to talk to inmate Cooper.  I just told
18 him, "you need to calm down, Cooper, just calm down."

19          I don't know if he heard me, he did not look at me;
20 he didn't acknowledge that I said anything; he was very focused
21 on Ms. Harmon at that time.

22    Q     Did you know Curtis Campbell and Cranford?

23    A     Yes.

24    Q     Did you see them around this time?

25    A     I did.  Ms. Elie went out the front door.  We hit our

1    body alarms at that time.  Ms. Elie went out the front door, I
2    stepped back a few inches to look through the double doors to
3    see if they were coming; we saw them -- Ms. Elie was standing
4    at the door yelling and motioning for them to come and they
5    started running; they came in through the front door, they got
6    to the second door and I opened the door for them, and they ran
7    in through the door.
8         Q    How were they dressed?
9         A    They were in their uniforms.
10        Q    What did they do upon approaching?
11        A    When they ran through the doors, Cooper was standing
12   over Ms. Harmon yelling, and they got and told him -- they
13   tried to get him to stand against the wall.
14        Q    And then what happened?
15        A    They approached him, tried to pin him against the
16   wall, and he started flailing his arms.
17        Q    What effect did this flailing have on Cranford?
18        A    He was holding onto one arm, and Lieutenant Campbell
19   was holding the other one, and he swang his arm and Officer
20   Cranford flew down the hallway.
21        Q    Can you describe for the jury just how far he was
22   thrown?
23        A    It was pretty far.  I was standing in front of the
24   double doors and he flew right in front of me.
25        Q    Did he stumble?

UNITED STATES  DISTRICT COURT

1          A     No.  No, he was thrown.

2          Q     What was going on with Campbell?

3          A     He was trying to hold onto inmate Cooper -- he was

4    still standing there trying to get inmate Cooper, to subdue

5    him.

6          Q     Did you see Cooper also struggle with Campbell?

7          A     Yes.

8          Q     Can you describe that struggle at all?

9          A     It happened very quickly.  I know that they were

10   trying to subdue him, get him up against the wall.  I just saw

11   struggling.  He was just waving his arms around trying to get

12   them off of him.

13         Q     And then did other people come to help?

14         A     Yes, at that time the body alarms -- it was announced

15   on the radio, and staff started running through the door.

16   Dr. Gaskin came out of his office.  He attempted to assist

17   Lieutenant Campbell.  There were several members coming

18   through.  I was standing at the door holding the door open

19   directing the staff members in.

20         Q     And was he finally subdued?

21         A     Yes, they got him onto the ground.

22         Q     And then what happened?

23         A     At that point I was in the lobby.  When the body

24   alarm is lit, everyone that is available runs and responds, and

25   there was enough staff there in our area.  I was telling them,

1    "you guys can stop and just" -- they were standing in front of

2    the building just making sure everything was okay.

3        Q    And was he transported then to the SHU?

4        A    Yes.  I did not see him loaded onto the stretcher,

5    but I saw when the stretcher went out the side door when they

6    transported him to special housing.

7        Q    I want to draw your attention back to Exhibit 1.

8             Can you show us where the window that you secured is?

9        A    It is right there.

10            MR. FIGUEROA:  Can we go to Exhibit 10?

11       Q    Can you show us where your window is here on 10?

12       A    My window is not on here.  This is the hallway.  My

13   window is actually outside of these doors and into the waiting

14   room.

15            MR. FIGUEROA:  Could we show her Exhibit 11 that has

16   not been admitted?

17       Q    Do you recognize this?

18       A    That is the hallway.

19       Q    Does it depict your office or your window?

20       A    No, Ms. Harmon's office is here, and mine is a little

21   further back.  Those are the double doors that lead into the

22   lobby.

23       Q    Does 11 accurately depict the location of that

24   hallway on the day of this incident?

25       A    Yes.

1          MR. FIGUEROA:  Move for the admission of number 11.

2          MR. WEST:  No objection.

3          THE COURT:  It is admitted.

4          BY MR. FIGUEROA:

5      Q    If you could go over this again and show us what

6    these doors represent.

7      A    This door here is the double doors that lead out into

8    the hallway; this is the door to Ms. Harmon, that is actually

9    Ms. Harmon sitting there.  My office is next door, I remember I

10   have to cross through Ms. Harmon's office to get out the door.

11         MR. FIGUEROA:  If you can show the witness Exhibit

12   12, please.

13     Q    Do you recognize what is depicted in Exhibit 12?

14     A    This is the front lobby; this is the hallway and exam

15   rooms.

16     Q    Does this accurately depict the way that this

17   facility looked on the date in question?

18     A    Yes.

19         MR. FIGUEROA:  I move for the admission of Exhibit

20   12.

21         MR. WEST:  No objection.

22         THE COURT:  It may be admitted.

23         BY MR. FIGUEROA:

24     Q    Now, again for the jury so they can see it now --

25         MR. FIGUEROA:  Is this being published automatically?

1              THE COURT:  It's being published if you see it on
2     that monitor back there.
3              MR. FIGUEROA:  All right.  Thank you, Your Honor.
4          Q    What does the red X indicate?
5          A    That's the waiting room for the inmates when they are
6     waiting for sick call.
7          Q    And that is the waiting room that Cooper was in when
8     he first contacted you?
9          A    Yes.
10         Q    And does this show the hallway where the incident
11    occurred?
12         A    Where?
13         Q    Where is it?
14         A    Just right in here.  He was walking -- I am not sure
15    which exam room he came out of, but he was walking down the
16    hall back to the lobby.
17             MR. FIGUEROA:  If we could show the witness Exhibit
18    13, please.
19             THE WITNESS:  That is our lobby.
20             BY MR. FIGUEROA:
21         Q    Does this accurately depict the way the lobby looked
22    on the date in question?
23         A    Yes.
24             MR. FIGUEROA:  Move for admission of Exhibit 13.
25             MR. WEST:   May I voir dire briefly, Judge.

```
 1                    THE COURT:  No.
 2                    MR. WEST:  I have no objection.
 3                    THE COURT:  It is admitted.
 4                    BY MR. FIGUEROA:
 5          Q    What is this again?
 6          A    This is the front lobby where the inmates sit, where
 7      they sit while they are being -- waiting to be called for sick
 8      call.
 9                    MR. FIGUEROA:  No further questions.
10                    THE COURT:  Take our noon recess at this time, and I
11      will ask you to come back at 1:30.  We will be at recess until
12      1:30.
13                    Remember not to discuss the case with anyone, or
14      amongst yourselves.  And I probably should have told you, don't
15      say hi to lawyers, they won't think you are unfriendly, they
16      won't say anything to you.  So if you see a witness or a lawyer
17      in hallway, just ignore them.  All right.
18                    So we will see you and be ready to go at 1:30.
19                    (Thereupon, luncheon recess was had and the
20      proceedings resumed at 1:30 p.m.)
21
22
23
24
25
```

UNITED STATES  DISTRICT COURT

1              A F T E R N O O N   S E S S I O N

2              THE COURT:  We are back on the record.

3              We are fortunate to have our jury, all of them.

4              We have counsel and the defendant, the witness is on

5         the stand.

6              And I think, Mr. West, you were going to examine the

7         witness.

8                            CROSS EXAMINATION

9         BY MR. WEST:

10             Q    Good afternoon.

11             A    Good afternoon.

12             Q    You had mentioned that when the inmates come into the

13        medical unit that there is like a sign up sheet; right?

14             A    Correct.

15             Q    And I would like to show you what has been marked as

16        Exhibit 82 not in evidence.

17             Is that a sample of the sheet that comes in?

18             A    Yes.

19             Q    Now, there are different people writing here, in

20        these columns and these numbers.

21             Do you recognize that handwriting by chance?

22             A    That is my handwriting.

23             Q    So all these people checked in with you, then?

24             A    Yes, they did.

25             Q    And you take their IDs?

```
 1        A    Yes.
 2        Q    And then over here we have some other handwriting.
 3             Do you recognize whose handwriting that is?
 4        A    That is Dr. Fariall's handwriting.
 5        Q    So when he sees somebody, he puts in a time he saw
 6   them and he puts in the reason they were there?
 7        A    Correct.
 8        Q    And this document is dated 7-6-09.
 9             Does that appear to be the document that was filled
10   up the morning of this incident?
11        A    Yes.
12        Q    Do you see Mr. Cooper's name on here?
13        A    Yes.
14             MR. WEST:  I would like to offer this into evidence.
15             MR. FIGUEROA:  No objection.
16             THE COURT:  It may be admitted.
17             BY MR. WEST:
18        Q    I want to point a few things out.
19             We have the date here again of July 6, 2009.  That is
20   the date of this incident; right?
21        A    Correct.
22        Q    And we can see that's Adrian Cooper over here; is
23   that right?
24        A    Correct.
25        Q    He was the sixth guy to show up that morning?
```

1        A     Yes.

2        Q     And they just wait in turn until the doctor is ready

3    for them; correct?

4        A     Yes.

5        Q     Are the appointments for the dentist on here also?

6        A     No, that is a separate list.

7        Q     So there could have been additional people here in

8    that waiting room that aren't on this list?

9        A     Yes.

10        Q     And over here where it indicates next to Mr. Cooper's

11    name, the time was 10:26 when he was seen by the doctor?

12        A     That's what it appears to be.

13        Q     And these words, can you read that?

14        A     Multiple complaints.

15        Q     Now, I want to show you what is in evidence, Exhibit

16    Number 1.

17              When you testified, you indicated that you saw the

18    altercation, it took place in this area here; is that correct?

19        A     Correct.

20        Q     And when you saw Mr. Cranford thrown off or whatever,

21    however you want to describe it, when he came away from

22    Mr. Cooper, you said that he ended up over by the double doors;

23    is that correct?

24        A     Yes.

25        Q     Can you show us on here where the double doors are?

1          A     They are right here.

2          Q     And so that is the direction that he went when you

3     saw him thrown off?

4          A     Yes.

5          Q     This hallway here and this hallway here, is this any

6     place that inmates can go other than coming to and from their

7     appointments?

8          A     No, there is no inmates mingling in the hallways.  We

9     try to keep the double doors locked.

10         Q     You are talking about these double doors here?

11         A     Actually, both sets in between moves we will lock the

12    front door.  The double doors sometimes, if it is a busy day,

13    we are not able to lock them because there is a lot of traffic

14    going in and out.

15              MR. WEST:  Thank you.  Those are all the questions I

16    have.

17              THE COURT:  Any redirect?

18                         REDIRECT EXAMINATION

19    MR. FIGUEROA:

20         Q     I have a question about Exhibit 82.

21              If you would put that back up.

22              Now, I see that Jose Lujan was seen for glasses, and

23    Fernando Rodriguez Gomez was seen for glasses.

24              Is there a separate optometrist there in your

25    facility or would Dr. Fariall see all patients?

1       A    What they do is they come to sick call and they do a

2    basic eye exam, a screening, and they are referred to see an

3    in-house optometrist that comes once a month.

4       Q    I see that even though these people aren't in order,

5    it appears that Lujan was seen at 10:09 and Rodriguez at 10:11.

6       A    Correct.

7       Q    So that would mean that the last person to walk in

8    would be Adrian Cooper?

9       A    Yes.

10      Q    And it says here "emergency sick call cancelled."

11           Is that as a result of this incident?

12      A    Yes.

13           MR. FIGUEROA:  I don't have any further questions.

14           THE COURT:  You may step down.  No further questions.

15           (The witness left the stand.)

16           THE COURT:  Next witness.

17           MR. FIGUEROA:  I will call Clint Cranford.

18                          CLINT CRANFORD,

19    called as a witness for and on behalf of the Government, having

20    been first duly sworn, was examined and testified as follows:

21           THE CLERK:  State your full name and spell your last

22    name for the record.

23           THE WITNESS:  My name is Clint Cranford.  Last name

24    C-R-A-N-F-O-R-D.

25                       DIRECT EXAMINATION

BY MR. FIGUEROA:

    Q    Good afternoon.

    A    Good afternoon.

    Q    What is your occupation, sir?

    A    I am a special investigative support technician with the Federal Bureau of Prisons.

    Q    And you are an officer of the United States?

    A    Yes, sir.

    Q    Where is your duty station?

    A    FCI Safford, Arizona.

    Q    What are your duties?

    A    I conduct investigations into inmate activities, assaults, drugs, run drug and alcohol program within the institution.

    Q    How long have you been a federal correctional officer?

    A    Just over twelve years, almost thirteen.

    Q    Have you got any military experience?

    A    Yes, I do.

    Q    What is that and for how long?

    A    Nine years, eight months of military police, United States Army.

    Q    Were you ever stationed overseas?

    A    Yes, I was.

    Q    Where?

1      A    I spent two years in Posong, Korea, and three years
2   in Heidelberg, Germany.
3      Q    Did you also go to Bosnia at any time?
4      A    Yes, sir, I did.  I spent 12 months in Bosnia.
5      Q    Do you know a person by the name of Adrian Cooper?
6      A    Yes, I do.
7      Q    Is he present in the courtroom?
8      A    Yes, he is.
9      Q    Would you point him out, please, and tell us what he
10   is wearing?
11      A    The gentleman sitting over here with the black blazer
12   and I believe a light blue shirt.
13          MR. FIGUEROA:  May the record reflect he identified
14   the accused?
15          MR. WEST:  No objection.
16          THE COURT:  Yes.
17          BY MR. FIGUEROA:
18      Q    Was he a prisoner at Safford in July 2009?
19      A    Yes, sir, he was.
20      Q    I want to draw your attention to July 2009, about
21   10:20 in the morning.
22          Were you on duty at the Safford facility?
23      A    Yes, I was.
24      Q    That is in Arizona?
25      A    Correct.

1          Q     How were you dressed?

2          A     Dressed in pretty much current uniform I have here;

3     white shirt, blue pants.

4          Q     Can you stand up, please.

5                And it appears you have an American flag on the right

6     shoulder?

7          A     Yes, sir.

8          Q     What is on the left shoulder?

9          A     The Bureau of Prisons patch.

10         Q     And your name is on your right breast, I guess, it

11    says Federal Department of Corrections?

12         A     Left breast is Federal Bureau of Prisons and my name

13    is on the right.

14         Q     Thank you.  You can sit down.

15               Now, for any given shift, can you tell me the

16    approximate ratio of guards to inmates?

17         A     On day shift, which is typically 8 a.m. to 4 p.m.

18    depending on what post you are working, I would say there are

19    sixty staff to seventy staff versus 1200 inmates.  Evenings,

20    which is 4 p.m. to midnight, there are probably 20 staff for

21    1200 inmates.  Morning watch or graveyards, midnight to 8 a.m.,

22    probably 15, 20 staff versus 1200.

23         Q     Now, at 10:20 on July 6, 2009, what were you doing at

24    this time?

25         A     I happen -- my partner and I happened to be in the

1    lieutenant's office, we were getting ready to go to lunch.  The

2    phone rang, we were the only ones in the office, I picked the

3    phone up and Ms. Gonzalez was on the phone.

4           Q    And did she relay anything to you?

5           A    She requested that a lieutenant come over to the

6    health services building, the clinic, that an inmate was being

7    unruly and they wanted somebody of a supervisory capacity to

8    come over.

9           Q    How far away is the medical facility from where you

10   were?

11          A    I would say 60 to 70 yards maybe.

12          Q    Once you got this information, what did you do?

13          A    I told Ms. Gonzalez we would be on our way.  There

14   was no alarm in her voice, so hung up the phone, locked the

15   door and we walked towards the clinic.

16          Q    When you say "we," who else were you with?

17          A    My supervisor, Lieutenant Campbell.

18          Q    Is he present in this courthouse today?

19          A    He is not in this room, no, but he is here in the

20   building.

21          Q    What happened once you left the facility?

22          A    As we approached the steps coming up to the front

23   doors of the health services building, Diane Elie flung the

24   door open and stated we just activated a body alarm, staff is

25   being assaulted we need assistance.

1    Q    Can you tell the jury what her demeanor was?

2    A    She was excited, panic state, nervous and scared.

3    Q    So then what did you do?

4    A    We immediately rushed to the door, went through the

5    lobby of the clinic to a second set of doors, and that is where

6    the staff and Adrian Cooper were standing arguing back and

7    forth.  There were papers all over the floor, like a newspaper

8    that had been torn, they were just arguing loudly.

9    Q    Can you relay what was said?

10        Do you remember what was said?

11   A    No, I do not recall.

12   Q    You just remember they were arguing?

13   A    They were arguing, exactly, it was getting very out

14   of hand.  Mr. Cooper was in a very, I would say, combative

15   manner, loud and just coming at the staff.

16   Q    Now, who was in his immediate vicinity as you

17   approached?

18   A    As I approached, there was Joan Harmon, Lonny

19   Gonzalez, Dr. Gaskin, the dentist, and I believe maybe

20   Dr. Fariall.

21   Q    Where was Cooper at in relation to Joan Harmon?

22   A    He was, I would say, a couple of feet from her,

23   within arm's reach of her, facing her.  He was facing north and

24   she was facing south.

25   Q    What was he doing?

1          A     He was in her face yelling at her.

2          Q     And what was she doing?

3          A     She was trying to instruct him to turn around so he

4    could be identified.

5          Q     And then what did you do?

6          A     As soon as Lieutenant Campbell and myself came around

7    the corner we immediately told Cooper turn around and get up

8    against the wall so we could place him in hand restraints.  We

9    probably told him three times, he finally turned on his own and

10   went to face the wall.  I reached to grab his left arm,

11   Lieutenant reached to get his right to bring his arms behind

12   him to place him in hand restraints.

13         Q     What happened once you grabbed his arm?

14         A     He became combative and jerked his arm away from me,

15   in front of him, and he turned and flung me off of him; off of

16   his arm.

17         Q     When you say "flung you," what do you mean?

18         A     I was behind him, he pulled me holding onto his arm,

19   he pulled his arm up around him and threw me, in a sense.

20         Q     Did you actually go through the air?

21         A     My feet left the ground, yes.

22         Q     About how far?

23         A     I would say 6 to 8 feet and landed on my back against

24   the opposing wall.

25         Q     How did you feel once he threw you?

1    A    It knocked the air out of me, terrified me.  I never
2    have been assaulted by an inmate before, never even been
3    confronted in that manner by an inmate and I was scared.
4    Q    So then what did you do?
5    A    I immediately got back to my feet and went back at
6    inmate Cooper because Lieutenant Campbell was still trying to
7    spin him and turn him so he could be placed in hand restraints
8    by himself.
9    Q    What was he doing with Campbell?
10    A    Lieutenant Campbell still had his right hand and
11    Cooper was taking Lieutenant Campbell and smashing him into the
12    wall in a sense.
13    Q    And then did you get an opportunity to grab ahold of
14    Cooper again?
15    A    Yes, I did.
16    Q    And then what happened?
17    A    I attempted to bring his arm behind him again, he
18    continued to resist, would not give his arm up, he resisted the
19    restraints the whole time, and it was about that time that
20    additional staff had arrived.
21    Q    And then what happened?
22    A    The additional staff pretty much grabbed all of us in
23    a dog pile and took us to the floor.
24    Q    Did you have handcuffs with you at this time?
25    A    Yes, I did.

UNITED STATES  DISTRICT COURT

1          Q     What did you do with them?

2          A     I handed them off to Officer Patrick Welton and told

3     him "restrain this guy."

4          Q     And then what did you do?

5          A     Immediately disengaged.  Lieutenant Campbell and

6     myself immediately disengaged and walked off down the hallway

7     out of the area.

8          Q     Now, when Cooper was on the ground and everybody was

9     in this dog pile, did you hear Cooper say anything?

10         A     He was yelling saying, "these guys are choking me,

11     they are hurting me, they are attacking me, they are assaulting

12     me."

13         Q     Was anybody choking him?

14         A     No.

15         Q     Did you choke him?

16         A     No, I did not.

17         Q     Did you, in fact, get a medical assessment?

18         A     Yes, I did.

19         Q     Where at?

20         A     At FCI Safford and then I was sent downtown to the

21     Mt. Graham Regional Hospital for further evaluation.

22         Q     Did you receive any injuries as a result of this?

23         A     Yes, I did.

24         Q     What injuries did you receive?

25         A     I received bruised ribs, I received laceration to the

```
 1    top of my left hand; a jammed finger in a sense on my right
 2    hand, and I received bruises and scrapes to my -- the top of my
 3    right forearm.
 4         Q    Now, were you in any pain?
 5         A    Yes, I was.
 6         Q    Did you receive any scrapes on your hand?
 7         A    Yes, I did.
 8         Q    And have you got any idea, firsthand knowledge how
 9    you got those scrapes?
10         A    No idea how I received those scrapes.
11         Q    Do you remember saying you got them from Cooper's
12    teeth?
13         A    I was told by one of the doctors at Mt. Graham
14    Regional Hospital it is possible it could have come from
15    Cooper's teeth.
16         Q    But you don't remember scraping your hand across his
17    face or anything?
18         A    No, I do not.
19         Q    I show you Government's Exhibit or Exhibit Number 4.
20              Do you recognize this?
21         A    Yes, I do.
22         Q    What is this a photo of?
23         A    This is a photo of my left hand.
24         Q    Do you know when that photo was taken?
25         A    Should have been taken the day after the incident.
```

1          Q     And does that accurately depict the way your hand

2     looked the day after the incident?

3          A     Yes.

4          Q     Does it depict the swollen finger from the incident?

5          A     Yes, it does.

6                MR. FIGUEROA:  Ask that Number 4 be admitted.

7                THE COURT:  Any objection?

8                MR. WEST:  No objection.

9                THE COURT:  May be admitted.

10                BY MR. FIGUEROA:

11          Q     I see that you are pointing to the finger, the

12     pointer finger of your left hand?

13          A     Yes.

14          Q     Is that the finger that you injured?

15          A     Yes, it is.

16                MR. FIGUEROA:  And then if we could go to Exhibit 7,

17     which has been admitted.  Exhibit 3.

18          Q     Now, what is that a photo of?

19          A     This is a photo of my right forearm.

20          Q     There are bruises that are shown there and some

21     scrapes, it looks like.

22                Where did you get those?

23          A     I received those during the incident with inmate

24     Cooper.

25          Q     Do you know how you got them?

```
 1          A    I have no idea how I received them.  It was during
 2     the incident.
 3          Q    If I could show you Exhibit Number 6.
 4               What is that a picture of?
 5          A    A picture of my right hand.
 6          Q    Is that an accurate picture of the way your hand
 7     looked?
 8          A    Yes.
 9          Q    Do you know when that was taken?
10          A    Also the day after the incident.
11          Q    What are you showing there?
12          A    I am showing my right middle finger that was jammed.
13               MR. FIGUEROA:  May I ask this be admitted.
14               MR. WEST:  No objection.
15               THE COURT:  Admitted.
16               BY MR. FIGUEROA:
17          Q    Now, you are pointing toward what in the photograph?
18          A    I was pointing towards my right middle finger.
19          Q    You can see that it was swollen and injured in the
20     incident?
21          A    Yes, sir.
22               MR. FIGUEROA:  No further questions.
23               THE COURT:  Mr. West, any questions?
24               MR. WEST:  Yes, thank you.
25                         CROSS EXAMINATION
```

```
 1    BY MR. WEST:
 2         Q    Good afternoon.
 3         A    Hello.
 4         Q    Let's talk about your injuries for a second.
 5              As I understand it, it is the back of the left hand,
 6    and I believe it is Exhibit 4, if we could have that up,
 7    please.
 8              This is the hand that you indicated had some sort of
 9    scraping or something on the back of the hand; correct?
10         A    Correct.
11         Q    And where you are pointing there, you are pointing to
12    the back of your hand; correct?
13         A    Correct.
14         Q    And the medical reports that were received from Mt.
15    Graham Regional Medical Center, you went and visited them on
16    the 6th of July, 2009; correct?
17         A    That's correct.
18         Q    And do you remember the doctors telling you that
19    those injuries could be some sort of a bite mark?
20         A    The doctor said that that injury shown here in the
21    photo would be consistent with like a bite mark or a scrape
22    from, say, a tooth.
23         Q    And the middle finger that you have, you had that
24    x-rayed; correct?
25         A    Yes, we did.
```

1      Q     And do you recall the results of those x-rays?

2      A     Not off the top of my head; no, I do not.

3      Q     I want to show you a document that is part of Exhibit

4   No. 62 that is not in evidence.

5            Do you see that okay?

6      A     Yes, I can.

7      Q     Identifies you as the person; right?

8      A     That's correct.

9      Q     It said that this is the report and the x-rays says

10   three views of the middle finger were obtained as requested.

11           MR. FIGUEROA:  Objection, Your Honor.

12           May I ask a question on voir dire?

13           THE COURT:  Yes, go ahead.

14                       VOIR DIRE EXAMINATION

15   BY MR. FIGUEROA:

16      Q     Have you ever seen this before?

17      A     No, I have not.

18      Q     And you didn't draw this up or manufacture this; did

19   you?

20      A     No.

21           MR. FIGUEROA:  Calls for hearsay, Your Honor.

22           MR. WEST:  They are his medical records.  They are

23   not hearsay in terms of business record and they are kept in

24   the normal course of business.

25           THE COURT:  I know that.  Is your objection hearsay?

```
1              MR. FIGUEROA:  Hearsay.
2              THE COURT:  It is sustained.
3              MR. WEST:  Can we approach?
4              THE COURT:  No.
5                  CROSS EXAMINATION (Resumed)
6    BY MR. WEST:
7         Q    Do you recall the doctor telling you that that middle
8    finger was not broken?
9         A    Yes, I do recall that.
10        Q    Do you recall him telling you that it was not
11   dislocated?
12        A    That I don't recall.  He said it was more like it was
13   jammed.
14        Q    Like it was just jammed?
15        A    Jammed, correct.
16        Q    All right.
17             MR. WEST:  In Exhibit 7, if we could have that up
18   again.  I must have the wrong number.  3, my apology.
19             You have a tattoo you are pointing out as well;
20   correct?
21        A    I am pointing to the injuries on my arm.
22        Q    Is there a tattoo on your arm?
23        A    Yes.
24        Q    And that is your arm?
25        A    Yes.
```

1          Q     Can you tell us what that tattoo stands for?

2                MR. FIGUEROA:  I object.  This is irrelevant.

3                THE COURT:  Sustained.

4                BY MR. WEST:

5          Q     You are over at the lieutenant's office.

6                Do you have a rank?

7          A     GS-8.  I am a SIS support technician, investigator.

8          Q     What is that?

9          A     I investigate all inmate activities within the

10   institution to include assaults, fights, drugs, alcohol.

11         Q     Okay.  And do you have other duties besides

12   investigation?

13         A     I assist the lieutenant's office with whatever they

14   need.

15         Q     But your primary responsibilities, you are like an

16   investigator at that facility?

17         A     Correct.

18         Q     Now, when you got the phone call from Ms. Gonzalez,

19   you initially did not think there was an emergency?

20         A     No, I did not.

21         Q     So you and Lieutenant Campbell started to walk over;

22   correct?

23         A     Correct.

24         Q     And then Nurse Elie opened the door to the medical

25   unit and yelled at you to hurry; is that right?

1        A      That's correct.

2        Q      And she told you that they activated their alarm?

3        A      Correct, body alarm.

4        Q      Body alarm.  What is the purpose for that?

5        A      Certain radios have an alarm system assigned to it,

6    you press a button and it alerts in the control room and in a

7    loud audible noise, shows the radio number and the location

8    where that radio should be.  The control room officer will call

9    additional staff and have them respond to the emergency.

10       Q      So it's an emergency body signal, so to speak?

11       A      Correct.

12       Q      And the location that we are at in the medical unit,

13   are there any cameras in there that record what goes on?

14       A      No, there is not.

15       Q      When you were approaching and Nurse Elie is telling

16   you to hurry, she also told you that staff is about to be

17   assaulted?

18       A      Correct.

19       Q      When you had to go through the outside double doors;

20   correct?

21       A      Correct.

22       Q      And then you had to go through the inside double

23   doors; right?

24       A      Correct, go through a lobby or waiting area to the

25   next set of doors.

```
 1          Q    And I am showing you again what is marked as Defense
 2     Exhibit 1.
 3               So you basically came through this direction?
 4          A    Yes.
 5          Q    And Nurse Elie is at this door yelling for you to
 6     hurry?
 7          A    Correct.
 8          Q    And telling you someone is about to be assaulted?
 9          A    Correct.
10          Q    Did she tell you where that person was?
11          A    No.
12          Q    And then you went through this waiting rook room; is
13     that correct?
14          A    Correct.
15          Q    And were these along these walls, were there chairs
16     and benches throughout here?
17          A    There were a few chairs in there.
18          Q    Were there inmates sitting in the chairs?
19          A    Yes, there were a couple of inmates in there.
20          Q    A couple?
21          A    A couple.
22          Q    How many is a couple in your mind?
23          A    Three or four.
24          Q    Three to four people?
25          A    Yes.
```

```
 1          Q     Are you sure about that?
 2          A     Yes, I am.
 3          Q     Then you came through these double doors; is that
 4    correct?
 5          A     Yes.
 6          Q     And you came there and that is when you saw this
 7    confrontation; correct?
 8          A     Correct.
 9          Q     And you ordered inmate Cooper to face the wall and he
10    faced the wall; right?
11          A     I had to tell him three different times to turn
12    around and face the wall to be placed in handcuffs.
13          Q     You said that when you came in, you were of the
14    belief that Ms. Harmon was trying to put the handcuffs on him
15    at that time?
16          A     She was instructing him to turn around and face the
17    wall, and he was standing facing her, arguing with her and
18    yelling at her.
19          Q     Did you know that she had just taken handcuffs off of
20    him?
21          A     No, I did not.
22                MR. FIGUEROA:  Irrelevant.
23                THE COURT:  Overruled.
24                BY MR. WEST:
25          Q     You didn't know?
```

1        A    No, I did not.

2        Q    Did you talk to Ms. Harmon at all?

3        A    No, I did not.

4        Q    You and Lieutenant Campbell immediately used physical

5   force; isn't that true?

6        A    That is not true.

7        Q    So when you wrote in your report that you immediately

8   used physical force, your report was incorrect?

9        A    I wrote in my report I instructed inmate Cooper on

10  three different occasions to turn around and face the wall so

11  he could be placed in restraints.  Inmate Cooper refused to

12  turn around until the third request at which time he turned and

13  we attempted to place him in restraints.

14       Q    Now, at any time did you put a chokehold on

15  Mr. Cooper?

16       A    No.

17       Q    At any time did you see Lieutenant Campbell put a

18  chokehold on Mr. Cooper?

19       A    No.

20       Q    Are you familiar with all of your military police and

21  your time as a correction officer, do you know how to put a

22  chokehold across someone's neck?

23            MR. FIGUEROA:  I think this is getting into matters

24  that I have been precluded from going into.

25            THE COURT:  Counsel, why don't you come up.

UNITED STATES  DISTRICT COURT

1                    (Thereupon, counsel approached the bench and

2          conferred with the Court as follows:)

3                    THE COURT:  I would allow the question if there was

4          ever going to be any evidence that there was a chokehold.

5                    MR. WEST:  We have the physical evidence that he had

6          the abrasions against the neck.

7                    THE COURT:  That is no evidence of that chokehold to

8          me.

9                    Is there ever going to be any evidence that chokehold

10         is on him or is that just your questions?

11                   MR. WEST:  We have the entire video where he

12         complained to other people.

13                   THE COURT:  He can say anything he wants on a

14         videotape, setting up his civil case or whatever.

15                   MR. WEST:   That is speculation; we don't know it.

16         It is contemporaneous.

17                   THE COURT:  I am asking you right now, do you have

18         any direct evidence that anybody put a chokehold on him?

19                   MR. WEST:  I do have a  belief that there is evidence

20         of that, yes.

21                   THE COURT:  Who?

22                   MR. WEST:  Mr. Cooper can testify to that, if he

23         chooses.

24                   THE COURT:  Is he going to testify?

25                   MR. WEST:  We have not made the decision yet.

1          THE COURT:  Then I am going to sustain the objection.

2          You can call this witness back.

3          I am not going to let you go into something that

4     there won't be any evidence of a chokehold.

5          MR. WEST:  I was under the impression there was some

6     sort of pretrial ruling that I just violated.

7          THE COURT:  what he's talking about, I think, is the

8     expert witness that was going to testify.  This guy -- I want

9     him to describe what a chokehold is, but there first has to be

10    evidence that there was a chokehold, and there is not, and I am

11    not going to allow it in on the basis that he has marks on his

12    neck.  That could come from other than a chokehold; it's more

13    logical to assume that it came from other than a chokehold.

14    ``     Second, that after he was escorted out he's yelling

15    about somebody choking him.  That does not mean there was a

16    chokehold.

17         MR. WEST:  I will go to another question.

18         Thank you.

19         (Thereupon, counsel returned to their trial tables,

20    afterwhich the proceedings resumed as follows:)

21         THE COURT:  That question is withdrawn?

22         MR. WEST:  Yes.

23         THE COURT:  Go ahead.

24         BY MR. WEST:

25    Q    Now, you were present when he was taken down to the

1    ground; is that correct?

2         A    Yes, I was.

3         Q    At any time did you see anybody put any kind of

4    restraining hold on Mr. Cooper that was around his neck?

5         A    No, I never saw anybody do that.

6         Q    And you were present; correct?

7         A    Yes, I was.

8         Q    You would have seen that and you would have

9    remembered that.

10             Is that a fair statement?

11        A    That is true.

12        Q    Now, when you try to restrain somebody like that, you

13   basically want to get both arms pinned and both legs pinned;

14   correct?

15        A    Correct.

16        Q    And you had him on his stomach on the ground?

17        A    Correct.

18        Q    And you said you gave your handcuffs to somebody else

19   to put onto Mr. Cooper?

20        A    That's correct.

21        Q    Were those standard handcuffs?

22        A    Yes, they were.

23             MR. WEST:  Thank you, no further questions.

24             THE COURT:  Any redirect?

25             MR. FIGUEROA:  I don't have anything.

1          THE COURT:  You may step down and be excused, sir.
2          Thank you.
3          (The witness left the stand.)
4          MR. FIGUEROA:  May he return?
5          THE COURT:  He may go about his business.
6          MR. WEST:  Your Honor, subject to what we had up
7     there, I doubt that I will bring him back.
8          THE COURT:  He can go about his business subject to
9     recall.  Campbell.
10                    CURTIS KEVIN CAMPBELL,
11    called as a witness for and on behalf of the Government, having
12    been first duly sworn, was examined and testified as follows:
13          THE CLERK:  State your full name and spell your last
14    name for the record.
15          THE WITNESS:  Curtis Kevin Campbell, C-A-M-P-B-E-L-L.
16                    DIRECT EXAMINATION
17    BY MR. FIGUEROA:
18        Q    Good afternoon, Mr. Campbell.
19        A    Good afternoon.
20        Q    Can you tell us what your occupation is, please?
21        A    Currently I am a lieutenant at FCI Safford.
22        Q    You are a correctional officer for the Bureau of
23    Prisons?
24        A    Yes, sir.
25        Q    What are your duties?

```
 1          A     Excuse me?

 2          Q     What are your duties?

 3          A     My duties daily operations of the institution;

 4     monitoring inmate activities and staff.

 5          Q     How long have you been with the Bureau of Prisons?

 6          A     Twenty years and six months.

 7          Q     Do you have any military experience?

 8          A     Yes, sir.

 9          Q     And what is that?

10          A     United States Navy, two years and eight months

11     active.

12          Q     I want to draw your attention to July 2009.

13                Were you employed as an officer at the Safford

14     facility as a supervisor in July 2009?

15          A     Yes, sir, I was SIS lieutenant.

16          Q     Do you know a person by the name of Adrian Cooper?

17          A     Yes, sir.

18          Q     Is he present in court?

19          A     Yes, sir.  He is seated at that table directly to my

20     left wearing a blue shirt and suit.

21                MR. FIGUEROA:  May the record reflect that he has

22     identified the defendant?

23                MR WEST:  No objection.

24                THE COURT:  Yes.

25                BY MR. FIGUEROA:
```

1           Q    I want to draw your attention to July 6, 2009 at

2     about 10:20 in the morning.

3                Were you on duty at that time?

4           A    Yes, sir.

5           Q    How were you dressed?

6           A    In a normal uniform at the time, which is a

7     short-sleeved white shirt and blue snap on tie.

8           Q    Did it have identification that identified you as an

9     officer at the Bureau of Prisons?

10          A    Yes, sir.

11          Q    What were you doing at 10:20 on that date?

12          A    I was in a lieutenant's office checking the SIS box.

13          Q    Were you with anyone else?

14          A    Yes.

15          Q    Who?

16          A    Officer Clint Cranford.

17          Q    What happened then?

18          A    During the time that we were in the office, Officer

19    Cranford answered the phone.  Apparently Lonny Gonzalez

20    requested that a lieutenant come to the medical department and

21    there was an unruly inmate.

22          Q    So then what happened?

23          A    We departed the office and started to walk towards

24    the incident.

25          Q    What happened as you approached the facility?

```
 1          A    I believe Ms. Elie opened the doors and informed us
 2     that somebody had hit their body alarm and they needed
 3     immediate assistance.
 4          Q    Can you tell the jury what her demeanor was?
 5          A    Excuse me?
 6          Q    How did she act?
 7          A    She was excited and nervous like somebody that really
 8     would like some help.
 9          Q    And then what did you do?
10          A    We immediately responded to that, went through the
11     first set of double doors, through the second, and immediately
12     to our right.
13               We saw inmate Cooper in an aggressive stance and
14     Ms. Joan Harmon was backing up at that time.
15          Q    What do you mean in an aggressive stance?
16          A    He was almost bent over and pointing at her in a
17     loud, aggressive voice.
18          Q    What did you do then?
19          A    We immediately got between him and Ms. Harmon.
20          Q    What did you do then?
21          A    Gave him verbal commands to turn around and face the
22     wall.
23          Q    And then what happened?
24          A    He was noncompliant with our verbal wishes.  We
25     attempted to physically turn him against the wall to place him
```

1      in restraints.

2          Q     Then what happened?

3          A     He became combative at which time he threw Officer

4      Cranford down the hall, and I grabbed onto his right arm and

5      was holding on until other staff could arrive.

6          Q     And did he do anything to you while you had hold of

7      his arm?

8          A     Yes, sir.  He was driving his right arm and his right

9      shoulder and me into the wall.

10         Q     And then what happened?

11         A     During the course of the next couple of seconds or

12     minutes, other staff started to respond and we were able to

13     gain control of inmate Cooper and he was placed on the ground.

14         Q     Were you injured at all as a result of your

15     confrontation with Mr. Cooper?

16         A     Yes, sir.  I had a small trauma to the small of my

17     back, lower part of my back.

18         Q     Did you have any abrasions to your right forearm?

19         A     Yes.

20         Q     And then what happened?

21         A     At that time, once inmate Cooper was on placed on the

22     ground and in restraints, Officer Cranford and myself left the

23     area.

24              MR. FIGUEROA:  I have no further questions.

25              THE COURT.  Mr. West.

UNITED STATES  DISTRICT COURT

```
 1                          CROSS EXAMINATION
 2    BY MR. WEST:
 3         Q     Good afternoon.
 4         A     Good afternoon.
 5         Q     As part of your duties as the SIS officer, were you
 6    investigating a complaint regarding some officers over in
 7    Oklahoma?
 8              MR. FIGUEROA:  Objection, Your Honor, we had a
 9    hearing on this, I believe.
10              MR. WEST:  Could we approach?
11              THE COURT:  I have already ruled on that.  The
12    objection is sustained.
13              BY MR. WEST:
14         Q     How many of the inmates were interviewed over at the
15    Safford unit that were present at the altercation?
16              MR. FIGUEROA:  Objection, foundation.  If he knows.
17              THE COURT:  If he doesn't know, he can say so.
18              THE WITNESS:  I do not know.
19              BY MR. WEST:
20         Q     Did you conduct any of that investigation?
21         A     No, sir.
22         Q     Is it normal for victims of a case to sit in on
23    investigations regarding their case?
24              MR. FIGUEROA:  Objection.
25              THE COURT:  Overruled.
```

1            THE WITNESS:  Could you repeat the question?

2            BY MR. WEST:

3       Q    Yes.  Is it normal for a victim in a case to be

4  present during an interview of witnesses involving that case?

5            MR. FIGUEROA:  May I ask the circumstances?  It is

6  too general.

7            THE COURT:  Overruled.

8            He may answer.

9            THE WITNESS:  I am not sure what you are referring to

10 at the time.  I made no interviews concerning this incident.

11 It was referred to the FBI.

12           BY MR. WEST:

13      Q    Do you recall the FBI asking to interview people?

14      A    Yes, sir.

15      Q    And you submitted to an interview?

16      A    Yes, sir.

17      Q    Were you around, back in April of 2012, at the

18 facility?

19      A    Excuse me?

20      Q    Were you in Safford, FCI Safford in April of 2012?

21      A    I believe I was.

22      Q    Were you aware that the FBI was coming out to

23 interview an inmate?

24      A    No, sir.

25      Q    Would it have been appropriate for you to sit in on

1      that interview having been a victim?

2           A    I believe not.

3           Q    So if we have evidence that Mr. Cranford sat in on an

4      interview of one of the inmates by the FBI involved in this

5      case, would that have been proper, in your opinion?

6                MR. FIGUEROA:  Objection, this is improper.

7                THE COURT:  Sustained.

8                BY MR. WEST:

9           Q    Were you aware of Mr. Cooper's work duties over at

10     the facility?

11          A    No, I was not in charge of his work detail.

12          Q    Now, the injuries that you told us about, was there

13     any permanency to those injuries?

14          A    No, sir.

15          Q    Did you recover okay?

16          A    Yes.

17          Q    Did you have to have pain medications other than over

18     the counter?

19          A    No, sir.

20          Q    We hear that the nurse told you to put ice on your

21     back.

22               Did you do that?

23          A    Yes.

24          Q    And that took care of your problems?

25          A    Yes, sir.

```
1          Q    When you were approaching the door where nurse Elie
2     was at --
3          A    Yes, sir.
4          Q    -- that is the front door of the medical center;
5     right?
6          A    Yes, sir.
7          Q    And she was telling you to hurry up.
8               Did she tell you to hurry?
9          A    Yes, sir, she came through the door and said somebody
10    hit their body alarm and they needed help.
11         Q    Did she tell you that staff was about to be
12    assaulted?
13         A    No, sir.
14         Q    You don't recall that?
15         A    When you activate a body alarm or you request
16    assistance, you don't go into detail, you isolate it and you
17    respond to the situation.
18         Q    Do you or do you not recall her ever saying, standing
19    at that door, that staff is about to be assaulted?
20              MR. FIGUEROA:  Asked and answered.
21              THE COURT:  You may answer.
22              THE WITNESS:  I don't recall that statement, no.
23              BY MR. WEST:
24         Q    How close were you to Officer Cranford as you
25    approached the door?
```

1           A     We were running side by side.

2           Q     The reports suggested that as you came through that

3     second set of doors that you immediately applied physical force

4     to Mr. Cooper.

5           A     The initial response when we went through the door

6     was first to locate and then to get between inmate Cooper and

7     Ms. Harmon, and during that time we were giving him verbal

8     instructions to turn around and face the wall and he was

9     noncompliant to those directives.

10          Q     Did he face the wall?

11          A     No, sir.

12          Q     At no time?

13          A     I believe he made a circle.

14          Q     He made a circle?

15          A     Yes, sir, he went to pivot towards the wall and just

16    came completely around.

17          Q     I see.  Okay.

18                Now, to your knowledge, that is the first time any

19    physical force was applied to Mr. Cooper; is that correct?

20          A     There was no physical force applied to him with the

21    exception we were trying to physically turn him around and

22    place him on the wall at the same time giving him verbal

23    instructions to do so.

24          Q     My question was:  Prior to that occurring, are you

25    aware of any other physical force being applied to Mr. Cooper?

UNITED STATES  DISTRICT COURT

```
1          A     No, sir.
2          Q     And you were there until he was completely subdued;
3     is that correct?
4          A     Yes, sir.
5          Q     As you were trying to gain control other members of
6     the correction facility showed up.
7                Is that a fair statement?
8          A     Yes, sir.
9          Q     Do you remember how many folks came in?
10         A     No, sir.
11         Q     If somebody estimated eight to ten, do you think that
12    would be accurate?
13         A     That is probably a pretty fair count.
14         Q     So all of those people then took Mr. Cooper down to
15    the floor?
16         A     Yes, sir, he was placed on the floor.
17         Q     And when you say placed on the floor, were you aware
18    that he suffered a fractured elbow?
19         A     No, sir.
20               MR. FIGUEROA:  Objection, Your Honor, there is no
21    evidence of this.
22               THE COURT:  Sustained.
23               BY MR. WEST:
24         Q     At any time did you apply a chokehold to him?
25         A     No, sir.
```

1          Q     At any time did you place your arm or hands around
2     his neck?
3          A     No, sir, both of my arms were around his right arm.
4          Q     At any time did you see Officer Cranford put his arms
5     or hands around Mr. Cooper's throat?
6          A     No, sir.
7          Q     When all the other officers came and you took him to
8     the ground, did you see anybody at that time put their hands or
9     arms across his throat?
10         A     No, sir, in a situation like that, I was pretty much
11    concerned with what I had ahold of and assisting everybody else
12    in placing him on the ground.
13         Q     And what you had control of was his right arm?
14         A     Yes, sir.
15         Q     And how far is his right arm from his neck?
16         A     How far was his right arm from his neck?
17         Q     Yes.
18         A     Down towards his waist across the side of my body.
19         Q     His right arm is how close to his neck?
20         A     Guesstimate 20 inches.
21         Q     And you didn't see anybody while you were holding his
22    right arm do anything with his neck or his throat?
23         A     No, sir.
24               MR. WEST:  All the questions I have.
25               THE COURT:  Any redirect?

1          MR. FIGUEROA:  I have no redirect.

2          May he be excused from his subpoena?

3          THE COURT:  Yes.  Thank you, sir.

4          Next witness.

5          (The witness left the stand.)

6          MS. ROLLEY:  May we approach before the next witness

7    testifies?

8          THE COURT:  Come on up.

9          (Thereupon, counsel approached the bench and

10   conferred with the Court as follows:)

11         MS. ROLLEY:  I am sorry I didn't get a chance to

12   alert the court.

13         This is the witness that we planned to introduce the

14   video through and the respect of the video on the pretrial

15   conference what you saw with respect to our introduction of the

16   video was a clip of it.  It's actually longer than that; it's

17   six minutes and a half, and I want the court to be aware of

18   that, and I didn't realize that until we were playing it that

19   Mr. West has the video we plan to introduce.

20         THE COURT:  And you mention that because of afternoon

21   recess or what?

22         MS. ROLLEY:  I'm sorry.

23         THE COURT:  Why are you telling me this?

24         MS. ROLLEY:  I'm telling you that because when I

25   presented this in the pretrial conference, you had asked how

1    long is it going to be, so I thought that was of a concern to
2    you.
3                 THE COURT:  No.
4                 MS. ROLLEY:  No, it's all right.
5                 MR. WEST:  What she played for you in court is not
6    what they had given me, so they are playing what they gave to
7    me.
8                 MS. ROLLEY:  It's longer.  The one that we played was
9    chopped.
10                MS. ROLLEY:  Thank you, Judge.
11                (Thereupon, counsel returned to their trial tables,
12   afterwhich the proceedings resumed as follows:)
13                              HOLLY SCHULTZ,
14   called as a witness for and on behalf of the Government, having
15   been first duly sworn, was examined and testified as follows:
16                THE CLERK:  State your full name and spell your last
17   name for the record.
18                THE WITNESS:  My name is Holly Schultz,
19   S-C-H-U-L-T-Z.
20                MS. ROLLEY:  May I proceed, Your Honor?
21                THE COURT:  Yes.
22                MS. ROLLEY:  Thank you.
23                           DIRECT EXAMINATION
24   BY MS. ROLLEY:
25        Q    Good afternoon.

1          A      Good afternoon.

2          Q      Ms. Schultz, please tell us what you do for a living.

3          A      I am a registered nurse with the Bureau of Prisons.

4          Q      And where are you currently working?

5          A      At FCI Phoenix.

6          Q      In your past, did you work at FCI Safford as a

7     registered nurse?

8          A      Yes.

9          Q      When was that?

10         A      From 2007 until 2011.

11         Q      And you worked in the health services clinic at FCI

12    Safford in about 2009; is that correct?

13         A      Correct.

14         Q      What were your duties and responsibilities in that

15    job?

16         A      I had multiple duties.  If there was an emergency

17    situation, I got with the emergency situation; if there was

18    day-to-day sick call visits in the clinic, I ran a blood

19    pressure clinic, visit the special housing unit.

20         Q      When you were at FCI Safford, did you have a certain

21    exam room allotted to you or did you travel from exam room to

22    exam room?

23         A      I traveled from exam room to exam room.

24         Q      I want to direct your attention to July the 2nd of

25    2009.

```
1              Were you working has a registered nurse at FCI
2      Safford on that day?
3          A    Yes, ma'am.
4          Q    What were your typical hours of work?
5          A    I came in at 10:00 in the morning and worked until
6      6:00 p.m.
7          Q    And on that particular day, was that your regular
8      schedule?
9          A    Yes.
10         Q    So around 5:30 p.m. that day, you were at the clinic;
11     is that correct?
12         A    Yes.
13         Q    Were you by yourself or were there other employees
14     with you at that time?
15         A    I was by myself.
16         Q    What time did the clinic close?
17         A    At 6:00 p.m.
18         Q    And did you at about 5:30 on July the 2nd, 2009 come
19     into contact with a person known to you as Adrian Cooper?
20         A    Yes.
21         Q    And do you see Adrian Cooper in the courtroom today?
22         A    Yes.
23         Q    Can you please identify him for us by telling us what
24     he is wearing?
25         A    He is wearing a dark blue jacket and a light blue
```

1    button down shirt.

2          Q     Is he wearing a tie or not?

3          A     No tie.

4                MS. ROLLEY:  May the record reflect the witness

5    identified the defendant?

6                MR. WEST:  No objection.

7                THE COURT:  Yes.

8                BY MS. ROLLEY:

9          Q     When you came into contact with the defendant, where

10   were you; on that day, where were you?

11         A     I was inside the clinic.  I had just finished pill

12   line.

13         Q     You just finished what?

14         A     The evening distributing of the medications.

15         Q     What did you call that?

16         A     Pill line.

17         Q     Pill line.  Okay.

18               And when you saw the defendant, you had just finished

19   doing that and where was the defendant?

20         A     He was in the lobby of health services.

21         Q     And what was he doing?

22         A     He was trying to get my attention so I could speak

23   with him.

24         Q     So did you?

25         A     Yes.

1        Q     Where did that conversation take place?

2        A     In the lobby.

3        Q     So tell us about that conversation.

4              How did it start.

5        A     He was requesting that I renew his lower bunk pass.

6        Q     And describe for us during his request for the

7    renewal of his lower bunk pass, how was he behaving towards

8    you?

9        A     He was acting pretty normal, friendly, until I turned

10   him down for the lower bunk pass, and then he got into my

11   personal space and tried to intimidate me.

12       Q     Okay.  So did he tell you, though, why he needed the

13   lower bunk pass?

14       A     He stated that he was having a hard time crawling up

15   to the top bunk.

16       Q     He had an ankle problem?

17       A     Yes.

18       Q     So you said that he got in your space and was trying

19   to intimidate you when you turned him down for the pass.

20             Why did you turn him down for the pass?

21       A     I received an e-mail from a lieutenant, Lieutenant

22   Gibbs that he was trying to circumvent coming to sick call and

23   he didn't wish for us to renew his bottom bunk pass until he

24   came to sick call.

25       Q     So then you communicated to the defendant that you

1    could not honor his request; is that correct?

2         A    Correct.

3         Q    And then what happened from there?

4         A    He became frustrated and angry, got in my personal

5    space, tried to intimidate me.

6         Q    How did you feel?

7         A    I was scared.

8         Q    Was anyone with you?

9         A    No, I was alone.

10        Q    So what did you do?

11        A    I told him we are going to the lieutenant's office.

12   I felt that it would be better off for my safety if I took him

13   to the lieutenant's office.

14        Q    And so did you and the defendant then go to the

15   lieutenant's office?

16        A    Yes.

17        Q    Is that in the health services clinic or somewhere

18   else?

19        A    No, it is across -- it is about 50 feet from the

20   clinic.

21        Q    So you walked with the defendant over there?

22        A    Yes.

23        Q    And when you got to the lieutenant's office, what

24   happened there?

25        A    We spoke with Lieutenant Mullen, and an agreement was

1    reached that I issue Mr. Cooper a lower bunk pass through the

2    weekend and that when the weekend ended the lower bunk would be

3    expired and he would be required to go to sick call and be

4    reassessed by the physician.

5         Q    And what was the defendant's reaction to that?

6         A    He seemed happy about it.

7         Q    Now, this was July 4th weekend; is that correct?

8         A    Yes.

9         Q    So the following then next day of work for you was

10   July the 6th, 2009; is that correct?

11        A    Yes.

12        Q    Were you working on that day?

13        A    Yes.

14        Q    And your regular hours?

15        A    Yes.

16        Q    And so around 10:25, 10:30 a.m., were you in the

17   health services clinic?

18        A    Yes.

19        Q    And do you remember where you were around that time?

20        A    Yes, I was in the trauma room.

21             MS. ROLLEY:   And may we see Exhibit 1.

22        Q    And do you recognize this, Exhibit 1?

23        A    Yes.

24        Q    And this is the health services clinic layout;

25   correct?

```
 1              A      Yes.
 2              Q      Can you show us on this layout or exhibit where the
 3        trauma room was that you were in?
 4              A      Right there.
 5              Q      You put a dot where it says trauma treatment?
 6              A      Yes.
 7              Q      That is across from where?
 8              A      It is across from the dental.
 9              Q      So being in the trauma room clinic at that time, were
10        you treating a patient?
11              A      Yes, I was.
12              Q      And is that considered a place for emergency,
13        emergent issues?
14              A      Sometimes for emergencies, sometimes for doing
15        procedures.
16              Q      What, if anything, around that time while you were in
17        that room what, if anything, attracted your attention?
18              A      I hear yelling in the hallway.
19              Q      Did you recognize the voices?
20              A      Yes.  I recognized it as Ms. Harmon.
21              Q      Now, is Ms. Harmon someone you work with?
22              A      Yes.
23              Q      And you heard yelling, did you hear more than one
24        voice?
25              A      I heard her voice.
```

1          Q    And upon hearing that voice, Ms. Harmon's voice, what

2     did you do?

3          A    I took the inmate that was with me across the hallway

4     to the dental so that the inmate was safe, and I came up the

5     hallway to about here.

6          Q    And you are pointing to the area right in front of

7     the dental office in the hallway?

8          A    Yes.

9          Q    You took the inmate to the dental laboratory?

10         A    Yes.

11         Q    So when you were at that point, what do you see?

12         A    I see Miss Harmon is yelling saying, "Get up against

13     the fucking wall," to Mr. Cooper.

14         Q    How does that strike you?

15         A    That is not her normal unless something -- I knew

16     something must be going on for her to do that.

17         Q    And your view of Ms. Harmon and the defendant, how

18     would you describe their sizes in relation to one another?

19         A    I would say that Mr. Cooper is probably around 6 foot

20     5 and close to 300 pounds, and Ms. Harmon maybe 5 9, 140.

21         Q    Now, you said that was not Ms. Harmon's normal?

22         A    No.

23         Q    Did you do anything?

24         A    Yes.

25         Q    What did you do?

1          A    I hit my body alarm.

2          Q    Why did you do that?

3          A    Because I felt that Ms. Harmon was being threatened

4     by Mr. Cooper.

5          Q    And shortly after that, what was the next thing that

6     you remember happening?

7          A    The next thing I remember happening is Officer

8     Cranford and Lieutenant Campbell coming through the lobby

9     doors, and trying to get Mr. Cooper to comply and cuff up and

10    get up against the wall.

11         Q    Do you remember seeing anybody else in hallway at

12    that point?

13         A    Not at that point.

14         Q    Okay.  And how are you feeling when you see that;

15    when you see Officer Cranford and Lieutenant Campbell coming

16    in?

17         A    I was relieved to see that staff are responding to

18    the emergency.

19         Q    Did you say they ordered him to get against the wall;

20    the defendant?

21         A    Yes.

22         Q    What did the defendant do, if you remember?

23         A    I honestly don't remember.

24              He was angry.

25         Q    What told you that he was angry?

1          A     His voice; his tone of voice.

2          Q     Did you see him do anything?

3          A     When Lieutenant Campbell and Officer Cranford were

4    trying to get him to cuff up, he -- Mr. Cooper threw

5    Mr. Cranford to the side and he was banging Lieutenant Campbell

6    up against the wall.

7          Q     How were you feeling when you saw that?

8          A     I was scared.  I was scared for my coworkers because

9    of -- he is a big guy.

10         Q     Did you see anybody else during this?

11         A     After that time, quite a few staff came and as well

12   Dr. Gaskin.

13         Q     Who is Dr. Gaskin?

14         A     He is the dentist, the chief dentist at health

15   services.

16         Q     What do you recall seeing Dr. Gaskin doing?

17         A     He came up around and grabbed Mr. Cooper by the arm.

18         Q     Now, if you remember, is this before or after the

19   other staff members came?

20         A     It was before.

21         Q     So other staff members came into the clinic, I think,

22   correct?

23         A     Correct.

24         Q     Do you know how many staff members came in to assist?

25         A     Maybe five or six.

1     Q     And do you recall any of those staff members at some

2     point having a video camera?

3     A     Yes.

4     Q     Are there cameras in the health services clinic?

5     A     No.

6     Q     Stations in the clinic?

7     A     No.

8     Q     At least at that time?

9     A     There were not at that time.

10    Q     And so when Dr. Gaskin has ahold of the defendant's

11    arm, what is the defendant doing?

12    A     He is resisting.

13    Q     Sorry?

14    A     He is trying to get away.

15    Q     Is he saying anything?

16    A     "You are choking me, you are trying to hurt me."

17    Q     And when staff members arrived, you said five or six

18    of them, what happened at that point?

19          Are you still there watching?

20    A     Yes.

21    Q     What happened?

22    A     They took him down to the floor and applied handcuffs

23    to him.

24    Q     And what is the defendant doing?

25    A     He is angry.  He is not yelling, but he is stating

1     over and over again, "They are killing me, they are choking me,
2     they are trying to kill me."
3         Q    You say he is angry but he is not yelling.  What
4     about his voice told you that he was angry?
5         A    He had a raised voice, but not -- it wasn't yelling.
6         Q    Did you see anybody choking him during this?
7         A    No.
8         Q    What did you think when he said they are choking me?
9         A    What I was thinking was he's trying to play a game.
10             MR. WEST:  I object and move to strike.  That calls
11    for speculation.
12             THE COURT:  Overruled.
13             BY MS. ROLLEY:
14        Q    Now, someone in this group gets a video; is that
15    correct?
16        A    Correct.
17        Q    And you see this person taping?
18        A    Yes.
19        Q    And after the defendant is placed on the ground and
20    handcuffed, do you remember what happens next?
21        A    He kept saying, "You are choking me, you are choking
22    me, you are trying to kill me, quit trying to kill me, quit
23    beating me up."
24             After that time he was placed on a gurney and was
25    taken out the side door of health services to be taken to the

1      special housing unit.

2             Q     And do you remain with the defendant as he travels

3      from health services to that housing unit?

4             A     Yes.

5             Q     The special housing unit?

6             A     Yes.

7                   MS. ROLLEY:  Can we see Exhibit 1 again.

8             Q     Can you show us on Exhibit 1 where the defendant

9      exited the building?

10            A     (Indicating)

11            Q     You are making an arrow to the side door past the

12     secretary's office?

13            A     Yes.

14            Q     And that is where they took the gurney to the special

15     housing unit; correct?

16            A     Yes.

17            Q     And so as he is traveling to the special housing

18     unit, is he with others or by himself?

19            A     There were many other staff.

20            Q     What about the person who was videotaping?

21            A     They followed.

22            Q     And you as well?

23            A     Yes.

24            Q     Do you then continue, once you get to the special

25     housing unit, do you go in with everybody?

```
 1          A     Yes.
 2          Q     Are you making any observation of what happens in
 3     there?
 4          A     Yes.
 5          Q     What about the person that was videotaping; is that
 6     person in there as well?
 7          A     Yes.
 8          Q     And do you remain there with the others as the
 9     defendant is placed into the special housing unit holding cell?
10          A     Yes.
11          Q     And what about the person who was videotaping; is
12     that person there as well?
13          A     Yes.
14          Q     Now, later that afternoon did you have an opportunity
15     to examine the defendant?
16          A     Yes.
17          Q     Tell us about that.
18                Where did that take place?
19          A     There is an exam room in the special housing unit,
20     specifically for health services to examine inmates.
21          Q     So you did a physical examination of the defendant.
22                What were your observations and your assessment of
23     the defendant?
24          A     The only findings that I found on Mr. Cooper.  He had
25     a bruise to the left shoulder, back of his shoulder, an
```

1     abrasion to the left back of his arm.  He had some redness in

2     his collarbone area right here.

3            Q     What are you pointing to?

4            A     Here.

5            Q     Is that at the neck or below the neck?

6            A     Below the neck.

7                  And his wrists were a little bit red as well.

8                  I did vitals on him as well and they were within the

9     normal limits.  He was oxygenating at a hundred percent and his

10    lung sounds were good and his heart tones sounded good as well.

11           Q     Can you see this on your screen?

12           A     Yes.

13           Q     This is marked as an Exhibit 15 for identification.

14                 Do you recognize this?

15           A     Yes.

16           Q     What is this?

17           A     It is a video of what occurred after he was placed on

18    the gurney and taken to the special housing unit and while he

19    was in the holding cell.

20           Q     Is this a fair and accurate representation of when

21    you followed the defendant to the hallway of the health

22    services and he was placed in the SHU?

23           A     Yes.

24                 MS. ROLLEY:  I offer this into evidence, Your Honor.

25                 MR. WEST:  No objection, Your Honor.

```
 1                    MS. ROLLEY:  May we publish?

 2                    THE COURT:  Yes.

 3                    MS. ROLLEY:  Thank you.

 4                    (Videotape being played)

 5                    MS. ROLLEY:  Thank you, no further questions.

 6                    THE COURT:  Any questions, Mr. West?

 7                    MR. WEST:  Yes, sir.

 8                             CROSS EXAMINATION

 9      BY MR. WEST:

10          Q    Good afternoon.  We heard testimony that these passes

11      for the lower bunks were issued on an annual basis.

12          A    Not always.

13          Q    Are they sometimes issued on an annual basis?

14          A    Sometimes they were.

15          Q    Had you previously issued this lower bunk pass to

16      Mr. Cooper?

17          A    Correct.

18          Q    You had?

19          A    Yes.

20          Q    Why was he not given the annual pass?

21          A    It was a temporary injury that would heal within a

22      short amount of time.

23          Q    So you reexamined the injury later on and determined

24      it to have healed?

25          A    No, he had not reported back to the clinic.
```

```
1          Q    You just testified that it was a minor injury and it
2     healed over time.
3               How do you know that?
4          A    It was a sprain, an ankle sprain.
5          Q    And how do you know it would heal?
6          A    I don't know that it was.
7          Q    And he was there on July 2nd still complaining about
8     the ankle; isn't that correct?
9          A    Correct.
10         Q    So perhaps it had not healed?
11              MS. ROLLEY:  Objection, speculation.
12              THE COURT:  Overruled.
13              BY MR. WEST:
14         Q    And you said prior to this that the medical unit had
15    gotten some kind of an e-mail from a Lieutenant Gibbs?
16         A    Yes.
17         Q    And that e-mail told you what again, please?
18         A    To not issue a lower bunk pass until he came to sick
19    call.
20         Q    What is the difference between you doing it and sick
21    call, if you can help us out?
22         A    Sick call is in the morning.  You have to sign up for
23    sick call.  It is on Mondays, Tuesdays, Thursdays and Fridays.
24    The inmate would have to show up at the clinic between 6:30 and
25    7:00 in the morning to sign up to be seen and evaluated by a
```

```
 1      nurse or a physician.
 2           Q    So it wasn't that he wasn't going to the medical unit
 3      for the pass and being examined, it was that they wanted him to
 4      do it at sick call instead?
 5           A    Correct.
 6           Q    And you said that he was basically acting normal and
 7      friendly initially?
 8           A    Yes.
 9           Q    And then when the other lieutenant said that it was
10      okay he went away happy?
11           A    He did.
12           Q    You said that when you were in the trauma room, the
13      only yelling you heard was Ms. Harmon; is that correct?
14           A    Yes.
15           Q    And the only thing you hear her say is get up against
16      the fucking wall?
17           A    Yes.
18           Q    And so you hit your panic button?
19           A    After I saw what was happening.
20           Q    Within moments after you hear that statement?
21           A    Yes.
22           Q    Had you seen Ms. Harmon put handcuffs on Mr. Cooper?
23           A    I don't recall.
24           Q    Do you recall her taking handcuffs off of Mr. Cooper?
25           A    No, sir, I don't.
```

1      Q     Was it pretty quick when Campbell and Cranford showed

2    up?

3      A     It was fairly quick.

4      Q     And I believe you indicated that you didn't see

5    anybody place a chokehold on Mr. Cooper?

6      A     No, I didn't, sir.

7      Q     Did you see anybody put their hands on his throat?

8      A     Not on his throat; no.

9      Q     Anybody put their arm across his throat?

10     A     Not that I recall.

11     Q     And when he was on the ground, you still saw that

12   struggle; is that correct?

13     A     Yes.

14     Q     At that time did you see anybody put their hands on

15   his neck?

16     A     Not on his neck, no.

17     Q     And what about putting his arm around his throat?

18     A     No.

19     Q     You said that somebody showed up with a video; is

20   that correct?

21     A     Yes.

22     Q     This video that we just saw, is that when that

23   officer showed up?

24     A     Which officer, sir?

25     Q     The one with the video camera?

```
 1          A     Yes.
 2          Q     So he had just arrived when Mr. Cooper was being
 3     wheeled out?
 4          A     It was, yes.  It was a female officer that was
 5     videotaping, I believe.
 6          Q     There was a gentleman in a white shirt with glasses
 7     on in the video.
 8                Did you see him as you watched it?
 9          A     There were a couple with glasses.  The lieutenant?
10          Q     The lieutenant.
11          A     Yes.
12          Q     And who is that?
13          A     Lieutenant Elie.
14          Q     And that is Nurse Elie's husband?
15          A     Correct.
16          Q     Now, you indicated that you examined him at the SHU;
17     correct?
18          A     Yes.
19          Q     And what time was that?
20          A     It was approximately maybe an hour after when it had
21     occurred.
22          Q     Can you give me approximate time?
23          A     I honestly don't know what the time was.
24          Q     So it was approximately an hour after you first heard
25     the yelling by Ms. Harmon?
```

1          A      Yes.  There or around an hour.

2          Q      And you testified here a few minutes ago that the

3     injuries that you observed of Mr. Cooper -- I guess you said

4     there was a bruise to the back of his left shoulder; is that

5     correct?

6          A      Yes.

7          Q      And there were some abrasions on his posterior

8     portion of the left arm?

9          A      Yes.

10         Q      Can you tell the jury what part of the body is the

11    posterior?

12         A      The back portion, back here.

13         Q      So posterior would be the back, the back of our legs,

14    and when you look at arms, you put them down like this and this

15    is the posterior?

16         A      Yes.

17         Q      But then you testified that he had these red

18    abrasions but you said it was down here by his clavicle.

19                Do you recall saying that?

20         A      They were not abrasions, it was just redness in this

21    area.

22         Q      And you wrote a report; right?

23         A      Yes.

24         Q      I am going to show you what is not in evidence,

25    Exhibit Number 72.

1      A     A memo.

2      Q     Does that look like the report you prepared?

3      A     Yes.

4      Q     And then in this paragraph you begin to list his

5   injuries; is that correct?

6      A     Correct.

7      Q     And you have the bruise to the back of his -- to the

8   back of his left shoulder; correct?

9      A     Yes.

10      Q     And a superficial abrasion to the posterior portion

11   of the left arm.

12            That is what you testified about; right?

13      A     Yes.

14      Q     The next sentence, correct me if I am wrong, but

15   doesn't it say some mild redness was noted on the anterior part

16   of inmate Cooper's neck?

17      A     Yes.

18      Q     The neck is above the clavicle?

19      A     The neck is right here, from here up.  From here up

20   is the neck.  This is the airway.

21      Q     Right.  But this whole area here is considered the

22   neck; right?

23      A     Yes.

24      Q     And down below that is the collarbone?

25      A     The clavicle and the breastbone.

1          Q     But that is different than -- you can sit down.

2          A     Thank you.

3          Q     You look like you are being very specific here in

4    your report.

5                Isn't that a fair statement?

6          A     I was pretty accurate; yes, I would say so.

7          Q     And that is what you are trying to do; right?

8          A     Yes.

9          Q     And so if you would have wanted to say redness along

10   his clavicle, you would have said that; correct?

11         A     It was the lower portion where the redness was, here

12   on the anterior part of the neck, but not on the airway.

13         Q     You pointed the airway as being at the very top.

14         A     Yes.  There was no redness there.

15         Q     The airway runs all the way down into our lungs; does

16   it not?

17         A     It does.

18         Q     And you have carotid arteries on both side; is that

19   correct?

20         A     Yes.

21         Q     And they run all the way up to the brain down on into

22   the body; right?

23         A     Correct.

24         Q     The airway isn't just up here, it is any part of

25   this, you can cut the air off at any part of his neck; isn't

1    that true?

2           A    Yes.

3                MR. WEST:  No further questions.

4                THE COURT:  Any redirect Ms. Rolley?

5                MS. ROLLEY:  No, Your Honor.  Thank you.

6                THE COURT:  We will take an afternoon recess until

7    3:15.

8                That clock is probably a little fast, maybe 15

9    minutes.

10               Be ready to go in the jury room 15 minutes and recall

11   the admonition, please.

12               (Thereupon the jury exited the courtroom at 03:00 PM

13   for a brief recess)

14               THE COURT:  Back on the record in United States

15   versus Cooper.

16               Yes, sir.

17               MR. FIGUEROA:  Mr. West and I had discussions during

18   the break, and Mr. West agrees he is not going to call

19   Mr. Cranford just to testify about the prohibited testimony,

20   and I would ask permission at this time to excuse him from the

21   subpoena.

22               THE COURT:  Oh, yes.

23               MR. WEST:  No objection.

24               THE COURT:  He may be excused.

25               MR. FIGUEROA:  Thank you, Your Honor.

```
1              THE COURT:  Get the jury.
2              (The jury enters the courtroom)
3              THE COURT:  We have our jury in the box, we are ready
4    for our next witness.
5              MS. ROLLEY:  The government calls Dr. Lawrence
6    Gaskin.
7                        LAWRENCE J. GASKIN,
8    called as a witness for and on behalf of the Government, having
9    been first duly sworn, was examined and testified as follows:
10             THE CLERK:  State your full name and spell your last
11   name for the record.
12             THE WITNESS:  Lawrence Jeffrey Gaskin, last name
13   G-A-S-K-I-N.
14                       DIRECT EXAMINATION
15   BY MS. ROLLEY:
16        Q    Good afternoon, sir.
17        A    Good afternoon.
18        Q    Tell us what you do for work?
19        A    I am a dentist with the U.S. Public Health Service.
20   I work for the Bureau of Prisons.  I have worked for the Bureau
21   of Prisons for the last 21 years.
22             Do you want me to keep going on?
23        Q    Do you do more than that?
24        A    I work with the any kind -- any time there is any
25   kind of a deployment, there is a possibility of being called.
```

1    I was doing forensic dentistry at 9:11, so I was called two

2    weeks after that event.  I was there at Katrina, and I was in

3    the air two weeks after the earthquake in Haiti, and I was on

4    the ground for 17 days there.

5         Q    That is also part of your work?

6         A    Yes.

7         Q    So I think you said you are a public health officer;

8    is that correct?

9         A    That's correct.

10        Q    What rank are you?

11        A    I am a captain.

12        Q    You have been a public health officer for how long?

13        A    I have been a public health officer for the last 21

14   years.

15        Q    And your education, training and experience in

16   dentistry.

17             Where did you go to dental school?

18        A    I went to dental school at the University of North

19   Carolina, Chapel Hill.

20        Q    And dentistry, does that involve a branch of medicine

21   that deals with the study and diagnosis as it relates to and

22   prevention as it relates to the mouth and the airway; is that

23   correct?

24        A    It does.

25        Q    So you are working at FCI Safford.

1              You have been there for how long did you tell us?

2        A    I have been at Safford close to 18 years.

3        Q    And prior to that where did you work?

4        A    I worked in Danbury, Connecticut, in a male

5    institution that changed into a female institution, and I was

6    there for about three and a half years.

7        Q    So your entire profession in dentistry has been

8    through the Bureau of Prisons, working in public service?

9        A    That's correct.

10       Q    I want to direct your attention to July 6, 2009.

11             Were you working at FCI Safford on that day as a

12   dentist?

13       A    I did, I was working as a dentist on that day.

14       Q    And is your office located in the health services

15   clinic?

16       A    Yes, it is.

17       Q    And on that particular day at around 10:20, 10:25,

18   were you working in your clinic?

19       A    That's correct.

20             MS. ROLLEY:  And if we could just see Exhibit 1,

21   please.

22       Q    Can you see Exhibit 1, Doctor?

23       A    Yes, I can.

24       Q    Can you tell us if you recognize this?

25       A    Yes, I did.

155

```
 1          Q    What is it?
 2          A    It is the health services building at the Federal
 3     Bureau of Prisons in Safford.
 4          Q    And do you see your office in this building?
 5          A    I do.
 6          Q    Can you point to it?
 7          A    Do I need a pointer?
 8          Q    You made a little dot.
 9               And that is a dental laboratory?
10          A    Yes.
11          Q    Is that where you see patients?
12          A    Yes, it is.
13          Q    And next to it is a dental office.
14               Is that yours, also?
15          A    That's my office, yes.
16          Q    On July the 6th, 2009, around 10:20, 10:25, were you
17     in the laboratory or in the office?
18          A    I was in the laboratory.
19          Q    Your laboratory, does it have windows that face into
20     the hallway?
21          A    It does.
22          Q    Are those windows typically the blinds opened or
23     closed?
24          A    Typically open.
25          Q    On that particular day at that time you were seeing a
```

1     patient.

2              Did anything happen that attracted your attention?

3      A     I was seeing a patient and we heard loud noises in

4     the hall at that time, and I stopped what I was doing with my

5     patient to find out what was going on in the hall.  And I

6     started -- it sounded like the loud voices were coming from

7     Dr. Fariall's office.

8      Q     Can you show us on this layout, Exhibit 1, where

9     Dr. Fariall's office was?

10     A     I believe it was right here.

11     Q     At least the direction?

12     A     Yes.

13     Q     So the voices you heard were coming from that

14    direction?

15     A     Right.

16     Q     So did you do anything?

17     A     I slowly walked out of my office because if there was

18    any -- there were loud voices and if there was any kind of

19    confrontation, I did not want it -- I did not want to escalate

20    it in any way, I just wanted to find out what was going on.

21     Q     Did you go into the hallway or stay --

22     A     I walked into the hallway, and as I was walking into

23    the hallway, the confrontation was loud -- and let me see what

24    I can tell you.

25              One of the -- let's see.

```
 1                    MR. WEST:  I object to the narrative.  There is no
 2       question before him.
 3                    THE WITNESS:  It is not a question.
 4                    THE COURT:  The question was:  Did you walk into the
 5       hallway.
 6                    THE WITNESS:  I walked into the hallway:  The answer
 7       was yes.
 8                    BY MS. ROLLEY:  Thank you.
 9            Q    And so did you see a person or persons in the
10       hallway?
11            A    Yes, I did.
12            Q    Who did you see in the hallway?
13            A    In the hallway, I saw inmate Cooper.  He was coming
14       out of the office and he had to duck -- very tall fellow, very
15       large guy, he had to duck to come out of the office and I just
16       waited and it looked like everything was okay, still a lot of
17       aggressiveness in the sound of his voice, but there was no
18       problem, so I slowly walked back to my office and waited.
19            Q    Did you go back to your patient?
20            A    No, I didn't, because I wanted to find out how it was
21       going to end.  I wanted to see that Cooper would be leaving the
22       clinic.  If he was leaving the clinic and everything was okay
23       that would be fine.
24            Q    You said inmate Cooper.
25                 Do you see a person known to you as inmate Cooper in
```

1       the courtroom today?

2              Do you see him?

3              You are shaking your head.

4       A      Yes.

5       Q      And please tell us, describe for us what he is

6       wearing.

7       A      He is wearing a jacket, shirt, blue shirt.

8       Q      Is he with a tie or without a tie?

9       A      Without a tie.

10             MS. ROLLEY:  May the record reflect that the witness

11      identified the defendant?

12             MR. WEST:  No objection.

13             THE COURT:  Yes.

14             BY MS. ROLLEY:

15      Q      And so you waited back in your office; is that

16      correct?

17      A      That's correct.

18      Q      Did you remain there or did something else happen?

19      A      I waited to find out what was going to happen, and I

20      thought he was going to go through the two doors -- can I point

21      to where the doors are?

22      Q      Sure.

23      A      I thought he was going to exit through the waiting

24      room and that would have been the end of what I needed to do

25      and then go back to my patient.  The loud voices continue.

1          He turned the corner and there was verbal

2     confrontation with one of the nurses.

3          Q     Do you remember which nurse it was?

4          A     Nurse Elie.  Diane Elie.

5          Q     And verbal confrontation.  By that you mean what?

6          A     Loud voices, raising in voice, aggressive behavior.

7     I wasn't listening for the words, I was just listening to see

8     what was going to happen.

9          Q     Why did you listen to see what was going to happen?

10         A     Staff support.  We are there to support each other.

11         Q     And at some point, then, during this confrontation

12    with Nurse Elie, did you leave the hallway or did you remain

13    there?

14         A     I remained in the hall.

15         Q     Okay.  Tell us what you remember happening next?

16         A     They were talking and I believe someone must have hit

17    their body alarm because I saw two of our officers come through

18    the door.

19         Q     Which two officers, if you know?

20         A     Officer Campbell and Officer Cranford.

21         Q     How are you feeling at this time, at this point?

22         A     At this point I am feeling -- I am probably going to

23    get hurt in this confrontation because we are talking about

24    size and power and Cooper is a very big guy, so I was -- but I

25    was feeling that, but then I knew I was going to be involved.

```
 1         Q     How big are you?  How tall are you?
 2         A     I am 6 1, 6 2, somewhere between there.
 3         Q     And your frame.  How would you describe your frame?
 4         A     I am a pretty big guy, but I am nowhere the size of
 5    what Cooper is.
 6         Q     The defendant, is that who you are referring to?
 7         A     Yes, the defendant, I'm sorry.
 8         Q     So you see Officer Cranford and Lieutenant Campbell
 9    come in?
10         A     Yes.
11         Q     What do you remember seeing next?
12         A     I see them running towards him, and he is facing the
13    wall, and they are getting ready to grab him and they grab, I
14    believe it was the left arm and without much action he just
15    kind of like threw them into the air like they were rag dolls.
16               And at that point when I saw them running I was
17    running as well to grab him, but when they were thrown, I
18    stopped, but then I didn't -- he was still facing the wall and
19    I was waiting to see what I was going to do next, and I did not
20    do anything and then they came back in and grabbed him and then
21    I grabbed him.
22         Q     So why did you grab him at that point?
23         A     We were just trying to get control.
24         Q     Is that what you were trying to do?
25         A     Yes.
```

1        Q    Tell us what you did to try to control him?

2        A    To try to control him, I saw one of the officers had

3    grabbed the right arm, one of the officers had grabbed the area

4    of the head and I grabbed the left arm.

5             The struggle was upper area is where the struggle

6    was, so I just wanted to make sure that was in control.

7        Q    So you grabbed which arm?

8        A    I grabbed his left arm.

9        Q    What did you do?

10       A    I just held on.

11       Q    How did it feel?

12       A    Like iron.  Non compressible iron.

13       Q    Is the defendant saying anything during this?

14       A    Yes, he is talking and he's telling the other

15   inmates, "Come and help me, they are hurting me, they are

16   choking me, come in and help me."

17       Q    How would you describe the tone of his voice?

18       A    Confrontational.

19       Q    What about the volume?

20       A    Very loud.  Very loud, very disrespectful.

21       Q    Did you see anyone choking him?

22       A    I didn't.

23       Q    What did you think when he was yelling, "they are

24   choking me"?

25       A    When he was yelling, it was interesting that he would

1    yell that because a choking victim really doesn't have the
2    ability to yell.  He does not have ability to use that kind of
3    voice.  The international sign for choking is very similar to
4    this, one hand or two hands because they can't speak, but his
5    voice -- his tone never changed, it was very loud and very
6    aggressive the whole time.
7         Q    You said never changed.  What happened after you had
8    ahold of his arm and it felt like iron?
9         A    Right.
10        Q    What happened after that part?
11        A    After that part the other two officers had him and I
12   believe it was Officer Cranford said:  "Okay, the next thing is
13   we want you to get down to your knees."  He was facing the
14   wall, "so we want you to move down to your knees and we are
15   going to go slow on this," so he -- it was confrontational
16   compliance.  So he did move slowly down to his knees, and they
17   told him from there, "We are going to move you onto your side
18   very slowly," and they did and I am thinking if he falls
19   someone could still get hurt.  He was a big guy.
20        Q    You say confrontational compliance.  What does that
21   mean to you?
22        A    Very disrespectful, very aggressive body action, but
23   doing what he is asked to do in a general way.  He was asked to
24   face the wall and he continued to face the wall.  He could have
25   easily have turned around.  At no point did I feel like I was

UNITED STATES  DISTRICT COURT

```
1      in control.
2          Q    And you did not feel like you were in control because
3      why?
4          A    Because of size and power.  Very big guy.
5               And after he had thrown the two officers off, I had
6      an idea of what he could do if he wanted to get mad.
7          Q    So was he placed then on the ground?
8          A    Yes, he was.
9          Q    And during the time that he was placed on the ground,
10     is he speaking or not?
11         A    He is speaking the whole time, "Come on you guys,
12     come in, come over here, they are choking me, they are choking
13     me, come over here and help me."
14         Q    And what was his tone when he was saying "Come on you
15     guys, come over here, they are choking me"?
16         A    Very loud.
17         Q    Did you remain in the hallway?
18         A    Yes, I did.
19         Q    When did you leave?
20         A    I didn't leave until other staff came and I was
21     relieved.  Relieved, meaning I had his arm.  Until someone said
22     I will take the arm from here and then I could leave.
23              MS. ROLLEY:  May I have a minute, Your Honor?
24              THE COURT:  Yes.
25              MS. ROLLEY:  I have no further questions for this
```

1    witness, Your Honor.

2              THE COURT:  Any questions, Mr. West?

3              MR. WEST:  Yes, sir, thank you.

4                        CROSS EXAMINATION

5    BY MR. WEST:

6         Q    Good afternoon, sir.

7         A    Good afternoon.

8         Q    You indicated that you had a patient in your office

9    when you first heard this noise; is that correct?

10        A    That's correct.

11        Q    Do you remember who that patient was?

12        A    No, I don't.

13        Q    Do you remember having a patient in your office by

14   the name of Mr. Ramos?

15        A    That could be, yes.

16        Q    And when you are in your dentist office, do you have

17   one patient there at a time or do you work with multiple

18   people?

19        A    At that point there was one patient that I was

20   working on, yes.

21        Q    And had there been a patient that had just been

22   excused from your office just prior to this confrontation?

23        A    I don't remember.

24        Q    Patient that was in your office, did he stay in your

25   office until after the confrontation?

1          A    He stayed in the office -- once I was involved in the

2    confrontation, I wasn't checking on the patient.  My focus is

3    on what was going on in the hall.

4          Q    The patient that was in your office that you were

5    treating, when you went in the hallway, that patient stayed in

6    the room?

7          A    That's correct, until he was relieved.  He would have

8    been relieved by someone.

9          Q    Initially you heard the noise coming from

10   Dr. Fariall's office; is that correct?

11         A    That's correct.

12         Q    Did you hear the doctor saying anything?

13         A    I believe I heard him ask him to leave his office.

14         Q    And then did you later get an understanding that

15   there was a dispute between the doctor and Mr. Cooper about his

16   medical treatment?

17              MS. ROLLEY:  Objection, hearsay.

18              THE COURT:  Yes, sustained.

19              MR. WEST:  I didn't ask him what somebody said,

20   whether he gained that understanding.

21              THE COURT:  Go ahead.  He may answer.

22              Overruled.

23              BY MR. WEST:

24         Q    Did you get an understanding there was a complaint

25   about the medical treatment by Cooper?

1          A     I got the understanding that he was displeased with

2     whatever had been said.  I didn't get an understanding of what

3     was being said, I was listening more to tone.

4          Q     Okay.  Anyhow, Mr. Cooper then walked from the exam

5     room down the hallway towards the exit; correct?

6          A     Correct.

7          Q     And then you heard Nurse Elie get involved; is that

8     correct?

9          A     Yes, I heard confrontation there.

10         Q     And did you stay in the hallway now at this point in

11    time?

12         A     I stayed close to the door and inside dental.  I

13    didn't want to add to the confrontation.

14         Q     And did you then see Ms. Harmon get involved?

15         A     Yes, I did.

16         Q     Did you see Ms. Harmon tell Mr. Cooper to get up

17    against the wall and be handcuffed?

18         A     I heard the voice saying, "get up against the wall,"

19    yes.

20         Q     Did you see her putting handcuffs on him?

21         A     I didn't.

22         Q     What was blocking your view?

23         A     Where dental is, if you want to put the screen on, I

24    will show you where I am.

25         Q     Does that help you?

1          A       Yes.

2          Q       All right.

3          A       Okay.

4                  That's where I am, and this is where he would have

5          been, right where that dot is, so it is hard to really get a

6          good view around the corner.

7          Q       So you are basically in this doorway here?

8          A       Correct.

9          Q       And you are looking this direction and this corner is

10         blocking your view?

11         A       Well, there are people there as well.

12         Q       Who were the people that were blocking your view?

13         A       That would be a difficult thing to say because I was

14         listening for tone and seeing if I needed to get involved.  We

15         are talking three years ago.

16         Q       Yes, I understand.  Now, back to my question about

17         Ms. Harmon.

18                 Did you hear her talking to him about putting

19         handcuffs on?

20         A       I don't believe I heard, but I just heard "up against

21         the wall," and when he got up against the wall.

22         Q       Is that when the other two officers came running in?

23         A       Shortly after that.

24         Q       And Mr. Cooper was facing the wall when the other

25         officers came in?

1       A    And would not stop talking, correct.

2       Q    So he is going at the mouth and he is making noise

3  and complaining, right?

4       A    Yes.

5       Q    But standing at the wall, facing the wall; correct?

6       A    He is facing the wall.

7       Q    At the time that Cranford and Campbell come into the

8  hallway?

9       A    That's correct.

10      Q    You said one of the officers grabbed him in the area

11 of the head?

12      A    Uh-huh.

13      Q    They put their arm around in front at the anterior

14 part of his body to control the head?

15      A    I am just waiting to see if you -- okay.

16           When I went to grab the arm, my focus was on the arm,

17 and when you are focused on the arm you are not looking around

18 seeing what everybody else is doing, you focus on your one part

19 because my job is just not to let that arm go and after I had

20 seen the other two thrown off, I knew I could easily be thrown

21 off and I didn't want to take the chance if I was the one that

22 let go.

23      Q    So you just hung onto his left arm?

24      A    Yes.

25      Q    Do you know who was on his right arm?

```
1          A     I believe it was Campbell.

2          Q     And who was on his head?

3          A     Cranford.

4          Q     You said that Mr. Cooper threw these guys off, and I

5    am taking my left arm and kind of throwing it back over toward

6    the back?

7          A     That was not the action.  The action was one of

8    shoulder and just lifting up this way.  I could not believe the

9    power.  I didn't think those two big guys could be thrown off

10   so easily.

11         Q     Did you see Mr. Cooper taking Lieutenant Campbell and

12   slamming him into the wall?

13         A     No, I did not see that.

14         Q     Did you see Ms. Harmon come over and try to put a

15   hold on his, I believe it was his left thumb and her get thrown

16   off as well?

17         A     I didn't.  I was focused on the arm.

18         Q     Well, if you are holding on the arm and somebody is

19   holding onto the hand at the end of that arm, you don't think

20   you would notice that?

21         A     Not if I am leaning against the arm.  We went from

22   standing up to knees to laying down.

23         Q     How many guys did it take to lay him down?

24         A     There were three of us.

25         Q     Three of you?
```

1        A     But we were asking for his help and he gave it.

2        Q     And he helped you?

3        A     He helped us, yes, because at any time, I never felt

4   like I was in control.  At any time he wanted to change the

5   situation and take charge, he could have taken charge, we were

6   no match to him.

7        Q     So it would be, from what I am hearing you say, it

8   would be your opinion then if he wanted to hurt somebody he

9   could have hurt you bad?

10       A     Yes.

11       Q     You said that he was disrespectful but compliant with

12   the orders; correct?

13       A     Confrontational; right.

14       Q     When the other people came in to assist, at any time

15   did you interfere and say that you guys are applying too much

16   force or you should not be hitting or kicking, anything like

17   that?

18             MS. ROLLEY:  Objection.  The -- does the witness have

19   the basis to answer that question?

20             THE COURT:  He can say so if he doesn't know.

21             Overruled.

22             BY MR. WEST:

23       Q     Did you see anybody that you saw hitting him or

24   kicking him when he was on the ground and tell them to stop?

25       A     No, I didn't.

```
 1         Q     Was he still on the ground when they came in with the
 2    camera?
 3         A     There were no cameras.
 4         Q     There were no cameras?
 5               Did you ever see anybody come in with a handheld
 6    camera?
 7         A     No.
 8         Q     Never saw that?
 9         A     I never saw that.
10               There were three of us.
11         Q     I am talking about after the rest --
12         A     After that, once I was excused, once someone said I
13    have his arm, I went back to dental.  I didn't stay for the
14    whole thing.
15         Q     You didn't stick around and watch?
16         A     No, I didn't stick around and watch.
17         Q     I think I asked you whether or not you saw him
18    slammed into the wall?
19         A     I didn't see him slammed.  I saw him raise his arm
20    and I saw Campbell go flying, but my focus was straight ahead.
21    In a prison situation you are worried about being sucker
22    punched.  Are you familiar with that term?
23               When you are looking this way and you get a punch
24    this way, so I was focused on what I was focused on.  Once he
25    left my field of vision, I wasn't changing where I was looking.
```

```
1          Q     But you never saw Mr. Cooper with Campbell on his arm

2     where Cooper is ramming him into the wall like this?

3          A     No, I never saw that.

4                MR. WEST:  Thanks, nothing further.

5                MS. ROLLEY:  No redirect.  Thank you.

6                THE COURT:  Dr. Gaskin, you may be excused.

7     Thank you, sir.

8                THE WITNESS:  Thank you.

9                (The witness left the stand)

10               THE COURT:  Next witness.

11               MS. ROLLEY:  The government rests.

12               THE COURT:  Counsel, you want to approach?

13               MR. WEST:  Yes, sir, thank you.

14               (Thereupon, counsel approached the bench and

15    conferred with the Court as follows:)

16               THE COURT:  Okay.  What are we going to do?  Rest?

17               MR. WEST:   I think we are going to recess.

18               THE COURT:  I am not going to recess.

19               MR. WEST:  I don't have any witnesses here.

20               THE COURT:  Then you rest.

21               MR. WEST:  Yes, sir.

22               THE COURT:  Are you going to call your client?  He's

23    here.

24               I am not going to recess because you don't have your

25    witnesses here.  That is your obligation.
```

UNITED STATES  DISTRICT COURT

1          I am not letting you call any experts.

2          MR. WEST:  Tomorrow I am planning on bringing in my

3    experts for an offer of proof, and if you deny, then after that

4    point in time --

5          You indicated you would let me make a record.

6          THE COURT:  You can make it in writing, if you want.

7          MR. WEST:  I prefer to have it on the record with

8    them testifying.

9          THE COURT:  Clearly they wouldn't be testifying about

10   any chokehold at this point since there is no evidence of a

11   chokehold.

12         So that's grounds enough, so I need to know.  It's

13   your case now, Mr. West.

14         What do you propose to do right now?

15         MR. WEST:  I am proposing to ask this court for a

16   short recess so I can consult with my client.  I don't have any

17   other witnesses prepared to be here.  I didn't really believe

18   that we would be done by this time.  I was thinking the way

19   things were moving we would probably have Gaskin tomorrow

20   morning.  I have people lined up to come in tomorrow, and they

21   will be here when we tell them to be here in the morning.  I

22   have the two inmates that were in the waiting room when this

23   occurred, and they are both under subpoena and both prepared to

24   be here tomorrow.

25         I apologize, Judge.  I didn't realize we would get

1    done this fast.

2            THE COURT:  The government has had a roomful of

3    witnesses back there.  That's the way we do it so we can submit

4    a case.

5            I don't impanel these jurors to waste their time and

6    wait for your schedule.

7            MR. WEST:  I apologize.  I would have asked earlier

8    what they were planning to do, but we had so many witnesses.

9            THE COURT:  What does the government want to do?

10           You can ask your client if he wants to testify, I

11   guess, but --

12           MR. WEST:  Can I have five minutes to do that,

13   outside the presence of the jury, please.

14           THE COURT:  But you you are telling me that you do

15   have two witnesses.

16           MR. WEST:  I do, sir.

17           THE COURT:  And two experts?

18           MR. WEST:  I do.

19           THE COURT:  You would like to call

20           MR. WEST:  Correct.

21           THE COURT:  And you have the potential of calling

22   your client?

23           MR. WEST:  That's correct.

24           THE COURT:  Is either one of these two lay witnesses

25   going to describe a chokehold on Mr. Cooper before he is taken

```
1    down?
2             MR. WEST:  No, sir, but they are going to
3    contradict -- they are going to testify that the initial
4    arguments and everything all took place inside the waiting
5    room, not in the hallway as the government has presented their
6    case.  They are going to have some information that is going to
7    be contrary to what is being presented by the government, and
8    that is consistent with what Mr. Ramos testified for on behalf
9    of the government.
10            Now, one of my clients is coming in on Greyhound at
11   7:30 tonight, and that is Herrera Davila.  He is the one that
12   we had problems with, but we finally caught up to him this
13   weekend.
14            THE COURT:  I guess this case was going pretty slow,
15   and I can see how you might be --
16            MR. WEST:  I was concerned that we weren't going to
17   start tomorrow afternoon initially, but it moved pretty fast
18   this afternoon.
19            THE COURT:  Based on everything you have told me, I
20   am not going to let either one of those experts testify.  So to
21   save their time, to save money, you may make a record, but you
22   could do that by oral avowal or do it in writing, if you wish.
23   File something tomorrow morning to make an offer.
24            MR. WEST:  I'm sorry, Judge.  When we had the
25   pretrial conference, you told me I could bring my expert in to
```

1          testify and make an offer of proof.

2                    THE COURT:  That is when I hadn't heard the case yet.

3                    MR. WEST:  So I made those arrangements for them to

4          be here tomorrow.

5                    THE COURT:  Well, all I am saying is why can't you

6          cancel them and submit a written offer?

7                    MR. WEST:   Is the court ruling at this point they

8          are not going to testify regardless of the offer?

9                    THE COURT:  Yes.  I am just letting you make a

10         record.

11                   MR. WEST:  Okay.

12                   I guess I can do that.

13                   THE COURT:  I don't find anything they can say that

14         would assist this jury in any regard.  One of them is going to

15         testify about some prison procedures and the like; right?  And

16         the other is going to testify about a reaction to a chokehold.

17                   MR. WEST:  I beg to differ, but we are just putting

18         in an exhibit that somebody talked about now, and now we just

19         had a witness that said he saw Cranford on his head, and

20         Cranford denied ever doing that.

21                   We have the abrasions on his neck; we have the teeth

22         marks on the back of Cranford's hand.  I think that is more

23         than adequate evidence to show that he potentially had a

24         chokehold.

25                   THE COURT:  I don't agree.

1          The offer anyway is to support some reactionary

2     thing.

3          MR. WEST:   I understand.  I do understand what you

4     are saying.

5          THE COURT:  Those are alleged crimes in this case

6     that occurred before they take him down.  There is no alleged

7     crime when he is down on the ground.  He mentions when he was

8     down he was choked.

9          MR. WEST:  He said the guy came around the corner and

10     came up from behind him and put a chokehold on him.

11          THE COURT:  He said he was choked from behind.

12          MR. WEST:  And that's what his statement was.

13          THE COURT:  Well, all right.

14          MS. ROLLEY:  That was his statement but --

15          THE COURT:  If you are actually going to have those

16     experts here and you insist on doing that to make your record,

17     I guess we could put on your two witnesses and then you can

18     make a record after the case is submitted or something.

19          That's what I was suggesting.  It is sure a savings

20     to a lot of people and time if you want to do something in

21     writing or make an avowal on the record what you intend to show

22     through these witnesses.

23          I did say that before we started the trial to bring

24     them in to make an offer, but I am so convinced that it is not

25     coming in, and I am trying to save that time.

1          MR. WEST:  All I can do is try to be prepared, like

2     you are already telling me I should have had people here this

3     afternoon.  I had those people, Mr. Rayfen (ph) arrived today,

4     and I am meeting with him tomorrow, and I will bring him down.

5     If I can put something in writing, I will.

6          MR. FIGUEROA:  Yet they should be called.  Insofar as

7     the doctor, he is talking about some autonomic nervous system

8     reaction which is blinking your eyes or breathing.

9          THE COURT:  Let's get the jury out of here and then

10    we will talk about it some more, and we will do jury

11    instructions, too.

12          (Thereupon, counsel returned to their trial tables,

13    afterwhich the proceedings resumed as follows:)

14          THE COURT:  Sorry, ladies and gentlemen. We are going

15    to recess for the day.

16          We have some things to do in this case yet today, but

17    the good part is that we are not only on schedule, probably

18    ahead of schedule, so we are not going to, you know,  -- well,

19    suffice to say we are at the very least on schedule, if not

20    ahead, so I will send you home at this time and we will start

21    again tomorrow morning at 9:30.

22          Recall the admonition, though.

23          What are they?  Don't talk with anybody about the

24    case, don't let anybody talk to you, don't do any research,

25    look anything up that has anything to do with the case.

1          So we will see you tomorrow morning at 9:30.

2          (Thereupon the jury exited the courtroom at 03:52 PM

3     as the proceedings resumed as follows:).

4          THE COURT:  We will talk about these jury

5     instructions first so I can get my staff -- I have modified the

6     offense instructions.  There are three.

7          Are you following me, one on each count, just very

8     slightly to make them a better read.

9          Cathy, if you would give these to counsel.

10         THE COURT:  And in your packets, of course, there are

11    both 3.3, if the defendant does not testify, and 3.4, if he

12    does, so I have to remove one.

13         Do you know enough now to remove 3.4?

14         MR. WEST:   I asked if I could spend some time, and I

15    have not had that opportunity yet, so we will know first thing

16    in the morning .

17         THE COURT:  Tell me first thing in the morning.

18         There is a 4.6 in here, I think, which is defendant's

19    conviction of a crime, and, of course, I am not going to use

20    that unless he should testify.  So you will need to remind

21    me -- if he does testify, I will give 4.6; if he does not, we

22    will remove both 3.4 and 4.6.

23         Another issue was -- the next instruction is on

24    expert or opinion testimony.  I'm not sure about that one.

25         I guess -- the only person who -- well, there's

1    Dr. Gaskin.

2              MR. WEST:  We will probably only give this if you

3    allow me to call one of my experts, is what I'm thinking.

4              THE COURT:  That's what my thinking was.

5              What do you think?  Let's say neither one of those

6    defense experts testify.  Would 4.14 still be applicable?

7              MS. ROLLEY:  Yes, I think that's fine, Your Honor.

8              THE COURT:  Fine what?  To take it out?

9              MS. ROLLEY:  If they testify, I think it's fine to

10   leave it in.

11             THE COURT:  But I am talking about if they do not.

12             MS. ROLLEY:  If they do not, take take it out.

13             THE COURT:  Is that with you too, Mr. West?

14             MR. WEST:  There are no other experts.

15             THE COURT:  And did somebody offer 4.16 on charts and

16   summaries?

17             Let's take that out of there.

18             MS. ROLLEY:  I don't think that was ever offered in

19   the pre-conference, Your Honor.

20             THE COURT:  A couple further back, 4.16 is charts and

21   summaries.

22             We don't need that, do we?

23             MR. WEST:  I don't believe I asked for it unless it

24   was by mistake.

25             THE COURT:  That was probably just my mistake.  We

1      will remove that.

2            You will see the edits I made to the offense

3      instructions.

4            I know what is not in here, and I think, Mr. West,

5      you offered it, was 4.8 on impeachment evidence, witness.  You

6      have heard evidence that so and so, a witness, and then it says

7      specifies a basis for impeachment.  The only person I was

8      thinking of was the first witness in this case, Ramos, who had

9      a list of felonies as long as your forearm at least.

10           THE COURT:  Do you want that?

11           MR. WEST:   Both of my lay witnesses tomorrow morning

12     are both people that were in the prison, so they are both

13     felons.

14           I don't know how long there list of felonies is, if

15     it's was one or two, but --

16           THE COURT:  Well, should we give 4.8

17           Do you want 4.8?

18           MR. WEST:  And that's the one that says that these

19     witnesses have a felony, you can consider that, but still --

20           THE COURT:  It says, you may consider this evidence

21     in deciding whether or not to believe this witness and how much

22     weight to give to the testimony of this witness.

23           Do you want that?

24           MR. WEST:  I think we should.  I don't know -- is

25     there a reason not to give it?

1                   THE COURT:  No.

2                   MR. WEST:   I would suggest it is appropriate.

3                   MS. ROLLEY:  That's fine with the government.

4                   THE COURT:  Are you going to ask about West's witness

5        convictions?

6                   MS. ROLLEY:  If he doesn't get it out first, I'm sure

7        we will.

8                   MR. FIGUEROA:  All you are going to find in Safford

9        during the daytime are cops and criminals.

10                  If these guys are not wearing uniforms.

11                  THE COURT:  Let me get some names in so that I can

12       have that prepared for tomorrow.  That guy, Carlos Ramos, was

13       one.

14                  And what are your witnesses names, Mr. West?

15                  MR. WEST:  Darrell Martinez, and the other

16       gentleman's name -- they are on the witness list, sir.

17                  THE COURT:  I'm looking.  Martinez.  And is that --

18       pablo Herrera Davila is the other gentlemen.

19                  And he's going to testify, Herrera Davila?

20                  MR. WEST:  Yes.

21                  THE COURT:  Jose Pablo -- Mary Ellen, we are going to

22       do 4.8, and what I would like you to do -- why don't we just

23       say, you have heard evidence that Carlos Ramos Darrell Martinez

24       and Jose Pablo Herrera-Davila, witnesses, have been convicted

25       of felonies, and then include the second sentence; correct?

1              MR. WEST:  Yes, sir.

2              THE COURT:  Government?

3              MS. ROLLEY:  Yes, Your Honor.

4              THE COURT:  Mary Ellen, if you do that, that's 4.8.

5         And then the other question I have before I have you

6    make a record was -- your predecessor counsel had submitted a

7    self defense instruction, so that's still in the record.  And

8    then you, when you submitted your proposed instructions, you

9    didn't ask for self-defense, you asked for legal justification,

10   which is 6.7.

11             MR. WEST:  I believe that's correct.

12             THE COURT:  And that is in your packet, and self

13   defense is not because since you didn't ask for it, it doesn't

14   not apply any way.  But since you did not ask for it, you, in

15   particular didn't ask for it.

16             MR. WEST:  Right.

17             THE COURT:  Now, are you suggesting that there is

18   some evidence that supports a legal justification instruction,

19   which is 6.7?

20             MR. WEST:  I am.

21             THE COURT:  What is it?

22        What's the evidence?

23             MR. WEST:  Pardon me.

24             THE COURT:  What's the evidence?

25             MR. WEST:  I understand at this point in time it's

1    somewhat scant, but there is evidence of injuries to both
2    Mr. Cranford and my client that would be consistent with
3    somebody trying to forcibly take the hand away from our throat.
4    Surprisingly, a person's mouth is really close to their throat,
5    and so if there is teeth problems with the Cranford's hand,
6    that he had something go on with his hand means his hand had to
7    be up near my client's face.
8            If it's near his face, it's remarkably close to his
9    neck as well, which would then be consistent with what
10   Mr. Cooper was complaining about.  And if we are -- it's part
11   of our defense.  Clearly, I will have to convince the jury that
12   we've even gotten to that point for them to consider it.  I
13   believe the burden is on us to get to that level, so --
14           THE COURT:  Well, the four prongs of justification --
15   prong number two is the defendant did not recklessly place
16   himself in a situation where he would be forced to engage in
17   criminal conduct.
18           And prong three, the defendant had no reasonable
19   legal alternative.  So as to prong three, Mr. Cooper was a
20   prisoner in a federal facility.  His reasonable legal
21   alternative would have to have been to submit to whatever they
22   were telling him to do.  And since he didn't do it, was he
23   reckless in placing himself in that situation?
24           MR. WEST:  It's a question of fact for the jury to
25   determine.

1           We have conflicting stories, and after we put on our

2    case, we are going to have additional conflicting stories as to

3    how this all went down.  And, you know, I believe that he has a

4    right to put a defense on.  The instruction doesn't hurt

5    anybody.

6           THE COURT:  I understand that's your theory.  That's

7    while I am straining to give it to you, but what is the

8    government's position on 6.7, since that is the defense theory

9    of the defense here?

10          MS. ROLLEY:  Your Honor, Mr. West calls it scant

11   evidence.  I don't think that there has been evidence.  There

12   is evidence of injury to him.  No one has testified how he got

13   that injury.

14          The court has pointed out that he had no reasonable

15   legal alternative here.  I think it is clear from the evidence

16   and from what the witnesses have stated he did have a legal

17   alternative, so I don't think that he has proven any of the

18   prongs that are needed for this justification and jury

19   instruction.

20          THE COURT:  So the government objects?

21          MS. ROLLEY:  Correct.

22          MR. WEST:  Your Honor, this dovetails precisely with

23   Dr. Herron's testimony, because if he was truthfully being

24   choked and he feels the life forces going out of his body, his

25   autonomic nervous system, whether they can or cannot pronounce

1          it, is what is going on at this point in time.

2                    THE COURT:  I understand that is your theory.

3                    At the very least, why don't I leave it in there

4          until both sides rest, and then I will call you up.  I won't

5          surprise you.

6                    That's all the questions I had except for -- did you

7          have any problem with the form of verdict, last page?

8                    MS. ROLLEY:  No, Your Honor.

9                    THE COURT:  So are there any further objections to

10         the court's proposed instructions at this point or objections

11         to the refusal to give any other instructions?

12                   MS. ROLLEY:  The government has no objections to

13         either.

14                   MR. WEST:  Judge, I haven't been able to figure out

15         what your modification was.

16                   THE COURT:  Take a look at those three -- I just took

17         out some -- I just noticed it when I was reading, frankly, the

18         indictment that there is this long title to this first guy's

19         position.

20                   If you lay them side by side, you will see there is

21         no substantive difference.  I just -- in the second element, I

22         didn't want to call him Federal Bureau of Prisons Special

23         Investigative Technician Clint --

24                   MR. WEST:  I see. I don't have any problem with

25         that.

UNITED STATES  DISTRICT COURT

1              That was the only modification?

2              THE COURT:  All three of them had --

3              MR. WEST:  Similar -- well, that's not a problem.

4              THE COURT:  Now, Mr. West, I don't know of any others

5     that you requested that you would want to make a record on.  I

6     don't remember.

7              Statements of defendant.  That's in there because his

8     thing on the tape.

9              Oh, I know what it was.  I did not include an

10    instruction on knowingly, which you offered 5.6, and I don't

11    know why you did that.

12             You probably did that to be consistent with your

13    spasmodic reflexive thing to a chokehold, I guess, but I didn't

14    see how knowingly --

15             If I look at the elements of the -- I don't care that

16    much.  I just didn't think it would apply.

17             Did the government care about 5.6?

18             MS. ROLLEY:  No, Your Honor.

19             MR. WEST:  Your Honor, in your instruction of what

20    the charges are, the 8.4-1,2 and 3, where is the mens rea in

21    here?

22             THE COURT:  It's a general intent crime, but --

23             MR. WEST:  He has to intend to assault somebody; it

24    can't be done by an accident, and that's why I put in

25    knowingly, because his intentions have to be -- I mean, we

1       don't have a crime unless there's a mens rea, so they have to

2       prove it beyond a reasonable doubt that he intended to assault

3       these people, or that he acted knowingly.

4                   MR. FIGUEROA:  That's not the law, Your Honor.

5                   MR. WEST:  There is no crime on the books unless it's

6       a per se crime that doesn't have a mens rea to it, this is a

7       crime that is not per se.  There has to be a mens rea of some

8       sort.

9                   MR. FIGUEROA:  Mens rea is just doing the act.  And

10      knowingly is not an element of it.

11                  If the act is done, the statute is satisfied unless

12      it's through some type of fit or something.

13                  THE COURT:  What if Mr. Cooper is out in the hallway,

14      and for whatever reason -- maybe he's having a good day and he

15      goes whoopy, and he throws up his arms and hits a federal

16      officer behind him, didn't even know he was there and breaks

17      his nose.

18                  Has he committed the offense described in 18 USC 111

19      B.

20                  MR. FIGUEROA:  He has, Your Honor, as long as his

21      body acts, but then you would have the defense of accident.

22                  THE COURT:  I don't know of any -- an accidental

23      assault?

24                  MR. FIGUEROA:  The U.S. attorney wouldn't charge it,

25      I guess.

1          THE COURT:  Isn't that that you are saying, Mr. West?
2     There has to be some volition or lack even though it's not a
3     specific intent to cause the particular injury.
4          Actually he doesn't even have to intend the injury,
5     does he?
6          MR. FIGUEROA:  No, he doesn't.
7          MR. WEST:  But he has to intend the act that causes
8     it.
9          MR. FIGUEROA:  But to intend the act just means he
10    wills his body to move.  And there is no knowingly, or there is
11    no intent to assault a federal officer, it's just willing --
12    and we don't have that fact situation here where he was walking
13    down the hall and was gleeful about the fine medical treatment
14    he received at the FCI Safford.
15         We have an assault in which he actively attacked the
16    officer.
17         THE COURT:  We are talking about the jury though,
18    instructing the jury.
19         MR. WEST:  Mens rea actus reus, we have to have both
20    to have a crime.  It's basic 101 law school, 30 some years ago.
21         THE COURT:  Then why didn't they put it in the model
22    instruction?
23         MR. FIGUEROA:  The instructions, as I recall,
24    recommend that no instructions about intent be given.
25         THE COURT:  I am looking at the comment, and it

1        doesn't really say that.

2                 MR. FIGUEROA:  I wish I had my --

3                 THE COURT:  You are talking about they cite a case in

4        a comment that voluntary intoxication is not a defense; it does

5        not require intent to cause the bodily injury.  But what about

6        the intent or the mens rea of the assault?  I mean, implicit in

7        an assault is -- it's an intent.  I mean, that's our common law

8        legal education.  We are talking about instructing a jury here,

9        but clearly there's nothing in 8.4.

10                 MR. FIGUEROA:  The Supreme Case is Feola.  It says

11       all that is necessary is that the act be done.  And then there

12       is Twine Kleinberg (ph) which says that assault on a federal

13       officer is a general intent crime.

14                 Now, there are situations in which, for example,

15       somebody is driving a car, hits the brakes, the brakes don't

16       work, and the police officer's car is rammed, in which that act

17       is so removed from the assault that the mens rea requirement

18       isn't there.  I agree there is mens rea, but to define it for

19       the jury I think is opening up a can of worms.

20                 The statute as written is defined in the model

21       instructions, and the model instructions doesn't have that.

22                 Now, if his defense is that there was some type of

23       accident, or if he was in a fit, then so be it, but there is no

24       evidence of that.

25                 THE COURT:  Oh, wait a minute.

1           I'm given 8.4-B, which says there is a forcible

2   assault when one person intentionally strikes another?  Or

3   willfully attempts to inflict injury on another, or makes a

4   threat.  That what we need.  We don't need knowingly.

5           THE COURT:  One person intentionally strikes another.

6   You can argue that Cooper didn't do that?

7           He's being slammed against a wall and he throws

8   people off; he didn't intend to strike anybody.

9           MR. WEST:  My recollection is there is no intent

10  instruction; right?

11          THE COURT:  I just read it to you.

12          MR. WEST:  No.  What you read to me was what was the

13  definition of forcibly assaultive, and I agree that's correct.

14  But, I mean, honestly the way I believe it should be reading to

15  the effect that he forcibly assaulted -- he intentionally

16  forcibly assaulted these people.  But when you look at the

17  complete instructions, we have the intent instruction, but I am

18  concerned that the jury doesn't understand that to get to this

19  forcibly assaulted, they have to find intent.

20          Does that make any sense?  I know you can define it.

21          THE COURT:  I am going to tell them there is a

22  forcible assault when one person intentionally strikes another.

23          You can argue that that he didn't do that at all and

24  therefore he's not guilty.

25          That's a whole lot better for him than a knowing

1  instruction.

2       MR. WEST:  Okay.

3       THE COURT:  Can they argue that?

4       The reason I misled us is that I took that last

5  paragraph out because I didn't want to read it three times.  So

6  I took it out and put that paragraph as a stand alone to be

7  read after the three count instructions, so I mislead us, so I

8  don't think that we have a problem here.

9       MR. FIGUEROA:  Chapman says that that part has to be

10  in the instruction.

11       THE COURT:  It is.

12       MR. FIGUEROA:  Are you going to put it in as another

13  paragraph in each instruction or just one?

14       THE COURT:  Just one, to follow all three of them.

15       So we don't have a 5.6 problem.  I'm not going to

16  give it.

17       Any other record, Mr. West, on the instructions?

18  Either the ones being begin or the ones refused?

19       MR. WEST:  Not at this time.

20       If I come up with some brilliant insight tonight, may

21  I bring it up again tomorrow?

22       THE COURT:  Probably not, unless I have time to fix

23  it because I am going to have these ready to go tomorrow.  We

24  are going to argue this case.

25       MR. WEST:  I believe so.

1          One other thing, Judge, if I may.  The way I have
2     been working for the last twenty plus years, when I put a
3     witness on a stand who has a felony conviction, I basically
4     will have them admit they committed a felony, but I don't go
5     into the nature of the charges.  And I know that on direct
6     examination with Mr. Ramos they started stringing out all of
7     his offenses.  I think that's inappropriate.
8          THE COURT:  I think they just said what the felony
9     was.  They didn't give any facts.
10          MR. WEST:  My understanding is that it is adequate
11     just for them to admit that they have been convicted of a
12     felony.  You don't have to about into the specific felony
13     unless as you ruled the other day --
14          THE COURT:  Honesty and stuff?
15          MR. WEST:  Yes.
16          THE COURT:  That's my understanding, but --
17          MR. WEST:  I don't want to inadequately direct my
18     client so when they come up and say you have this and this and
19     this and this.
20          THE COURT:  I got you.
21          So Steve puts on his two witnesses, and he wants to
22     steal the thunder.  They are going to say I am convicted of a
23     felony or felonies, and he's not going to say what they are.
24          Does the government have any intention of examining
25     that witness to say, as a matter of fact that witness was child

1    molesting or --

2          MR. FIGUEROA:  If there are any child molesters that

3    will testify.  At this point, they are just drug dealers, and

4    I'd be glad to let him get away with that.

5          THE COURT:  You're not going to have them say what

6    the felony was?

7          MR. FIGUEROA:  No.

8          THE COURT:  I think you're right, but I've seen it

9    both ways, and I haven't had any serious problems with it.

10   Depends on what the felony is, you know.

11         THE COURT:  Again, what I am saying to you, Mr. West,

12   is since I am so firmly entrenched that neither one of these

13   experts can in any way, shape or form assist this jury on any

14   relevant issue or any element of the offenses charged, then I

15   am not going to let them testify.  So what I was saying to you

16   was you can regroup here in a few minutes and see if you don't

17   want to submit just a written offer of proof, so and so witness

18   would testify that chokeholds deprive blood to the brain, blah,

19   blah, and sometimes people involuntarily react.  Or you can do

20   that in open court here yourself and not bother those people.

21         What I am going to try to avoid doing in all events

22   is not bother the jury.  In other words, I don't want you to

23   put on a witness or two and then we have to take a break for an

24   hour because you are going to make an offer of proof with two

25   experts.

1            That I am not going to do.

2            Instead of that, I would have both sides rest, maybe

3      even after arguments.

4            I want you to have your record.  I'm just trying to

5      figure out how to do it so you are satisfied and your record is

6      satisfied, so think about that.

7            MR. WEST:  Your Honor, to be perfectly honest with

8      the court, I don't think that we can satisfy the record.  I

9      don't think that you can completely preclude my experts until

10     you've had a fall offer of proof, and I can't rest until you

11     have done that.

12           What if I can convince you?  What if I convince you

13     that Dr. Herron is relevant and you understand what he's going

14     to say and it clicks.

15           THE COURT:  I'm convinced not by you or the witness,

16     but I am convinced by the evidence or the lack thereof.

17           MR. WEST:  That may get reshaped tomorrow.

18           THE COURT:  Did you have a Rule 29 motion

19           MR. WEST:   For the record I make a Rule 29 motion at

20     this point.

21           THE COURT:  That's denied.  I find sufficient

22     evidence that a jury could find a guilty verdict as to each

23     count.

24           I have a sentencing at 9:00 that is going to take

25     certainly until 9:30, so we can't do anything before then, so

1    just be ready to go at 9:30.

2              MS. ROLLEY:  Thank you.

3              MR. WEST:  Thank you.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES  DISTRICT COURT

1

2

3

4

5                    C E R T I F I C A T E

6

7            I Chris Wallace, certify that I took the shorthand

8      notes in the foregoing matter; that the same was transcribed

9      under my direction; that the preceding pages of 196 typewritten

10     matter are a true, accurate and complete transcript of all the

11     matters adduced, to the best of my skill and ability.

12

13                              s/Chris Wallace
                               _____
14                              CHRIS WALLACE, RPR, CRR

15

16     Dated: July 10, 2012

17

18

19

20

21

22

23

24

25

UNITED STATES  DISTRICT COURT