1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF ARIZONA

3   ----------------------------------)
                                      )
4                                     )
    UNITED STATES OF AMERICA,         )
5                    Plaintiff,       )
                                      )
6            vs.                      ) No. CR 10-00239
                                      )
7   ADRIAN COOPER,                    )        Tucson, Arizona
                     Defendant.       )        May 24, 2012
8                                     )
                                      )
9   ----------------------------------)

10

11                 TRANSCRIPT OF JURY TRIAL DAY THREE

12

13          BEFORE THE HONORABLE CINDY K. JORGENSON
                  UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15

16  For the Plaintiff:   By:   Jesse J. Figueroa & Karen E. Rolley
                               U.S. Attorney's Office
17                             405 W. Congress St., Suite 4800
                               Tucson, AZ   85701
18
    For the Defendant:   By:   Steven D. West
19                             177 N Church Ave., Suite 909
                               Tucson, AZ   85701
20

21
    Mary A. Riley, RMR, FCRR
22  United States Court Reporter
    U.S. District Court
23  405 W. Congress St.
    Tucson, AZ   85750
24

25       Proceedings produced by computer-aided transcription

2

```
 1                      INDEX OF WITNESSES

 2   MARJOE JENNINGS

 3   Direct Examination by Mr. West              Page  4

 4   Cross-Examination by Mr. Figueroa           Page  7

 5   Redirect Examination by Mr. West            Page  8

 6

 7   DURELL MARTINEZ

 8   Direct Examination by Mr. West              Page  10

 9   Cross-Examination by Ms. Figueroa           Page  20

10   Redirect Examination by Mr. West            Page  25

11

12   JOSE PABLO HERRERA-DAVILA

13   Direct Examination by Mr. West              Page  27

14

15   DEFENSE OFFER OF PROOF:

16   JAMES EVANS AIKEN

17   Direct Examination by Mr. West              Page  39

18   STEVEN HERRON, M.D.

19   Direct Examination by Mr. West              Page  45

20   CLOSING STATEMENTS

21   By Ms. Rolley                               Page  57

22   By Mr. West                                 Page  71

23   By Mr. Figueroa                             Page 100

24

25   JURY INSTRUCTIONS                           Page 113
```

TRANSCRIPT OF PROCEEDINGS

1

2    (9:42 a.m.)

3         MR. FIGUEROA:  You included in the proposed inclusions

4    instruction number 4.1, which is an instruction that is given

5    when a defendant makes a statement.

6         THE COURT:  Yes.

7         MR. FIGUEROA:  He did not make a statement.

8         THE COURT:  Well, because of the videotape.

9         MR. FIGUEROA:  Oh, okay.

10        THE COURT:  He made a number of statements there.

11        MR. FIGUEROA:  Okay.  All right.

12        THE COURT:  Actually one, about being choked.

13        MR. FIGUEROA:  Okay.  All right, thank you.

14        THE COURT:  That's the only reason I --

15        MR. FIGUEROA:  All right.

16        THE COURT:  I mean, unless you --

17        MR. WEST:  I think that's appropriate, Judge.  I think

18    that should be given.

19        THE COURT:  All right.

20        (The jury entered the courtroom.)

21        THE COURT:  We now have our jury in the box.

22        Good morning, folks.

23        THE JURY:  Good morning.

24        THE COURT:  And Mr. West, the government having rested,

25    do you have a witness to call?

1     MR. WEST:  I do, your Honor.  The witness -- first

2 witness I'd like to call is Special Agent Marjoe Jennings.

3     THE COURT:  Is that you?  Come forward please, sir.

4     (Marjoe Jennings was duly sworn by the clerk.)

5     THE COURT: All right.  Go ahead, Mr. West.

6     MR. WEST:  Thank you.

7         MARJOE JENNINGS

8        DIRECT EXAMINATION

9 BY MR. WEST:

10 Q Good morning, sir.

11 A Good morning.

12 Q You were -- you work for the F.B.I., correct?

13 A Correct.

14 Q And how long have you been working for the F.B.I.?

15 A Since April, 2010.

16 Q All right.  And at some point in time you have become

17    involved with this case, correct?

18 A Correct.

19 Q And I believe it was in April of 2011 you went out to the

20    Safford facility and conducted some interviews?

21 A If that's -- you -- if you have a paper that says that.  I

22    do not -- refresh that memory.

23 Q Okay.  Anyways, to prepare for those interviews you did go

24    to the facility and conduct some interviews, correct?

25 A If that's what you have, a 302 that says -- I do not recall

1       that.

2    Q  You don't recall going out there?  Assuming for the

3       moment -- and I'll get the paperwork --

4    A  I have done interviews at Safford.  If that's -- if that's

5       the correct date.  I just don't recall.

6    Q  You're just not sure about the date?

7    A  Correct.

8    Q  Not --

9    A  Right.

10   Q  But you did go to Safford, and you did conduct interviews --

11   A  At some point.

12   Q  -- regarding this case?

13   A  Yes.

14   Q  Okay.  All right.  So since you weren't the original F.B.I.

15      agent that did this, I'm assuming that you reviewed the

16      file?

17   A  Correct.

18   Q  Okay.  And when you reviewed that file, did you determine

19      which witnesses had been interviewed?

20   A  Yes.

21   Q  Okay.  And can you tell the jury which one of the inmates

22      were interviewed back in 2009 based upon your review of the

23      file?

24   A  I can't tell you that right now.

25   Q  Do you know if any of those inmates were interviewed at any

1       time?

2   A   I know that --

3           MR. FIGUEROA:  Objection.  Calls for -- calls for

4   hearsay.

5           THE COURT:  No, overruled.

6           THE WITNESS:  I know that the inmate Cooper was

7   attempted to be interviewed.

8   BY MR. WEST:

9   Q   Okay.  I'm showing you what's in evidence Exhibit Number 82.

10      That's a sign-in sheet for the inmates that were over at the

11      medical unit on the morning of this incident, correct?

12  A   That appears to be so.

13  Q   Okay.  Did you interview -- or anybody with the F.B.I. based

14      upon your review of the file interview any of those people?

15  A   I would have to look at the file, sir.

16  Q   Okay.  Do you have any information about any inmate being

17      interviewed by the F.B.I. before April of 2012?

18  A   Before April of 2012?  I -- I do not know, sir.

19  Q   Okay.  You did review the file, correct?

20          MR. FIGUEROA:  Asked and answered, your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  In 2011, sir, yes.

23  BY MR. WEST:

24  Q   Okay.  You're the designated case agent as you sit here

25      today?

1    A    Today, yes.

2    Q    Okay.  Did you become familiar -- you were here yesterday as

3         well, correct?

4    A    Yes, sir.

5    Q    Did you become familiar with the file in order to be the

6         designated case agent to sit here in trial?

7    A    I reviewed the witnesses that I saw that were going to be

8         called, sir.

9    Q    Okay.  But you have seen the F.B.I. file, correct?

10   A    Yes, sir.

11   Q    Okay.  And you don't have any recollection of ever seeing

12        any interviews being conducted of any of the inmates that

13        are on this list in Exhibit 82, correct?

14   A    I do not, sir.

15   Q    Okay.

16             MR. WEST:  That's all the questions, I have, Judge.

17             THE COURT:  All right.

18             Questions?

19             MR. FIGUEROA:  Yes, I've got a couple questions.

20                           CROSS-EXAMINATION

21   BY MR. FIGUEROA:

22   Q    Now, when Mr. West talks to you about the F.B.I. file, that

23        is not the disclosure file that was presented to him, is

24        that correct?

25   A    That is correct, sir.

1   Q    All right.  Are you aware that he has been provided with

2        over 700 pages of disclosure in this case?

3   A    That's correct.

4             MR. WEST:  Objection.  Relevance, your Honor.

5             THE COURT:  Overruled.

6             THE WITNESS:  That is correct, sir.

7   BY MR. FIGUEROA:

8   Q    And is the F.B.I. file anywhere near that amount?

9   A    It is not.

10  Q    And so it's probable that there's a lot of things in the

11       disclosure that is not in the F.B.I. file?

12  A    That is correct.  In fact, I have it with me.  It's

13       approximately this thick.  (Indicating.)

14  Q    Did you in any way interfere with the defense's ability to

15       interview anybody on that list?

16  A    I did not.

17  Q    Do you know if anybody from the F.B.I. interfered in any way

18       with the defendant's ability to interview people on that

19       list?

20  A    Absolutely not.

21            MR. FIGUEROA:  That's all I have, your Honor.

22            THE COURT:  Any redirect, Mr. West?

23                         REDIRECT EXAMINATION

24  BY MR. WEST:

25  Q    Talking about interviews, is it general practice with the

```
 1          F.B.I. to have victims present during interviews of eye
 2          witnesses?
 3               MR. FIGUEROA:  Objection, your Honor.  This is
 4     improper.
 5               THE COURT:  Sustained.
 6     BY MR. WEST:
 7     Q    You said you have the entire F.B.I. file here?
 8     A    Yes, sir.
 9     Q    Okay.  You reviewed that file?
10     A    Yes, sir.
11     Q    And did you find a single interview in that file referencing
12          an interview of an inmate?
13               MR. FIGUEROA:  Objection, your Honor.  I think it's
14     improper redirect.
15               THE COURT:  I'm going to let him answer that question.
16               THE WITNESS:  Can you restate the question, sir?
17     BY MR. WEST:
18     Q    You have the F.B.I. file here, correct?
19     A    Correct.
20     Q    You've reviewed that file, correct?
21     A    Correct.
22     Q    And when the F.B.I. interviews somebody, they write a
23          report, correct?
24     A    Correct.
25     Q    So you reviewed the file to see what interviews were
```

1           conducted, correct?

2    A      Correct.

3    Q      And did you find a single interview in there of any inmate?

4    A      I believe an inmate was interviewed last month.

5    Q      So except for Mr. Ramos that was interviewed in April of

6           2012, there was no other inmate interviewed, correct?

7    A      In addition to inmate Cooper?

8    Q      Was he interviewed?

9    A      He was attempted to be interviewed.

10   Q      Okay, but he wasn't interviewed, so there's no report,

11          correct?

12   A      Right.

13   Q      That's it, right?

14   A      Yes.

15          MR. WEST:  Thank you.

16          MR. FIGUEROA:  I have nothing, your Honor.

17          THE COURT:  All right, agent.  You may stand down.

18   Thank you.

19          Call your next witness.

20          MR. WEST:  Yeah, your Honor, I'll call Durell Martinez.

21          THE COURT:  Somebody will need to get him, I guess.

22          Step forward over here, please, sir.

23          (Durell Martinez was duly sworn by the clerk.)

24          THE COURT:  Go ahead.

25                        DURELL MARTINEZ

1                       DIRECT EXAMINATION

2     BY MR. WEST:

3     Q    Good morning, sir.

4     A    Good morning.

5     Q    Ever testify in a courtroom before?

6     A    Never.

7     Q    Okay.

8     A    No.

9     Q    Okay, nervous?

10    A    Very nervous.

11    Q    Okay.  Just listen to the questions, answer them if you know

12         what the answers are, and try to relax as best you can,

13         okay?

14    A    Okay.

15    Q    Mr. Martinez, it's our understanding that you were an inmate

16         at the FCI Stafford -- or Safford, excuse me, back on July

17         of 2009?

18    A    Yes.

19    Q    Okay.  And did you have a recollection of having seen an

20         incident occur in the -- in the medical unit over there?

21    A    Yes, I do.

22    Q    All right.  Now, I'm going to show you a list here, Exhibit

23         Number 82, and you can actually go to the screen there, I

24         believe, and can you point to your name on that list?

25    A    Yes, I see it.  Right here.

1   Q   Okay.  Can you just see if you can make a circle around it

2       just for right now?

3           Beautiful.  Thank you.

4           Now, do you know how your name got on that list?

5   A   No.  I don't recognize the form.

6   Q   Okay.  Did you check in with somebody when you came to the

7       medical unit to see the doctor?

8   A   Yes, I think we did.  I think I did.

9   Q   All right.

10  A   I did.

11  Q   All right.  So tell us about being in the waiting room,

12      okay?

13          How many people were in that waiting room?

14  A   There had to have been about at least 10 to 15 of -- of us

15      inmates in the waiting room.

16  Q   There's chairs that go all around the -- the waiting room

17      correct?

18  A   Correct.  And then I -- there was chairs also in the middle

19      of the waiting room.

20  Q   Okay.  And were -- were most of those chairs occupied?

21  A   Yes.

22  Q   All right.  And did you ever -- do you remember

23      approximately how long you had -- well, did you ever see the

24      doctor that day?

25  A   No.

1   Q   All right.  Do you remember how long you had to wait before

2       this incident happened?

3   A   Anywhere from half an hour to 45 minutes.

4   Q   Okay.  Was anybody in that room grumbling about having to

5       wait for the doctor to show up?

6   A   Yes.

7   Q   When -- I guess, what was the general mood in there?  You

8       know, it looks like there's a lot of people sitting there

9       waiting.

10  A   Yeah, well, I mean, you know, it was quite a wait, you know,

11      so there was, you know, quite a few of us that were getting

12      impatient, you know, and the mood of the room was -- it was

13      quiet, you know.  I don't think nobody really knew each

14      other, you know, so everybody was --

15  Q   All right.  Do you recall Mr. Cooper?

16  A   Yes, I do.

17  Q   Okay.  And can you tell us where he's sitting, and what he's

18      wearing?

19  A   Today, in this room?

20  Q   Yeah.

21  A   He's sitting over there with the black suit on, white tie.

22  Q   Okay, white shirt?

23  A   Yeah.

24  Q   That's fine?

25          MR. WEST:  May the record reflect he's identified

1   Mr. Cooper, sir?

2             THE COURT:  Yes.

3             MR. WEST:  Thank you.

4   BY MR. WEST:

5   Q   Now, did you see anything unusual happen regarding

6       Mr. Cooper?

7   A   On?

8   Q   Well, while you were at the -- at the medical unit.

9   A   Yeah, I -- I noticed the gentleman was getting a little --

10      very impatient, and just -- I -- questioning the -- the

11      staff there, why the wait was so long.

12  Q   Okay.

13  A   And from -- from there on, you know, some -- excuse me, some

14      voices kind of escalated, you know.  I don't know what was

15      said, but I remember hearing -- you know, not very loud, but

16      you know, an impatient voice, you know --

17  Q   Yeah.

18  A   -- inquiring why the wait was so long.

19  Q   Okay.  And where was that taking place?

20  A   I believe it was the nurse's station window.

21  Q   Okay.  Inside the waiting room?

22  A   Inside the waiting room, yes.

23  Q   Okay.  What happened next?

24  A   There was -- it continued to escalate.  It kind of -- like,

25      a -- like, into an argument, like, almost.  Words were

1       exchanged between Mr. Cooper and the nurse.  Then after a

2       while -- you know, I didn't pay attention, you know, to what

3       was being said, you know.  I just -- you know, it was none

4       of my business so I didn't really, you know, pay attention

5       to what was said, but after a while I believe the nurse, you

6       know, unprofessionally, I would say, you know, kind of, you

7       know, got upset as well, and tried to have Mr. Cooper sit

8       down, which he did but then, you know, I guess -- you know,

9       he was -- he was upset still because of the wait.

10  Q   Sure.  Let me interrupt you, sir.  You said that somebody --

11      when you say nurse, are you talking about a female person?

12  A   Yes.

13  Q   Okay.  Did you know the staff there very well?

14  A   No.  I only had been there, like, a few days before this

15      incident.

16  Q   Okay.  Is it fair to say that a female person came and

17      directed him to sit down someplace?

18  A   Yeah.

19  Q   Okay, and where did that take place?

20  A   In the waiting room.  Right in the middle of the waiting

21      room.

22  Q   All right.  And -- and what did Mr. Cooper do when he was

23      told to sit down?

24  A   I -- his voice was raised again, and you know, at that point

25      I think he was upset and stood back up and was, you know,

1      exchanging words again with the staff there.

2   Q  Okay.  And what happened next?

3   A  He was pulled into a hallway where I couldn't see, you know,

4      outside of the waiting room.

5   Q  Okay.  Hang on a second.  I'm going to show you Exhibit

6      Number 1 that's in evidence.  Okay.  This has been put into

7      evidence, and -- and here's the waiting room.

8          Do you recognize the double doors here that go outside?

9   A  Yes.

10  Q  Okay.  And these are the double doors that go up the long

11     hallway.  Do you recognize that?

12  A  Yes.

13  Q  Okay.  And you said you -- you were seated in the waiting

14     room.  Can you tell the jury -- and you can just -- just

15     point and touch the screen there and you can show

16     approximately where you were sitting.

17  A  Approximately right here.

18  Q  Okay.  Can you make, like, an X mark there for us?

19         Beautiful.  Thank you.

20         Okay.  And this -- I don't know which way you see it.

21     I guess this -- this window here -- well, first of all, is

22     it a window?

23  A  Yes.

24  Q  Okay.  And can you see into the secretary area that way?

25  A  If you're standing directly in front of it, yes, you can.

```
 1   Q   Okay.  All right.  So I believe you told me that somebody
 2       came and told him to go out into the hallway?
 3   A   Correct.
 4   Q   Okay.  And did he follow those instructions?
 5   A   Yes.
 6   Q   Did you -- were you able to see out in the hallway now what
 7       was taking place?
 8   A   No.  I could see the hallway, but they were around the
 9       corner where I couldn't see, but just hear talking and stuff
10       like that.
11   Q   So you could hear things going on?
12   A   Um-um.
13   Q   Okay.  After he was taken out into the hallway, what
14       happened next?
15   A   Again, you know, I couldn't see what was going on, but I
16       could hear.
17   Q   Okay.
18   A   Sounded like something -- like an argument.
19   Q   Did you see anybody else arrive?
20   A   Shortly after two correction officers walk in from -- from
21       the outside.
22   Q   Okay.  And did you -- were you able to identify what type of
23       officers they were?
24   A   I believe -- they were SIS officers, I believe.
25   Q   Okay.  And how were they dressed?
```

| | | |
|---|---|---|
| 1 | A | In their uniforms.  White t-shirt, blue pants. |
| 2 | Q | So white shirts and blue pants? |
| 3 | A | Yes. |
| 4 | Q | Okay.  What did you see next -- or what did you see or hear |
| 5 | | next? |
| 6 | A | Again, you know, I couldn't see, but I could hear where |
| 7 | | everybody was around the corner, and heard some fumbling, |
| 8 | | like, you know, could have been -- you know, like, |
| 9 | | wrestling, or like -- I couldn't -- I can't tell you what it |
| 10 | | was, but I heard.  You know, it was pretty loud. |
| 11 | Q | Okay.  Did you see anything after that? |
| 12 | A | Yeah, I seen one of the correction officers fall down to the |
| 13 | | ground, and then -- |
| 14 | Q | And how were you able to see him? |
| 15 | A | Because he -- he fell in the door area that you walk |
| 16 | | straight back to the hallway. |
| 17 | Q | Okay.  Can you show the jury, maybe put an X mark |
| 18 | | approximately where it was that you saw him falling down? |
| 19 | | Okay, so just outside the double doors that would go |
| 20 | | into the medical unit? |
| 21 | A | Correct. |
| 22 | Q | Okay.  What happened after that? |
| 23 | A | I seen the -- the officer get back up and go back to around |
| 24 | | the corner where I couldn't see, heard some more, you know, |
| 25 | | fumbling, I guess you would call it, and then more |

1   correction officers came running, and told us to get out.

2 Q Okay.  So did they all stay in the room that you were in,

3   these other officers that came, or did some of them go in

4   the hallway, or what happened?

5 A I believe they all went in the hallway, but you know, at

6   that same time is when I was -- me and all, you know, the

7   rest of the inmates were escorted out.

8 Q Okay, being told to leave, and you're being told to leave

9   through this door and exit back out into the compound?

10 A Correct.

11 Q Okay.  Did anybody, prior to my office contacting you,

12   interview you about this case?

13 A No, sir.

14 Q So the first time you had any contact with anybody about

15   this case was when my office contacted you?

16 A Yes.

17    MR. WEST:  No further questions -- I'm sorry.  One more

18 question.

19    THE COURT:  Sure.

20 BY MR. WEST:

21 Q Would you have refused to -- to talk to people about this

22   incident if they would have -- you know, if somebody from

23   the prison or the F.B.I. came and talked to you?

24 A Yes, I probably would.

25 Q Okay.  All right.  But you're okay to talk now, is that

1      right?

2  A    Yes.

3           MR. WEST:  All right, thanks.

4           THE COURT:  Mr. Figueroa?

5                         CROSS-EXAMINATION

6  BY MR. FIGUEROA:

7  Q    Good morning.

8  A    Good morning.

9  Q    My name's Jesse Figueroa.  I'm one of the prosecutors in

10      this case.

11           Now, you testified that you would have been -- you

12      probably would not have spoken to one of our representatives

13      who -- if we went to speak to you about this incident while

14      you were in prison?

15  A    Correct, yeah.

16  Q    And that is because you didn't want to be branded a snitch,

17      is that right?

18  A    Correct.

19  Q    And if you would, in fact, give testimony helping the

20      government, there would have been a danger to you, isn't

21      that right?

22  A    I believe so.  Yeah.

23  Q    Now, you are no longer in prison, so then there is no danger

24      to you now, is that right?

25  A    Correct.

1   Q   Okay.  And isn't it part of the -- I forgot where I was

2       going.

3           Okay.  Here.  You -- you were there waiting to see a

4       doctor?

5   A   Correct.

6   Q   Now, what was your ailment?

7   A   It was actually part of their processing, being new to the

8       to the prison there.

9   Q   Okay.

10  A   Every inmate has to go through a medical screening --

11  Q   Okay.

12  A   -- as part of processing.

13  Q   But you -- there were other people there on this list -- how

14      do I make this --

15          THE CLERK:  There's a little wheel there.  Right there.

16          There you go.

17  BY MR. FIGUEROA:

18  Q   And I'm referring to Exhibit 82.  There are other people on

19      this list.  Did you know any of these people?

20  A   No.

21  Q   Do you know why they were waiting to see a doctor?

22  A   No, I don't.

23  Q   Now, you see where it says emergency sick call canceled?

24  A   Yes.

25  Q   All those people below Jose Herrera-Davila didn't get to see

1   a doctor that day, isn't that right?

2 A Yes.

3 Q And the reason why they didn't get to see a doctor was

4   because Mr. Cooper had decided to get into a fight with

5   corrections officers, isn't that correct?

6     MR. WEST:  Objection, your Honor.  May we approach?

7 Move to strike.

8     THE COURT:  No, sustained.

9 BY MR. FIGUEROA:

10 Q At any rate, you did not get to see a doctor that day?

11 A No.

12 Q And you were told to leave after there was this altercation

13   that you witnessed?

14 A Yes.

15 Q Now, everyone was getting impatient?

16 A Yes.

17 Q Because they thought that they were waiting too long to see

18   a doctor?

19 A Yes.

20 Q And you were impatient?

21 A I was getting a little impatient, yes, myself.

22 Q And other people there were impatient?

23 A Were impatient, yes.

24 Q Did you see any of these other people attack an officer?

25 A No.

| | | |
|---|---|---|
| 1 | Q | Did you attack an officer? |
| 2 | A | No. |
| 3 | Q | Did you to express your impatience get in a nurse's face and |
| 4 | | express your impatience that way? |
| 5 | A | No. |
| 6 | Q | So Cooper was the first one to really question the staff |
| 7 | | about the wait there, isn't that right? |
| 8 | A | Yes. |
| 9 | Q | And he was the first one to become angry, isn't that right? |
| 10 | A | No.  We -- like I said, there was quite a few that were |
| 11 | | impatient and making, you know, comments under their breath, |
| 12 | | you know, but -- so he wasn't really the only one that was |
| 13 | | kind of upset. |
| 14 | Q | But he -- I'm sorry, but he was the first one to confront a |
| 15 | | nurse or secretary about it, isn't that right? |
| 16 | A | Yes. |
| 17 | Q | In fact, he was the only one that confronted a nurse or |
| 18 | | secretary over that, isn't that right? |
| 19 | A | Yes. |
| 20 | Q | Now, prison is filled with all kinds of different people, |
| 21 | | isn't that right? |
| 22 | A | Yes. |
| 23 | Q | And that's true of the prison in Safford, isn't that right? |
| 24 | A | Yes. |
| 25 | Q | And isn't it true that it is not the safest place to be? |

1   A   Yes.  It's not.

2   Q   And isn't it true that order has to be maintained at that

3       prison?

4   A   Yes.

5   Q   And has to be maintained for the safety of the staff, is

6       that correct?

7   A   Yes.

8   Q   And it also has to be maintained for the safety of the

9       inmates, isn't that correct?

10  A   Yes.

11  Q   So while you have the ability at Safford to, say, go to a

12      cabana and watch TV, or to play sports, you really know all

13      the time that you are in prison, is that right?

14  A   Yes.

15  Q   And you also know that in order to maintain control of the

16      facility, assure the safety of the officers, assure the

17      safety of the doctors and dentists, assure the safety of the

18      inmates, that you have to listen to what the correctional

19      officers tell you to do, isn't that true?

20  A   Yes.

21  Q   And you -- you also know that you're not supposed to raise

22      your voice to them, because that -- that compromises the

23      security of the facility, is that not true?

24  A   Yes.

25  Q   Now, you couldn't see the struggle that you heard?

1   A   No.

2   Q   Because you were in the waiting room, and that occurred in

3       the hallway?

4   A   Yes.

5   Q   Okay.  But you did see a correction officer fall to the

6       ground?

7   A   Yes.

8   Q   Do you remember saying to Ken D'Agostino, the defense

9       investigator, that you saw him fly against the hallway?

10  A   Yes.

11  Q   Okay.

12          MR. FIGUEROA:  I don't have any further questions, your

13  Honor.

14          THE COURT:  Any redirect, Mr. West?

15                      REDIRECT EXAMINATION

16  BY MR. WEST:

17  Q   When you were watching what was going on with Mr. Cooper,

18      did you think that he was affecting the safety of the

19      facility when he was complaining about the medical

20      treatment?

21          MR. FIGUEROA:  Objection, your Honor, it's a -- calls

22  for speculation.

23          THE COURT:  Overruled.  I'll allow it.

24          THE WITNESS:  No.

25  BY MR. WEST:

1   Q    You said that the nurse acted unprofessionally.  Do you

2        remember that?

3   A    Yes.

4   Q    What was the appearance of her behavior towards Mr. Cooper?

5            Was she trying to calm him down, or was she trying to

6        agitate him?

7            MR. FIGUEROA:  Objection, your Honor.  Improper

8   redirect.

9            THE COURT:  Sustained.

10  BY MR. WEST:

11  Q    You can't answer the question.

12           MR. WEST:  Well, may we approach, because --

13           THE COURT:  No.

14           MR. WEST:  All right.

15  BY MR. WEST:

16  Q    Did you think that the actions -- the unprofessional actions

17       of the nurse --

18           THE COURT:  Here's the problem with those questions,

19  Mr. West.  It's not proper redirect.  You're on redirect.

20           MR. WEST:  All right.  I'll rephrase the question.

21           THE COURT:  It should pertain to the questions asked on

22  cross.

23           MR. WEST:  Very good.

24  BY MR. WEST:

25  Q    Did you think that the nurse's actions were --

```
 1            THE COURT:  Same objection.  You can go on to some
 2   other topic, Mr. West.
 3   BY MR. WEST:
 4   Q    To assure the safety of the facility, did you think that the
 5        nurse's actions were compelling a safe behavior, or was it
 6        making things worse?
 7   A    I would say making things worse.
 8            MR. WEST:  Okay.  Thank you.
 9            THE COURT:  All right.  You may step down and be
10   excused, sir.  Thank you.
11            MR. WEST:  I'll get my next witness.
12            (Jose Pablo Herrera-Davila was duly sworn by the
13   clerk.)
14                    JOSE PABLO HERRERA-DAVILA
15                      DIRECT EXAMINATION
16   BY MR. WEST:
17   Q    Would you spell your last name, please?
18   A    Herrera.  H-E-R-R-E-R-A.
19   Q    And how do you spell Davila?
20   A    D-A-V-I-L-A.
21   Q    Thank you, sir.
22   A    You're welcome.
23   Q    Mr. Herrera -- is that how I should address you?
24        Mr. Herrera, correct?
25   A    That's correct.
```

1   Q   All right.  Mr. Herrera, you -- back in July of 2009 you

2       were an inmate at the FCI Safford, is that correct?

3   A   That's correct.

4   Q   Okay.  And you've been previously convicted of a felony.

5       That's why you were there, that you were sentenced to

6       prison, right?

7   A   Yes.

8   Q   Okay.  So there was an incident that happened back in July

9       of 2009 in the medical unit.  Did you remember that

10      occurring?

11  A   Pretty much, because I was there suffering from my high

12      blood pressure and my legs swollen.  It's, like, right now I

13      can show you.  Same thing right now.  Okay.  And then I was

14      asking for a medical attention, like everyone else, you

15      know.  Yeah, and --

16  Q   And did you see something go on with a big guy?

17  A   Yes, I remember because it was right by my side, you know.

18      He was complaining, like everyone of us, about medical

19      attention.

20  Q   Okay.

21  A   And suddenly the secretary was in her office, and come out

22      of the office, and --

23  Q   Okay -- we'll go step-by-step.

24  A   Okay.

25  Q   Let me ask questions, all right?

1        So the gentleman sitting over here at -- at counsel

2     table, do you recognize him?

3   A  No, but -- no, not at all.

4   Q  Okay.  Do you remember there being -- can you describe the

5     guy you were just talking about?

6        What did he look like?

7        How big was he?

8   A  He was a big guy.  He was a black guy, you know.  Big, tall

9     guy, you know, and -- and suddenly he get into an

10    argument --

11  Q  All right.

12  A  -- because -- for the same thing, asking for proper medical

13    attention.  That's all we was asking, so he was asking for

14    the same thing.

15  Q  Were -- did it appear that people were, including yourself,

16    dissatisfied with the medical attention you were getting at

17    the -- at the clinic?

18       Were you dissatisfied with the medical attention at the

19    clinic?

20  A  Come on.  Come on, Mr -- please.

21  Q  They've never spoken with you.  They don't know.

22  A  Okay.  No, nobody was satisfied.  I was paralyzed because of

23    that.  I was a healthy man.

24       MR. FIGUEROA:  Your Honor, may I ask that he not

25  narrate?  Just answer the question.

1       THE COURT:  Yes, respond to the question, would you

2  please, sir?

3       THE WITNESS:  No, we wasn't -- I wasn't.

4  BY MR. WEST:

5  Q    You weren't happy with the service?

6  A    Of course not.

7  Q    Okay.  Did you have a stroke out there out at Safford?

8  A    That's correct.

9  Q    Okay.  And then you had to be taken to a -- a better

10       medical -- in fact, you went to an FCI medical facility,

11       correct?

12 A    Yes, after I -- after I -- they release me from some

13       hospital here, St. Joseph Hospital in Tucson, they flew me

14       to Rochester, Minnesota, Medical Center.

15 Q    Okay.  And has it taken you a while to recover from that

16       stroke?

17       MR. FIGUEROA:  Objection.  It's all irrelevant.

18       THE COURT:  Sustained.

19 BY MR. WEST:

20 Q    Okay.  We're going to move on from that, okay?

21       Now, let's go back to -- I have a -- a list here that I

22       want to show you.

23       Can you see that okay over there?

24 A    Excuse me?

25 Q    Can you see that on your screen, the list?

| | | |
|---|---|---|
| 1 | A | Yeah, I can see everything. |
| 2 | Q | This is Exhibit 82.  Is your name on that list? |
| 3 | A | Yes.  One, two -- |
| 4 | Q | Can you take your finger and touch the screen, and you can |
| 5 | | circle your name.  Could you do that for us? |
| 6 | A | Right here. |
| 7 | Q | Okay.  You've kind of put a line through your name, but it's |
| 8 | | Jose Herrera-Davila, correct? |
| 9 | A | That's me. |
| 10 | Q | All right.  And you didn't get a chance to see the doctor |
| 11 | | that day, correct? |
| 12 | A | No, sir. |
| 13 | Q | All right.  Something happened at that -- at the medical |
| 14 | | visit, correct? |
| 15 | A | Yes.  A lot of things happened. |
| 16 | Q | Okay.  On this day when you saw -- well, did you later learn |
| 17 | | that the fellow that was the -- the big guy, that his name |
| 18 | | is -- is Mr. Cooper? |
| 19 | A | Yes, because he's -- from that particular moment, he |
| 20 | | disappeared.  I hear some -- |
| 21 | | MR. FIGUEROA:  Your Honor, may I raise the same |
| 22 | objection, please? | |
| 23 | | THE COURT:  Yes. |
| 24 | | Just answer the question that's put to you. |
| 25 | | THE WITNESS:  Yeah.  I never hear again from him. |

BY MR. WEST:

Q   Okay.  But you've learned that that big guy's name was
    Cooper, correct?

A   Eventually, yes.

Q   All right.  Okay.  So now when -- when Mr. Cooper -- was he
    complaining about medical treatment there?

A   Yes.  Like everyone else.

Q   What happened -- what happened next?  Did somebody come and
    talk to him?

A   Yes.  The secretary come out of the office and start talking
    to him.

Q   Okay.

A   But while she's talking to him, pushed the button.  So
    suddenly come the -- all the CO's, and --

Q   Okay, let's back up a second.  You're in the waiting room,
    right?

A   Right.  Yes, sir.

Q   And you see this verbal confrontation going on between
    Mr. Cooper and one of the female employees?

A   Yes.  That's right.

Q   Okay.  And you just said something about the lady pushed a
    button.  Can you explain to the jury what the button is that
    you saw being pushed?

A   Well, when you push the button and here's one of the sides
    of the -- I don't know what side it was, you know, but she

1     push the button, because he was right before me, and

2     suddenly -- while at the same time it was, "Are you with

3     Mr. Cooper?"  And suddenly the CO's came, and they took us

4     outside, you know, because they don't want to see.

5  Q  Okay.  Before the CO's came -- and that's the correction

6     officers, right?

7  A  (No verbal response.)

8  Q  And you have to say yes.  You can't nod.

9  A  Yes, sir.

10 Q  All right.  Before they came, did Mr. Cooper stay in that

11    room the entire time, or did he go someplace else?

12 A  No, they -- the secretary tells -- tell him to go inside to

13    the medical.  He --

14 Q  Okay.  We have an exhibit here.  This -- this shows us

15    the -- the building for the medical unit, okay?

16 A  Okay.

17 Q  Do you see that there?

18 A  Yes, sir.

19 Q  All right.  And over here we have the waiting room?

20 A  That's right.

21 Q  Okay, and this is the doors going outside, correct?

22 A  That's correct.

23 Q  And these are the doors going back to where the doctors and

24    the dentists are?

25 A  That's correct.

1   Q   So can you tell us where -- where you saw him taken?

2   A   Excuse me?

3   Q   Can you tell us where you saw Mr. Cooper being taken?

4           Okay.  You've drawn a line, and you've shown that he

5       went into the hallway, is that right?

6   A   Yeah.

7   Q   Okay.  Were you able to see or hear anything in the hallway?

8   A   Yes, I hear a struggle when the CO's appeared from

9       everywhere, and that's just trouble.  And they tell us to

10      get out of there, you know?  I mean, out of the blue chairs.

11      And I never saw Mr. Cooper again.

12  Q   Okay.  When Mr. Cooper -- well, you understand that for

13      safety reasons if you're given an order, you're supposed to

14      follow it, right?

15          If the CO's give you an order, you're supposed to

16      follow the order, right?

17  A   That's correct.

18  Q   And was Mr. Cooper told to go out into the hallway?

19  A   Excuse me?

20  Q   Was he told to go out into the hallway?

21  A   Yeah.  The secretary told Mr. Cooper to go into the hallway.

22  Q   Okay.  Was he following the instructions he was given?

23  A   That's correct.

24  Q   Okay.  Did you hear or see anything else regarding

25      instructions that were given to him before the CO's got --

1          got there?

2    A    Well, I just -- there was arguing, keep arguing, but I

3         didn't hear anything because they was already inside of the

4         hallway -- the particular hallway right there.

5    Q    So you couldn't see?

6    A    I can't see it.

7    Q    You could hear?

8    A    Yes.

9    Q    Could make out any words?

10   A    No.  No.  She was arguing.  That's all.

11             MR. WEST:  Okay.  That's all the questions I have.

12             Thank you.

13             THE COURT:  Any questions, Mr. Figueroa?

14             MR. FIGUEROA:  May I have just one second?

15             THE COURT:  Sure.

16             MR. FIGUEROA:  Your Honor, I have no questions for this

17   witness.

18             THE COURT:  All right.

19             Sir, you can stand down, be excused.  Thank you.

20             THE WITNESS:  That's it?

21             THE COURT:  Be careful stepping down.

22             THE WITNESS:  Oh, you're welcome.  You're welcome.

23             MR. WEST:  May we approach?

24             THE COURT:  Yes.  Come on up.

25                          BENCH CONFERENCE

1    MR. WEST:  I have Dr. Herron and Mr. Aiken here to

2  present my offer of proof or testify, so I am suggesting that we

3  release the jury at this point in time, do the offer of proof as

4  quick as we can, and if you want me to put them on -- if not,

5  I'll rest.

6    MR. FIGUEROA:  This is evidence of --

7    THE COURT:  Other than the offer of proof, you're done?

8    MR. WEST:  Yeah, but I'm not going to rest until,

9  obviously, we make that decision.

10    THE COURT:  Well, can you do this expeditiously?  That

11  is, would you stipulate to credentials, and we're not talking

12  about the actual qualifications?

13    MR. WEST:  I'm assuming what I'm going to -- I've told

14  both of them we're just going to do nuts and bolts, get a feel

15  for what they're talking about.  It won't be the entire

16  testimony, but get the feel for their testimony.

17    MR. FIGUEROA:  You -- we've already done this with

18  Mr. Aiken.

19    MR. WEST:  We have not.

20    MR. FIGUEROA:  There was a list of the things that he

21  would have testified to.  It's already been denied.

22    MR. WEST:  Your Honor, that's not a true statement.

23    THE COURT:  So let's assume -- obviously, if one of

24  them were to testify, we'd have more for the jury.  Assuming

25  these experts do not testify and we have the representation from

1  Mr. West that he's going to rest, does the government have any

2  rebuttal?

3          MR. FIGUEROA:  I do not.  We're prepared to argue.  I'd

4  say one thing.

5          THE COURT:  Sure.

6          MR. FIGUEROA:  Perhaps I in-artfully said that.  He's

7  not permitted to testify unless I opened the door, and I did not

8  open the door, so I think that's the issue here, not just --

9          THE COURT:  Let's not argue that point now, because

10  I've already told Mr. West I'm convinced they're not going to

11  testify -- I'm even more convinced that they're not going to

12  testify, but I'm going to let him make a record.

13          So let's excuse the jury.  We can certainly do this in

14  a half an hour.

15          MR. WEST:  I think so.

16          THE COURT:  Why don't we give them a recess for 20

17  minutes.  We'll need a short break.  Let me tell them to come

18  back at 11:00 o'clock, and I think I'll go out on a limb and tell

19  them that we'll hear arguments at that time.

20          MR. WEST:  Well --

21          MR. FIGUEROA:  You're not going to break the limb, are

22  you?

23          MR. WEST:  You know, Judge, I just honestly -- I think

24  that's improper.

25          THE COURT:  What's improper?

1          MR. WEST:  To tell them we're going to argue at 11:00

2   and then if I put witnesses on, they're going to wonder what the

3   heck is going on.  I understand your perspective.

4          THE COURT:  I've got you.  Well, I'll just recess until

5   11:00 o'clock.

6          MR. WEST:  Tell them we've got legal stuff to do.

7          THE COURT:  Yeah.

8          MR. WEST:  Thank you, sir.

9          (The bench conference was concluded.)

10          THE COURT:  All right, ladies and gentlemen, there's

11   some legal stuff I need to do, and it will take a little longer

12   than here at sidebar.  We're still doing okay on time, but I'm

13   going to recess you guys for 30 minutes.

14          So if you'd be in the jury room ready to go at 11:00

15   o'clock, we should be able to start at that time, I hope.  So

16   I'll excuse you at this time.

17          And if you'd recall the admonitions.

18          Thank you.

19          (The jury left the courtroom.)

20          THE COURT:  All right, be seated.  We're in session now

21   without the presence of the jury for the purposes of the

22   defendant's offer of proof.

23          Mr. West?

24          THE WITNESS:  Good morning, your Honor.

25          THE COURT:  Good morning, sir.  Come on up.

1          (James Evans Aiken was duly sworn by the clerk.)

2                          JAMES EVANS AIKEN

3                          DIRECT EXAMINATION

4    BY MR. WEST:

5    Q    Mr. Aiken, we're going to basically stip to your

6         qualifications as an expert, but what is your expertise in?

7    A    I have 40 years experience in operational as well as

8         management classification, all aspects of the security

9         delivery of prison systems, not only on an institutional

10        level, but also as the chief executive officer of prison

11        systems.

12   Q    Okay.  And you do advisory work, correct?

13   A    Yes.  I provide expert technical assistance to a number of

14        jurisdictions throughout the country, as well as being

15        appointed to a presidential, slash, congressional commission

16        on prison rape elimination, which the final reports that

17        were signed off by the Attorney General was lifted, I think,

18        last Thursday, if I'm not mistaken.

19             MR. WEST:  Okay.  If it's okay with the Court, I'd just

20   like to lead him through a few things.

21             THE COURT:  Yes.  Fine.

22   BY MR. WEST:

23   Q    Mr. Aiken, is it a fair statement that safety is the number

24        one concern within prison systems?

25   A    Very definitely.  That's the common denominator with inmates

| | |
|---|---|
| 1 | as well as staff.  Safety.  Everyone wants to be safe. |
| 2 | Q   Okay, and now you've testified plenty of times before |
| 3 | juries, correct? |
| 4 | A   That is correct, sir. |
| 5 | Q   And from your perspective as an expert, do you think that |
| 6 | jurors are able to understand what it's like to be in a |
| 7 | prison setting? |
| 8 | MR. FIGUEROA:  Your Honor, I'm going to object to this |
| 9 | as speculation of what the jury -- |
| 10 | THE COURT:  No. |
| 11 | MR. WEST:  This is -- |
| 12 | THE COURT:  No, I'm going to let him answer. |
| 13 | THE WITNESS:  Can I answer it, Judge? |
| 14 | THE COURT:  Yes. |
| 15 | THE WITNESS:  Oh, thank you, sir. |
| 16 | There is a completely different perspective.  Jurors do |
| 17 | not understand this abnormal environment we call a prison.  Often |
| 18 | lay people make mistakes of assessing things that go on within a |
| 19 | prison system with community eyes.  You have to make an |
| 20 | assessment based on prison eyes.  Does that mean that you condone |
| 21 | that behavior?  No.  You'd better understand it.  You must |
| 22 | understand where it is, and why it's happening in the context or |
| 23 | paradigm called a confinement facility. |
| 24 | BY MR. WEST: |
| 25 | Q   Okay.  When -- I mean, unless somebody's been to prison, |

1          it's just hard to imagine what it's like.  Is that a fair

2          statement?

3     A    If you've not been in a prison environment, you will

4          understand that the behaviors are different, the culture is

5          different, the communications are different, the

6          relationships are different, and you -- you will be making

7          mistakes of assessing it with looking at what goes on in

8          communities, completely.

9     Q    And -- and we had some discussion here in the courtroom

10         regarding small numbers of staff versus the large numbers of

11         inmates.  And we talked the other night, and you said, well,

12         you deal with that through professional trust.  Can you

13         explain that to the Court?

14    A    Yes.  You approach these issues knowing that you are in

15         charge, and there's some responsibilities that go with that

16         authority.  Professional trust is one in which inmate

17         population know that you're going to be treated fairly,

18         you're going to be treated consistently, you are going to be

19         not singled out to have adverse things happen to you,

20         whereas in another context there's probably the same, or

21         another inmate is treated differently.  You have to make

22         sure that you are firm, concise, consistent, and

23         predictable.  And when you lose that professional trust, an

24         analogy that I use a great deal is flying on an airplane.  I

25         give a ticket -- I pay for a ticket.  I get on an airplane,

1    and they take me 36,000 feet at 560 miles an hour.  I didn't
2    interview the pilot.  I didn't have someone hired to go
3    check that aircraft to make sure that it was safe.  I didn't
4    check out all the evacuation protocols.  I have a
5    professional trust that they're going to get me from point A
6    to point B in a safe, secure manner.  Same context within a
7    prison.  Inmates can't wake up one morning and say, you
8    know, I don't like this prison.  I'm going to call a cab and
9    go home.  You can't do that.  So you have to have as an
10   administrator, or as security a level of professional trust
11   that inmates know that you're going to be -- that they are
12   going to be treated fair, consistently.  Sure, maybe the use
13   of force, maybe not, whatever.  It's got to be done in a
14   fair, consistent, professional manner.
15 Q  Okay.  And are there certain principles that are applied
16   when an incident happens in a prison?  There's an
17   investigation that takes place, correct?
18 A  That is correct, yes.
19 Q  And what would be the -- the protocol, or purpose, or policy
20   that would follow up with an investigation?
21      Would everybody be interviewed, or just select people?
22 A  No, you interview everybody that's within sight and sound of
23   the incident.  Now, compared to a community situation, a
24   prison is a controlled environment.  You know where
25   everybody is, where everybody's supposed to be.  You can

1             conduct interviews with inmates, staff, check videotapes,

2             listen to radio tapes if they're available, look at the

3             structure, relook at it.  But the key point is getting

4             statements from everybody.  Now, those statements from

5             inmates may be I didn't see a thing, or if I did see

6             something I wasn't going to tell you.  Okay, but I

7             interviewed you.  I covered that.  And that's important to

8             have 100 percent coverage to ensure that you went through

9             every angle to build this professional trust, and to also

10             ascertain what happened, and how it happened.

11 Q    Okay.  Use of force is an issue within the prison system

12        correct?

13 A    Yes, sir.

14 Q    And is there sort of a --

15             MR. FIGUEROA:  Continuum of force.

16 BY MR. WEST:

17 Q    Yeah, continuum of force -- my colleague here told me the

18        term.  We start with calm us down, down to having to shoot

19        and kill someone, right?

20 A    Yes, sir.  There's continuing use of force.  The first thing

21        you have to understand is that you have to know your steps.

22        You have to know what are those things that I need to do to

23        de-escalate the situation so that it will not go to the next

24        level.  Does that mean relinquish my power?  No.  I've been

25        in use of force situations from placing handcuffs to

1       ordering a sniper to kill an inmate, and the inmate was

2       killed.  So I've been through the whole gamut.  So what I'm

3       saying is maybe your best foot forward is two steps back.

4       One, of maybe not saying anything, making an appropriate

5       assessment of what's going on before you act.  Number two,

6       active listening.  Listen to the person.  Two people cannot

7       argue.  It takes two people, I'm sure -- I'm sorry, to

8       argue.  One person cannot argue with oneself.  And I'm in

9       authority, so I'm not going down to your level.  I can use a

10      command voice versus active listening.  I am in control

11      here.  Sit down.  Or I can use use of force.  I've had

12      situations where no -- nobody laid a hand on a person.  Why?

13      Because we waited until the cavalry got there.  Now it's 25

14      people versus one.  What are you going to do about it?

15      There's many ways in order to de-escalate and defuse

16      potential situations from getting into physical

17      confrontations.  And I can go on with chemical munitions,

18      use of canines, the whole nine yards.

19  Q   We want to keep this short, if we can.

20          Based upon your expertise, do you think that jurors

21      understand the principles we just got done talking about?

22  A   No.

23          MR. WEST:  Okay.  Your witness.

24          THE COURT:  You don't need to ask any questions, I

25  don't think.

1          MR. FIGUEROA:  I don't have any questions, your Honor.

2          THE COURT:  All right, Mr. Aiken, you can step down and

3    be excused.  Thank you, sir.

4          THE WITNESS:  Thank you, your Honor.  Have a good day,

5    sir.

6          THE COURT:  Thank you.

7          MR. WEST:  I'll get my other guy.

8          (Steven Herron was duly sworn by the clerk.)

9          THE COURT:  Good morning.

10          THE WITNESS:  Good morning.

11                          STEVEN HERRON

12                       DIRECT EXAMINATION

13    BY MR. WEST:

14    Q    And how are you employed?

15    A    I'm a psychiatrist at the University of Arizona.

16    Q    Okay.  And you're involved in forensic psychiatry?

17    A    I am a forensic psychiatrist, yes.

18    Q    And you were asked to come to court today because Dr. Morenz

19         wasn't available during this trial time, correct?

20    A    That's correct.

21    Q    Okay.  So you're kind of stepping up and substituting for

22         him?

23    A    Yes.

24    Q    The purpose for you to testify was to explain to a jury

25         about the autonomic nervous system, is that right?

1    A    Yes.

2    Q    That's what we talked about, right?

3    A    Yes.

4    Q    Okay.  So I'm going to kind of lead you through stuff.

5         Maybe you'll have to explain, but a lot of them just yes or

6         no answers, I suppose.

7              The autonomic system, that's the one that makes our

8         heart beat, and breathing, and pupils dilating and

9         contracting, things like that, correct?

10   A    Yes.

11   Q    Okay.  Has it also been found to be involved in how people

12        act in certain circumstances?

13   A    From -- from an emotion standpoint, yes.  Emotions are

14        directly related to the nervous system.

15   Q    Okay.  And based upon your expertise, do you believe that

16        juries understand how emotions are connected to the

17        autonomic nervous system?

18   A    That's a hard question to answer.  I mean, juries can

19        certainly be educated about it, for sure.

20   Q    But do you think that's common knowledge?

21   A    I would imagine some people understand that there is some

22        relationship between the two, yes.

23   Q    Tell the Court how this -- first of all, you've had some

24        experience working the prison system, correct?

25   A    Yes, I have.

1    Q    Okay.  And how do you describe the emotional state of people

2         in prison, basically?

3              Are they in fear most of the time, anxious?  I mean,

4         how would you describe it?

5    A    Well, I mean, I think in general a correctional institution

6         is a place of high stress, and because of the high stress

7         there is an increased level of -- there's a heightened sense

8         of emotion.  So whether it's fear, whether it's anxiety,

9         whether it's depression -- I mean, there is definitely

10        certain increases in emotional content in a correctional

11        institution.

12   Q    Okay.  Do -- okay, so what kind of emotions are we talking

13        about here?  Anger?  Confusion?  Are these things that would

14        all be part of this?

15   A    Sure.  I mean, the primary ones are fear or anxiety.  I

16        mean, those are the things that you see most in a

17        correctional facility.

18   Q    Okay.  You're somewhat familiar with the facts in this case,

19        correct?  I mean, in a general sense?

20   A    Yeah.  In a very general sense, yes.

21   Q    Okay.  With respect to that, we have an inmate who is --

22        we've got evidence that he's angry about medical treatment

23        over there, so that's -- that's starting to kick in, his

24        emotions, and the autonomic nervous system, correct?

25   A    When people get angry, yes, the autonomic nervous system is

1      activated.

2  Q   All right.  And what -- what occurs next?  I mean, if -- if

3      somebody is used to taking certain commands and then those

4      commands are interrupted and changed, can that cause

5      confusion, and upset, and affect those emotions?

6  A   It could certainly cause confusion.

7  Q   Okay.  And you're familiar with the procedure to cuff people

8      up, correct?

9  A   Yes, I've seen it many times.

10 Q   Okay.  And if somebody is -- is submitted to be handcuffed,

11     hands behind the back, and then somebody only puts one

12     handcuff on and tells him to turn around, what would your

13     expectation be about the anxiety level of that individual,

14     the inmate?

15 A   Well, I would imagine if it's somebody who's been

16     incarcerated for a while, that that would definitely --

17     would increase their anxiety.  I mean, that is not something

18     that I've seen.

19 Q   It's not the normal practice, right?

20 A   Not that I've seen, no.

21 Q   Okay.  Now, can you give the judge a couple examples of how

22     the autonomic nervous system kicks in with high stress

23     emergency situation type of things?

24 A   Well, maybe the best example I can give is any kind of life

25     threatening situation.  So in many cases people who are in

1        fear for their lives can't catch their breath, stuff like

2        that.  They -- you know, the autonomic nervous system

3        activates, so there's this huge rush of adrenaline.  Heart

4        rate goes up, usually respiratory rate goes up.  There is

5        muscle tension.  There's all these kind of things that just

6        the autonomic system activates, because of the -- you know,

7        the typical thing is the fight or flight response.  So when

8        the autonomic system activates, it's all of these things

9        happening at once.

10   Q   Okay.  You had told me that you're a competitive swimmer,

11       and that there's an example you can tell the Court about how

12       that can occur when you're swimming?

13   A   Well, I mean, I do swim, and so one of the things that --

14       I've done some open water swims, so -- you know, in the

15       ocean.  And you leave with a bunch of people, and even

16       though I've swam a bunch, and I feel very comfortable in the

17       water, there have been occasions where I've been pushed down

18       by swimmers behind me, and things like that.  And even

19       though I know what's going on, if I lose my breath the first

20       reaction is to panic.  It's, you know, to get to the

21       surface.  It's to get oxygen.  It's to get air.  And there's

22       really very little that's of interest to me other than just

23       getting back to the surface so I can get air.  So you know,

24       you thrash.  You do all sorts of things, just kind of -- it

25       doesn't really matter who's in your way.  You just want to

1           get up to get your lungs full of oxygen.

2   Q      Now, are you telling your arms to thrash and push, or is the

3          autonomic nervous system doing that without you consciously

4          thinking about the will to go grab that guy or do something?

5   A      Right.  It's not -- I mean, it's not conscious by any

6          stretch of the imagination.  I mean, you're -- if you're

7          honestly in fear for your life, if you think that you're

8          desperate to catch a breath, it really doesn't matter.

9          You're not thinking about, well, there's this guy here and I

10         can push him out of the way, or there's some free space

11         there.  You just do it.  You just do it.  It's not anything

12         that you think about at all.  And that is all autonomic

13         nervous system.

14  Q      Okay.  And the same would be if hypothetically somebody was

15         being choked and they thought they were going to go

16         unconscious, same type of flight and fight syndrome?

17  A      If -- I mean, if they -- if they feel their life's in

18         danger, absolutely.

19  Q      Okay.  All right.  Is this a common phenomena that's been

20         testified to your knowledge in other courts?

21  A      Yes.

22  Q      And is this a phenomena that has been found in other courts

23         to be outside the realm of the general understanding of the

24         public, or of the jury?

25  A      No.  It's not outside the understanding of a jury.  I mean,

```
 1              they can understand it if you explain it to them.
 2    Q    If you explain it to them?
 3    A    Yes.
 4    Q    But without your explanation, is it their common knowledge
 5         what you've just discussed with us?
 6    A    I'm -- no.
 7    Q    Okay.
 8    A    I mean, unless there's a juror that's had a life threatening
 9         event.  That would be the only way they might know that.
10    Q    Okay.  All right, and -- and this is the same type of
11         testimony that Dr. Morenz has repeatedly done in other
12         courts, is that correct?
13    A    That's my understanding, yes.
14    Q    All right, and are you a forensic psychologist -- or
15         psychiatrist along with everything else that you do, your
16         credentials, correct?
17    A    Yes.
18    Q    And forensic means you work with criminal cases, correct?
19    A    Criminal and civil cases, yes.
20              MR. WEST:  Okay.  That's all I have, Judge.
21              THE COURT:  All right, thank you.
22              Anything from the government?
23              MR. FIGUEROA:  I have nothing, your Honor.
24              THE COURT:  Okay, Doctor, thank you, very much.  You
25    may step down.
```

1          THE WITNESS:  Thank you.

2          THE COURT:  All right, Mr. West.  I'm excluding the

3   testimony of both witnesses.

4          And so the defense rests?

5          MR. WEST:  Yes.  I'll rest in front of the jury at the

6   time.

7          THE COURT:  Government rests?

8          MR. WEST:  Yes, your Honor.

9          THE COURT:  Both sides rest.

10         Now, back to -- we're going to call the jury in here,

11  and you can start your arguments, but I -- you know, I've got

12  obvious concern with a justification defense in your instruction

13  6.7.  I -- I need some evidence to support the instruction.  A

14  scintilla is not enough as the cases say, but I need some

15  evidence.

16         I can't imagine any evidence that the defendant was

17  under an unlawful and present threat of death or serious bodily

18  injury before he assaulted these three officers.  I -- there is

19  no evidence that he was -- well, actually, ever under threat of

20  death or serious bodily injury, but the assaults occurred before

21  he's even taken down to the ground.  I mean, I -- I know that's

22  your theory of the case, and I'm stretching to try to -- the

23  safer thing to do, if that's part of my job is to be safe with

24  the Court of Appeals, but the safer thing to do would be to give

25  the instruction, but I can't find any evidence.

1    Now, the government has some obligation to protect its

2    record.  Are you objecting to the Court's giving 6.7?

3    MS. ROLLEY:  May we have just one minute, your Honor?

4    THE COURT:  Sure.

5    MR. FIGUEROA:  Your Honor, I'm going to object to it.

6    I understand what's safe and what's not safe, but we don't have

7    any evidence that -- that he acted in response to even getting

8    choked.  If he was choked, there's no evidence that he was acting

9    in response to that.  All he's saying is when he was being

10   wheeled out I was choked, I was choked.  There's just no evidence

11   that that's why he acted this way.

12   As to the other elements, his -- we would just submit

13   it.  There's just no case.  There's no evidence that he -- that

14   he didn't seek another lawful course.

15   THE COURT:  Well, I'll give you a final shot at it,

16   Mr. West.

17   MR. WEST:  Well, thank you, sir.

18   Your Honor, you have to look at the evidence in its

19   totality at this point in time to determine whether or not you're

20   going to give an instruction or not.  That's a fair statement, I

21   think, correct?  And the totality of the evidence here

22   suggests -- or first of all, we have a known injury to the back

23   of Cranford's hand that the doctors assessed to be tooth marks.

24   Cranford says he never put his hand up by Mr. Cooper's face at

25   any point in time.  Mr. Cooper is examined an hour after this

1    incident occurred.  Every witness so far has said they never put

2    any -- any kind of hold on his throat.  That's the evidence.

3    Does that mean that that's the truth?  It doesn't.  Well, what

4    that means is that --

5              THE COURT:  What it means is there's no evidence.

6              MR. WEST:  What?  Pardon me?

7              THE COURT:  It means there's no evidence.

8              MR. WEST:  Well, I don't think I finished yet, but --

9    then we have Mr. Cooper's statements, and that is evidence, you

10   know?  It is.  It's in evidence.  It's been admitted.  It's been

11   played to the jury.  And he says in that statement that the guy

12   in the white shirt --

13             THE COURT:  Right.

14             MR. WEST:  -- came around the corner and put a choke

15   hold on him.

16             THE COURT:  Well, at one point he says he's down on the

17   ground when that -- he was down on the ground when he was choked.

18             MR. WEST:  Sure.  And that goes to credibility, does it

19   not?  It goes to the weight of that statement.  It doesn't go to

20   whether the statement is in evidence.  So we have evidence of him

21   saying that a man in a white shirt, who would be Mr. Cranford,

22   came around the corner, got on him, put a choke hold on him.  He

23   doesn't say what he did in response to that, okay, but then we

24   have physical evidence consistent with that, because if you put

25   your arm across my throat and I pry it off --

1            THE COURT:  All right, I'll -- I'll give it.

2            MR. WEST:  Thank you, sir.

3            THE COURT:  So let's take just a few minutes, and then

4     we'll argue the case.  If we have to interrupt the arguments -- I

5     don't like doing that, for a noon recess, but we will.  I don't

6     know how long you're going to go, but we'll start the arguments

7     here in a few minutes.  So gird your loins.

8            MR. WEST:  Yeah.  Your Honor, I don't know how long

9     they're going to take to begin with, but I estimate my argument's

10    probably going to take about 30 to 45 minutes.  I'll try not to

11    talk too fast.

12           THE COURT:  I guessed that already.  That's why I said

13    we would probably have to take a break.  But that's good to know,

14    because then I know when to take that break.

15           MR. WEST:  Well --

16           THE COURT:  I -- you know, the problem with that is

17    that I do not want to interrupt your argument.  I don't mind

18    interrupting the arguments.  But maybe what we can do is to get

19    the government's opening and your argument, and then maybe come

20    back for rebuttal and instructions, but that gives them more time

21    for rebuttal, so --

22           MR. WEST:  Well -- or alternatively, depending on how

23    long they take -- and do you instruct before or after?

24           THE COURT:  After.

25           MR. WEST:  Okay.

1         THE COURT:  And I'll give them -- by the way, I give

2   them a copy of these instructions that they have --

3         MR. WEST:  Yes, sir.

4         THE COURT:  -- but I give it to them right before I

5   instruct them.

6         MR. WEST:  Again, I don't know how long they're going

7   to take, but if they go up to, say, 11:30, do you want me to

8   argue all the way up to whenever you decide to go to lunch, or

9   could we just take an early lunch, and I'll come back and argue

10  afterwards, and they can --

11        THE COURT:  Yeah, I'll just play that by ear.  But let

12  me ask you this.  Would you rather have your argument interrupted

13  for a noon recess, or give the government additional time to

14  prepare the hammer argument during a noon recess?

15        MR. WEST:  Well, I'd rather -- I'd rather they argue

16  and we take lunch, and we'll both --

17        THE COURT:  That wasn't the choice.

18        MR. WEST:  Well, then I misunderstood you.  You're

19  talking about breaking mine in half, you're talking about?

20        THE COURT:  Yes.

21        MR. WEST:  If you want to do that, I can handle that.

22        THE COURT:  Well, I'm asking your preference.  I'm just

23  thinking of all the things that can happen here.  Would you

24  rather have your own argument interrupted during the noon recess

25  or would you rather complete your argument if we didn't go

1    beyond, say, 12:15, which means the government would have more

2    time to think about how to hammer you on the head in their

3    rebuttal.

4              MR. WEST:  Yeah, I -- if I'm going to start my

5    argument, I'd rather you cut me off, say let's go to lunch, and

6    come back and finish Mr. West.

7              THE COURT:  All right.

8              (The Court recessed at 10:58 a.m., and reconvened at

9    11:07 a.m.)

10             (The jury entered the courtroom.)

11             THE COURT:  We're back on the record with our jury.  We

12   have counsel and the defendant.

13             Both sides rest?

14             MR. WEST:  Yes, your Honor, I'd rest.

15             MS. ROLLEY:  Yes, your Honor.

16             THE COURT:  All right.  So we're ready for closing

17   arguments.

18             Is the government ready to proceed?

19             MS. ROLLEY:  Yes, your Honor.

20             THE COURT:  All right, go ahead.

21             MS. ROLLEY:  Thank you.

22             Your Honor, counsel, members of the jury, good morning.

23   It's really -- or should not be to some of you, or maybe to many

24   of you a surprise that life is a series of expectations and

25   limitations.  For example, think about two people on the street

1    arguing, screaming, yelling at one another.  There's probably a

2    reasonable expectation that a cop would come along and limit the

3    conduct between those two people.

4            What about when people go to a courthouse, for example?

5    They come in the front door.  There's an expectation that they're

6    going to be searched, and there's a limitation on what they can

7    bring into courthouses.  Lots of courthouses don't allow cameras,

8    cellphones, or guns.

9            Well, ladies and gentlemen, in many ways a prison is no

10   different.  A prison is no exception.  Even in a building on a

11   prison campus, which isn't set up like a typical prison, a

12   building such as a health clinic.  It's got exam rooms.  Exam

13   rooms may be running down both sides of a hallway.  And in this

14   case this -- this health clinic had an employee, at least one

15   employee, who went to work.  She was a correctional officer, but

16   she didn't carry handcuffs.  She never cuffed a person in several

17   years.

18           But there's still limitations and expectations, even in

19   a setting like that.  At FCI Safford, you heard in the evidence

20   that -- and it's a reasonable expectation, inmates should

21   reasonably expect to receive medical treatment.  But in that

22   health clinic there was also a limitation, and you heard about

23   that.  For non-emergent visits, inmates were expected to report

24   in in the morning between 6:30, 7:00 for sick call.  And they

25   came into that health clinic, into the waiting room, and they

1   were expected to sign in and sit down.  And many times, I think

2   from the evidence, there was a wait.  But that was the

3   expectation.  And also, in that clinic there was a limitation.

4   For non-emergent visits, inmates were allowed one complaint per

5   visit.  That was the limitation.

6          But on the morning of July the 6th, 2009, there is an

7   inmate six foot five, big guy, mountain of a man.  Not happy

8   about that limitation.  He was loud.  He was angry at times.  He

9   was frustrated because he had a list of complaints, and he

10   expressed that he was being denied treatment.  So that morning in

11   his anger and in his belligerence while his fellow inmates were

12   out in the waiting room expecting to receive medical care, at

13   some point that morning that inmate injured three employees who

14   that morning on that day expected to come to work and just simply

15   do their jobs.  And that inmate, ladies and gentlemen, was the

16   defendant, Adrian Cooper.  That's what this case is about.

17          And in the opening that Mr. Figueroa did for you a

18   couple of days ago, he talked about this case and what it was

19   about.  And he told you it was about the prison, and it was about

20   the brave men and women that worked there.  And I submit to you

21   that's what this case is about.  It's about their work there at

22   that prison, and it's about the expectations and limitations that

23   go along with it.

24          On July the 6th, 2009, the evidence has shown to you

25   that the defendant committed three crimes.  He threw Officer

1   Cranford, he smashed Lieutenant Campbell, and he pushed Joan

2   Harmon.   Three people who were federal employees at that time.

3   Three people who were -- at that time when this happened to them

4   were in the performance of their duties.   Three people who as a

5   result, or because of the defendant's actions were in pain, and

6   were injured.   That's the evidence.

7           And what you heard in the evidence, ladies and

8   gentlemen -- although it took us a couple of days to do this,

9   what you heard in the evidence is that this actually happened

10  fast, really quick.   At least, I think, two witnesses told you

11  that.   It started out -- may I have -- I wanted to use the

12  layout -- or I'll use the screen.   That's all right.   I didn't

13  plan this very well.

14          It started out -- as you can see from the screen, it

15  started out, and as you heard in the evidence, as a disturbance

16  in the hallway.   People were working that day in different parts

17  of the -- the medical building.   Holly Harrelson was in the

18  trauma treatment area.   Dr. Gaskin was in the dental lab.   The

19  nurse, Elie, was getting a medical file.   Joan Harmon, a medical

20  secretary, was at her station, and Lani Gonzalez was at her

21  station.   And there was a disturbance in the hallway.   And that

22  disturbance ended up disrupting medical care for the inmates that

23  were there, and it disrupted the employees from servicing that

24  day because those employees had to come out in the hallway and

25  see what was going on, and see if they needed to render

1    assistance to this disturbance.

2           You heard from Nurse Elie.  She was in the medical

3    records area.  I think she was saying she was pulling a file.

4    Your memory governs, ladies and gentlemen, but my memory of the

5    evidence is that she said she was pulling a file.  And she hears

6    a loud voice.

7           So what does she do?  She goes down that hallway and

8    sees where the examination rooms are, as you can see on Exhibit

9    1, and she sees the defendant, six foot five, flailing his arms,

10   loudly shouting about being refused medical treatment, and

11   shouting about a list, a disturbance that brings Nurse Elie away

12   from her work and into the hallway.

13          And what does Joan Harmon tell you about how this

14   started as far as she was concerned?  She was a medical secretary

15   at that time at the facility.  She heard loud voices.  She heard

16   something to the effect of don't raise your voice to me.  And she

17   stops what she was doing as, and as a correctional officer, which

18   she told you she was also, she goes out and she stops to assess

19   what's going on.

20          You also heard from Nurse Schultz.  She was treating a

21   patient in the trauma room.  She had heard a disturbance.  She

22   recognized Joan Harmon's voice.  And what caught her attention, I

23   submit to you from the evidence, is that Joan Harmon didn't sound

24   the same to Ms. Schultz, because Joan Harmon, she remembers, said

25   something like face the fucking wall.  And to Ms. Shultz, that

1    was -- I submit to you based on the reasonable inference of the

2    evidence, that was out of the character.  So Nurse Schultz told

3    you she took her patient from the trauma room over to the dental

4    laboratory so she could see out in the hallway to assist and

5    assess what was going on.  Do what was another part of her

6    function in that health clinic in that prison, and that is she's

7    to help in terms of the order of the clinic, and the order of

8    prison in addition to treating those patients.

9            Dr. Gaskin, the dentist, who was in his dental

10   laboratory treating a patient at the about the time that he hears

11   a disturbance.  So what does he do?  He goes out and he sees the

12   defendant -- or strike that.  Prior to that he hears a

13   disturbance or hears loud noise coming from Dr. Fariall's office

14   to the left down the hall from him.  And he goes out, and he sees

15   the defendant, and the defendant is expressing his displeasure.

16   So Dr. Gaskin told you he waited at the dental lab around the

17   door, and then he sees the defendant go around the corner, and

18   Dr. Gaskin starts to look, as he says to show support for staff,

19   and he sees a verbal confrontation between the defendant and

20   Nurse Elie at that point.

21           And Officers Cranford and Campbell, they're getting

22   ready to eat their lunch.  I think that's what the evidence was.

23   And they're being called to come over because -- I submit to you

24   based on the evidence, because of the defendant's behavior.

25           And it continues, because the defendant was actually --

1  on that day during this incident he was a wave of emotions, as

2  the evidence told you.  He was angry.  He was loud.  He was calm.

3  He got upset.  He was compliant.  He was frustrated.  He was

4  noncompliant.  And as Nurse Schultz told you, at the end of this

5  he was playing for the camera.

6          And I submit to you, ladies and gentlemen, the evidence

7  also told you that those people were out in the hallway.  They

8  were riding that wave of emotion too, but they felt based on the

9  evidence concern, threatened, fear, scared.

10         Nurse Elie told you that she was trying to calm him

11  down out in the hallway.  Calm down.  Face the wall.  But the

12  defendant's agitated.  He's continually uncooperative with her.

13  He's challenging her -- challenging her at every direction.  And

14  she told you she felt threatened.

15         Nurse -- Nurse -- Joan Harmon, the medical secretary at

16  that time, she told you about her interaction with the defendant.

17  She tried in a calm, firm voice with force to control the

18  defendant.  And she had control of him at one point.  He was in

19  the chair.  He was sitting down.  She had control.  But then the

20  defendant gets out of that chair, and the focus is back on him,

21  back on his behavior that she's so concerned about.  She doesn't

22  turn and tell Nurse Elie anything at that point.  He got up.  He

23  faced her aggressively.  She tries to then control the situation.

24  She tells him to face the wall.  She does it to calm, to control

25  the situation.  She puts handcuffs on him.  She starts to be able

1    to do that, but then she realizes something's wrong.  She gets

2    nervous, because the cuff doesn't fit.  It escalates again.  The

3    defendant's asked to turn around, and he says which way?  Which

4    way?  And I think there was evidence either from Ms. Harmon or

5    from someone else that he inches -- bending down inches from her

6    face, and she told you she could feel the heat of his breath.

7    He's angry.  It's escalating.  She's getting nervous.  And at

8    some point in this incident she told you she was scared to death

9    as this went on.

10          Nurse Schultz, she told you that she was scared for

11    Ms. Harmon at some point, and then at some point during all of

12    this when Officers Cranford and Lieutenant Campbell came in, she

13    felt safe.  And then when she saw what happened, she was

14    concerned and scared for her coworkers.

15          And Dr. Gaskin told you that he had some concern as he

16    watched what was going on.  He told you he's a big guy.  He's

17    six-two.  But he said no match for the defendant.

18          Officer Cranford, as he's walking towards the clinic

19    he's calm, but he encounters a nervous, excited Nurse Elie --

20    Elie -- Elie.  And this veteran of -- correction officer,

21    veteran -- veteran of the armed forces, when he went in there and

22    he encountered the defendant, he went flying the evidence was.

23    And he told you that he was scared.

24          Ms. Gonzalez, she also expressed that at some point she

25    was in fear for Ms. Harmon.  When she watched the interaction

1   between the defendant and Ms. Harmon, she took steps back looking

2   for help, and she saw the defendant bend over at Ms. Harmon

3   inches from her face, and saying which wall?

4          The defendant, I submit to you, was no match.  And at

5   that point on that day at midmorning in that hallway the evidence

6   shows that he was without limitation.

7          Ms. Harmon -- he sees her reach for her body alarm, she

8   tells you, and he tells her go ahead.  Press that alarm.  See

9   what happens.  And what happens from there, shortly after the

10  evidence was that Officer Cranford arrives.  He sees Nurse

11  Harmon, and what he sees is Nurse Harmon and the defendant

12  arguing.  I think he said there were newspapers on the floor,

13  hears combative voice.  He orders the defendant to turn around

14  and face the wall.  The defendant at some point jerks away and

15  threw Officer Cranford, knocking the air out of him.  And the

16  other people that told you about that encounter and what they saw

17  with respect to what I submit was an assault was Lani Gonzalez,

18  Lieutenant Campbell, Joan Harmon, and Nurse Schultz.

19         Lieutenant Campbell, he tried to spin, he said, the

20  defendant around -- or spin him.  He was smashed into the wall.

21         And Joan Harmon, she tries at some point to put her two

22  hands around the defendant's thumb, and she's pushed into a

23  window sill.  The defendant was without limitation.

24         Now, at the beginning of this case and throughout some

25  parts of our days together the judge has told you that his job is

1    the law, and it's anticipated that he will instruct you on the

2    law.  I expect that he will instruct you that the government has

3    the burden of proof, and the government has to prove each and

4    every element of the crimes that the defendant is charged with

5    beyond a reasonable doubt.  I ask, members of the jury, that you

6    pay particular attention to every instruction the judge gives

7    you.  That's his job.  He told you that.  And I ask you that you

8    pay attention to that.  And as you listen to that, listen to the

9    elements that the government has to prove here, and I'll

10   summarize for it -- summarize them for you, but to simply say the

11   defendant's charged with three crimes, but all three crimes are

12   assault upon a federal officer.

13          He has to show -- strike that.  The government has to

14   show that the defendant, he, forcibly assaulted a person; that

15   this person was engaged in the performance of his or her duties

16   or official act when the assault occurred; and that the defendant

17   inflicted bodily harm upon that person.

18          The judge will also, I expect, instruct you with

19   respect to bodily harm, or bodily injury.  And keep in mind and

20   listen particularly to that instruction, I suggest to you.  It's

21   any significant injury.  For example, any painful, or obvious, or

22   medical attention ordinarily sought.

23          Now, with respect to the elements in the crime here and

24   the evidence, you've heard evidence that Officer Cranford, a

25   uniformed officer working as a corrections officer that day, was

1    called to assist.  He went over to the health clinic.  And you

2    heard evidence that he was thrown by the defendant with all the

3    force.  The defendant's about six foot five, the evidence was.

4    Larger -- bigger than Dr. Gaskin.  Throws Officer Cranford in the

5    air through the hallway.  Officer Cranford told you that, and I

6    submit to you the evidence is corroborated by what the others saw

7    in that hallway with respect to that.  It's corroborated by Dr.

8    Gaskin's account, Joan Harmon's account, Lieutenant Campbell's

9    account, and Lani Gonzalez's account.  And as a result of the

10   defendant's action, Officer Cranford sustained an injury.

11           You'll have exhibits with you, photographs 3, 4 and 6

12   depicting Officer Cranford's injury from the defendant's action.

13   Officer Cranford told you when he was thrown, he was -- he had

14   the air knocked out of him.  But he also showed you through the

15   photographs and through his testimony the injuries he sustained,

16   and Nurse Elie talked about those injuries when she examined him

17   that day.  He had right arm abrasions.  He had swollen fingers.

18   He had multiple contusions.  I think two to three fingers he said

19   were swollen.  He had back pain, and he had upper shoulder pain.

20   And Nurse Elie suggested as a part of her assessment for him --

21   from his examination that she reports -- or that he report and

22   seek an x-ray.  That's the evidence with respect to the assault

23   on a federal officer, Officer Cranford.

24           Assault upon a federal officer, Lieutenant Campbell.

25   You had evidence with respect to the forcible conduct on the part

1    of the defendant.   The evidence was -- or is that the defendant

2    smashed Lieutenant Campbell into the wall.   Cranford told you

3    that he saw that.   Lieutenant Campbell told you that that's what

4    happened.   Joan Harmon, I believe the evidence was, but your

5    memories control, that she saw the defendant push Lieutenant

6    Campbell.   And Nurse Schultz testified that she saw the defendant

7    back Lieutenant Campbell into the wall.

8            Lieutenant Campbell told you about his injuries, that

9    he had pain to the small back, and he had abrasions to his arm.

10   And Nurse Elie told you about the examination with respect to

11   those injuries, and what she suggested in terms of an assessment

12   and treatment is that he was to apply ice and use

13   anti-inflammatory as needed.

14           Now, with respect -- and that's the assault on a

15   federal officer with respect to Lieutenant Campbell.

16           Now, the evidence with respect to the crime of assault

17   on a federal officer with respect to Joan Harmon, ladies and

18   gentlemen, the evidence was that she did have a hold of the

19   defendant's thumb in an effort to apply -- I think she called it

20   a force technique, or compliance technique.   That was after the

21   assault occurred on the other two officers.   She -- instead of

22   being successful at that, the defendant pushed her into the

23   window sill.

24           She told you that she was pushed and thrown into the

25   window sill, and at that time that that happened she told you she

1    had pain.  She didn't have it later when Nurse Elie examined her,

2    but she had pain as a result of the defendant pushing her into

3    the window sill.  And you saw in the evidence, one of the

4    exhibits, she also had a bruise on her forearm.  That's the

5    evidence the government has proven with respect to that crime,

6    assault on a federal officer involving Joan Harmon.

7            She -- with respect to all of these people, they were

8    working that day, working as federal employees, and they told you

9    they were working as corrections officers through their

10   testimony.

11           Ladies and gentlemen, that's the government's case with

12   respect to the evidence of the defendant's guilt.

13           Now, as I mentioned, the judge's job and the

14   instruction on the law, it's expected he'll also instruct you

15   with respect to a justification instruction.  That instruction,

16   ladies and gentlemen, is one that refers to whether the

17   defendant's conduct was justified at the time of the crime.  His

18   Honor will give you the complete instruction, and it involves

19   four factors, I submit to you, that -- that must be shown.  And

20   with respect to those four factors, I would submit to you that

21   that hasn't been shown in this case.

22           One of the factors is that in order for justification

23   to prevail, the defendant must have no reasonable legal

24   alternative in this situation.  And I submit to you that's not

25   what the evidence was here.  The defendant -- based on the

1    evidence, the defendant did have an alternative.  He could have

2    complied.  He could have submitted to the orders that were

3    presented to him.  He chose not to do so.  These assaults

4    occurred as the result of his conduct.

5         The defense also presented for you -- they don't have

6    to present a case, but they presented a couple of witnesses.  And

7    it's fair, I submit to you, to at least mention those to you.

8         The witnesses that the defendant presented were other

9    inmates who -- they were denied treatment.  They were denied

10   treatment because it looks like on their sick call list, they're

11   in line to be called after Mr. Cooper was seen.  But one -- or at

12   least two, or one of them told you that Mr. Cooper was upset.

13   And I think it's fair to say based on the defense witnesses, they

14   were all pretty upset about the medical treatment.  You decide

15   whether or not that renders a bias to their testimony.

16        Clearly, the last witness the defense produced was

17   upset.  He was sick.  He was upset.  It wasn't good treatment

18   there from his perspective.  But that day he didn't get any

19   treatment at all, because sick call was canceled.

20        And the witness Mr. Martinez, he told you he saw a

21   fight.  He told you in essence, a reasonable inference from his

22   testimony is that the defendant started it.

23        Ladies and gentlemen, that's the evidence.  I've

24   submitted to you what the government has proven, and I submit to

25   you the government has proven it beyond -- the evidence that

1  supports the crime here the defendant is charged with beyond a
2  reasonable doubt.

3          There should be an expectation that three people could
4  have come to work that day and worked without any injury.  Based
5  on the evidence, members of the jury, find the defendant guilty.

6          Thank you.

7          THE COURT:  All right.

8          Mr. West, since we had that delay this morning, I'm
9  going to opt to go ahead.  I might have to interrupt you for the
10 noon recess, but why don't you go ahead.

11         MR. WEST:  Could I have a moment to get the exhibits
12 straightened out?

13         THE COURT:  Sure.

14         (Counsel conferred off the record.)

15         MR. WEST:  I've got to do logistics.  Can't start
16 talking to you without everything we need here.

17         Ladies and gentlemen, this is the last time I'm going
18 to talk with you.  You heard me speak with the witnesses here, et
19 cetera, but I never really had a chance to address you, except
20 during the opening statement.  But this is my last opportunity.
21 I don't have the burden to prove anything to you.  The government
22 must.  So they get what we call rebuttal argument.  So when I
23 finish, they'll stand up and they'll tell you why what I said you
24 should ignore.  That's your choice.  But there's a few things
25 that I just need to talk to you about a little bit here.

1          The first thing is, why are you all here?  You're a

2   jury.  Most of you never sat on a jury before, but we have now

3   pulled you away from your environment, and we brought you into

4   this courtroom for a few days, and we've asked you to listen to

5   evidence, and now we're going to ask you to make a decision as to

6   what occurred here, and what -- what your decision should be then

7   based upon the facts, and you should decide whether or not

8   Mr. Cooper's guilty or innocent.

9          Well, that word innocent.  The presumption of

10  innocence -- is this the only mike?  Have you got your wandering

11  mike.?

12          THE CLERK:  I do.

13          MR. WEST:  The presumption of innocence -- the

14  presumption of innocence is -- it's a fundamental principle of

15  basically our American way of life, okay?  And the defendant

16  cannot be found guilty of anything until you find that the

17  government has proved beyond a reasonable doubt that he's guilty.

18          One of the confusions about the concept of innocence is

19  that we don't have to prove innocence.  In fact, in a lot of

20  circumstances you can never prove innocence.  I mean, if we had a

21  video tape of everything that occurred in that hallway, and

22  everything that occurred in that waiting room, and everything

23  that occurred in those hallways, well, that might be pretty good

24  evidence.  You could really weigh that well.  But now you have to

25  be swayed by evidence, evidence from witnesses testifying on the

1    witness stand, people who come and testify under oath and tell

2    you what they observed and what they did as a result of those

3    observations.   To find somebody not guilty does not mean that you

4    find him innocent.   Kind of a tough -- tough perception there,

5    you know?  Because the truth is, you know, if they don't match

6    their burden, then they just have a deficient level of proof.

7    It's not satisfactory, okay?  That doesn't mean when you vote not

8    guilty that you are voting innocent.   The concept is innocent

9    until proven guilty.   Not guilty just means they didn't reach

10   that level of proof.

11          Now, to get an indictment to bring him into the

12   courtroom, all they have to demonstrate to -- to the Court or

13   whoever the -- you know, the body might be that they're

14   addressing, is probable cause - more likely than not a crime may

15   have been committed, and Mr. Cooper may be the guy that did it.

16   If you brought that proof into a courtroom and you proved to it

17   that level, you don't get a nickel when you're suing for money,

18   because that's an inadequate burden of proof just to get a civil

19   judgment.

20          In a civil case, it's more likely than not that this

21   occurred.   In other burdens of proof, it's clear and convincing

22   evidence, much higher burden of proof than just more likely than

23   not.   More likely than not is 51 percent.

24          Beyond a reasonable doubt is the highest burden of

25   proof that we have in this country.   And we did it for a reason.

1    None of us were born when this happened.  It really goes back to

2    the revolutionary war, because when the King charged somebody in

3    the colony with a crime, it became the person who was arrested's

4    burden to prove innocence.  And the people that wrote our

5    constitution said, hey, I don't want to live like that.  That's

6    too much power.  Now the government prosecutes.  We don't have a

7    King anymore.  But it's the same principles.  The government

8    prosecutes.  The government arrests.  The government goes and

9    takes probable cause to the grand jury.  The government

10   interviews the witnesses.  They prepare for -- the government's

11   agents, the two U.S. Attorneys here, they prepare the evidence

12   for them to present to you and bring it to this courtroom.

13        I'm going to submit to you that what the evidence has

14   shown thus far is that Mr. Cooper was set up, and the government

15   has covered up what they did.  Really?  Yes, that's right.

16   That's what's taken place in this case.  Look at the very first

17   principle of investigation.  Interview all the people who saw and

18   heard what happened.  That's a principle of investigation.

19   That's your expectation, because when your government agents go

20   out and do that investigation, don't you want to know what

21   everybody who was there saw and heard?

22        They have to prove to you what happened.  How many

23   times did the government stand up here in argument and say, you

24   know, this correction officer, this correction officer, this

25   person that worked at the facility.  All those people were

1    interviewed.  Look at all those names on that sheet.

2         Every one of those people was in that waiting room

3    while this all occurred.  They were all there.  None of them were

4    interviewed by the government until April of 2012?  Did they go

5    someplace else?  Did they leave the prison?  Did they go home?

6    Where were they?  I'll tell you where they were.  They were right

7    there.  And when the F.B.I. comes out there and interviews three

8    days later, they didn't interview any of them.  None.  Why?

9    Well, maybe they thought what -- what Mr. Martinez told you.  He

10   ain't going to say anything when he's in prison.  Well, maybe.

11   Maybe.  But how do you know unless you ask?  Because Mr. Herrera

12   was willing to testify.  He was willing to say what happened.  He

13   was upset about the medical treatment out there.  This was a huge

14   concern.  He ended up having a stroke because of the medical

15   treatment up there.

16        Technology confounds me sometimes.  I grew up where we

17   pointed to things in the courtroom, and not with our fingers on a

18   TV screen.

19        Standing at this door after doing her alarm is Nurse

20   Elie, yelling at the two guys coming to their assistance.  Staff

21   about to be assaulted.

22        They made them better in the old days too.  I just

23   broke your pointer, Judge.  I apologize.  The tip came off.

24        Standing right here and saying that.  And she told you

25   under oath that she couldn't see what was going on over here.

1    How did she know somebody was being assaulted?

2              And what happens when you get that call?  What happens

3    when they say that to you, that these guys are coming to assist?

4    They thought they were just coming to a disruptive inmate,

5    somebody who's unruly, I think is the term they used.  Okay?  Not

6    an emergency.  Not an assault.  But before they get to this door,

7    they're being told that somebody's being assaulted in here.  What

8    does that do to that heart rate, to the anxiety level, everything

9    going on with those officers?  Puts them on high alert.  Puts

10   them into a position to -- to charge.  Rescue.  Right?  Isn't

11   that what takes place when they get that information?

12             And when they charge in here, what do they say they

13   saw?  They said that they saw Mr. Cooper facing Ms. Harmon, and

14   in her face, right?  This confrontation's going on.

15             Meanwhile, the dentist is over here, and he told you

16   that he only heard Harmon yelling.  Cranford and Campbell said

17   the defendant's yelling.  But Gaskin was right there, and he was

18   there for a while watching, wasn't he?  That's what he said.  And

19   he only heard Harmon yelling.  And actually, my recollection is

20   that Cranford said when he came through, he only heard Harmon

21   yelling.  He didn't hear Cooper yelling.  But they immediately --

22   because they're expecting on assault, they react as if there's an

23   assault going on.  They didn't come up and say Cooper settle

24   down.  Stand up against the wall.  They didn't come and say

25   Cooper get up against the wall.  That's how a man in uniform gets

1    control.  Doesn't have to physically grab him.

2            And what do they think's going to happen when they grab

3    this huge guy who they say is facing Ms. Harmon?  What did Gaskin

4    tell you?  Gaskin said when they came in, he was facing the wall.

5    And that's what the defendant told you when he's being carted

6    out.  I was facing the wall.  They came -- run in through the

7    door, and the guy got on my back and was choking me.  Well, if I

8    was Cranford or Campbell and I thought one of the ladies in this

9    institution was being assaulted by a big guy like him, I'm going

10   to go gang busters too.  Right?  That's the reaction you would

11   expect them to make.

12           Why were they misinformed?  Why were they told there

13   was an assault taking place here by Ms. Elie?

14           Another very important factor here, location.  Where

15   did things take place?  Because son of a gun, if it isn't a fact

16   that all three of the inmates, including the government's

17   witness, said that the argument was taking place in the waiting

18   room -- well, wait a minute.  That's not what the government's

19   people said.  They said he never went into the waiting room.

20   Gee, is there a significant difference?  And I submit to you yes,

21   there is.  There's a huge difference.  Because what did Elie tell

22   you -- or Elie?  Elie told you that she wanted him to leave.  She

23   wanted him to go to the waiting room.  Harmon said she had him

24   sit down in a chair.  Mr. Martinez came and told you that yeah,

25   one of the ladies told him to sit down.  He sat down in the chair

1    in the waiting room.  Not out here in the hallway.  And you saw

2    the photograph, and it's going to be in evidence, of this

3    hallway, and there's no chairs out there.  In this waiting room

4    there are a lot of chairs.  That's where all these guys are

5    sitting, all these guys that you have their names on your screen

6    up there.  And those are just the medical guys, remember?  There

7    was a separate sign-up sheet for the guys doing dental, which was

8    Mr. Ramos.

9         And what did Campbell tell you?  I mean, credibility is

10   very important.  Campbell said there are only two or three people

11   in that lobby when he came in.  Really?  Two or three?  How many

12   people are on that list?  Everybody that hasn't been checked in

13   yet, everybody that's, you know, down below that line there,

14   they're waiting.  Well, you can count pretty good.  That's more

15   than two or three.

16        And the other thing is they can't move.  They're locked

17   in here.  Remember how Elie told you how they lock this door and

18   they lock this door?  They can only go when there's movement.

19   Periodically through the day -- I don't know how often it is, but

20   periodically through the day they say, okay, everybody move, go

21   to the next station.  And they go eat.  They go to their

22   workplace.  They go to their rec place.  But then they have to be

23   someplace.  They can't just wander around.  This isn't a college

24   campus.  This is a secured facility.  They have to be accounted

25   for 24-7.  The staff wants you to believe that he was never in

 1     the waiting room.  Why?  You have to ask yourself that question,

 2     why?  Why is that the position they want you to believe?

 3              The activation of this alarm is huge, okay?  Because

 4     what's happening when they press that button on their side, to

 5     call in the calvary, to call in the troops, come on in because

 6     we've got a problem.  Not just, you know, somebody skinned their

 7     knee, or somebody's complaining about one thing or another.  No.

 8     We've got an emergency here.  This is an emergency signal sent

 9     out to every available man to come and help.  And they came with

10     one expectation, the expectation that there's an emergency here.

11              They testified repeatedly that it wasn't until the very

12     later stages of what was taking place that they then pushed their

13     buttons.  Right?  Harmon had already come out of the room.

14     Harmon had -- you know, Elie went into the office and had

15     Ms. Gonzales please call the -- the lieutenants.  Okay?

16     Everything's happening out here.  And then the lieutenants get

17     there pretty quick.

18              Mr. Herrera-Davila came here to tell you what he saw.

19     We found him.  I brought him in here to tell you what he saw.

20     And he said that it was in the waiting room that they activated

21     the button, before they even took him into the hallway, before he

22     had this so-called noncompliance.  He was being compliant.  Was

23     he upset?  Of course he was upset.  Cooper, 10:26, multiple

24     complaints the doctor says he had.  Doesn't say he got treated

25     for it.  In fact, we know that what happened was that the doctor

1   refused to treat him, because you can't have multiple complaints.

2   I -- I believe all of you have gone to a doctor.  I don't think

3   there's a single one of you that hasn't visited a doctor.  That's

4   just the way our society is these days.  And when you go to a

5   doctor and you don't feel well, you know, my back hurts, my knees

6   hurt, I've been getting these headaches, I've got sinus problems,

7   does your doctor tell you, well, what do you want me to treat?

8   The knees?  The nose?  The back?  Take a pick, but don't bother

9   me with the rest of this stuff.  I don't have time for you.  Is

10  that this wonderful red, white, and blue medical treatment that

11  they've been selling to you throughout this trial?

12          MS. ROLLEY:  Objection.

13          THE COURT:  Overruled.

14          MR. WEST:  No, it's not.  That's not medical treatment.

15  That's barely significant care.  Mr. Herrera didn't get good

16  treatment.  He ended up with a stroke.

17          THE COURT:  Mr. West, excuse me.  That is the second

18  time you've done that.  That testimony was excluded.  You're not

19  to refer to it again.

20          Ladies and gentlemen, you're to disregard the

21  statements of counsel with regard to any medical treatment to

22  Mr. Herrera, not consider that in your deliberations.

23          Go ahead, Mr. West.  Do not make reference to that

24  again.

25          MR. WEST:  I apologize, your Honor.  I -- if you struck

1  it, I didn't realize it.

2          Regardless, Mr. Cooper is there for medical treatment.

3  He needs to give, apparently, some reason to get a lower bump.

4  And you may as well check out what's going on, Doc, because, you

5  know, I'm an ex football player.  Do you know how many aches and

6  pains I've got left over?

7          MS. ROLLEY:  Objection.  Not in evidence.

8          MR. WEST:  This is argument, Judge.

9          THE COURT:  No, overruled.  Overruled.

10          MR. WEST:  Let's talk about injuries for a minute.

11  Ms. Harmon was on the witness stand, and she testified about

12  this -- this very small bruise that she had on her arm.  I think

13  it was a centimeter by a centimeter.  It was a pretty small --

14  pretty small bruise.  In fact.  I submit to you if you look at

15  the pictures.  You can't even see it.  And I asked her, don't you

16  think that if he wanted to hurt you, he could have really hurt

17  you?  I don't know.  Really?  Okay.  Now, I submit to you -- I

18  ask you that question.  Do you believe for a moment that if

19  Mr. Cooper wanted to hurt Ms. Harmon, that he could have

20  inflicted more damage than that little one centimeter by one

21  centimeter bruise on her arm?

22          And think about how she said she got it.  He threw her

23  up against the window sill.  Really?  With his humungous

24  strength, this mountain of a man threw this woman into a window

25  sill and she didn't even feel the pain a little while later, and

1   she only got this tiny little bruise?  I submit to you that

2   that's an exaggeration of what took place, because if he'd have

3   thrown her into that window sill, you'd expect broken bones,

4   large contusions, something that's going to last for a while,

5   because after all, as you remember, he's a football player -- a

6   professional football player.  Ever watch TV and see those guys

7   throw each other around?  Think about one of those guys throwing

8   that small lady around.  We're not getting just a little tiny

9   bruise here.

10          Lieutenant Campbell, a two by three centimeter bruise

11  on his arm after he was slammed into the wall.  He's on -- on the

12  left -- on the right arm.  And what they're telling you is that

13  Cooper's taking him and slamming him into the wall.  Right?

14  That's what they said.  Didn't break a rib?  Didn't bust his arm?

15  Didn't have a large contusion, at least?  No.  Take a couple

16  aspirin, put some ICE on it.  You'll be okay.  That was his

17  treatment.  That's it.  Was he really slammed into the wall by

18  this six-foot five football player who towers over him?  I submit

19  to you gross exaggeration by all those witnesses.

20          And do you remember something else?  Gaskin said that

21  didn't happen.  Gaskin said that he saw the defendant -- one guy

22  this way, one guy this way.  He wasn't flinging anybody into a

23  wall.  He was flinging him back behind him, because he was facing

24  the wall.  Why would Gaskin say that?

25          And then we get to Cranford's injuries.  The indictment

1   says he's got a dislocated finger.  Turns out it's not a

2   dislocated finger.  His major injury, the finger, was -- it was

3   jammed.  You know, you jam your finger reaching into something,

4   trying to grab something.  Maybe he jammed into the wall, who

5   knows, when he's struggling.  We don't say there's no struggle.

6   I mean, nobody's suggesting that.  But the injuries are not

7   consistent with somebody who has the size and strength of

8   Mr. Cooper who intended to cause bodily harm, because I submit to

9   you that this large gentleman in this courtroom, had he wanted to

10  hurt any of them he would have done so.  And isn't that what

11  Gaskin told you?  When he grabbed that left arm, it was like

12  steel.  Tremendous strength.  Gaskin's, what, six-one, six-two,

13  240?  Something like that?  Said he didn't feel like he had any

14  control of that arm whatsoever.  He felt like Cooper could have

15  done what he wanted to with him.

16           Why didn't he hurt the dentist?  Maybe the dentist

17  wasn't aggressive.

18           Your Honor, I've got a way to go.  Do you want to break

19  for lunch?

20           THE COURT:  Yes.  This is a good time?

21           MR. WEST:  Yes.

22           THE COURT:  All right, we'll take -- I can't see half

23  of you guys.

24           MR. WEST:  I'll get it, Judge.

25           THE COURT:  I just want to be able to look you in the

1    eye when I tell you to recall the admonitions, please, over the

2    noon recess.  So we'll come back at 1:30.  We'll -- we're going

3    to be concluding this case.  Midafternoon it will be submitted to

4    you.  But until then, do not talk about the case with each other,

5    nor with anyone else, and don't look anything up, and behave

6    yourselves otherwise during the noon recess, and be back in the

7    jury room ready to go at 1:30.

8                 All right, thank you.

9                 (The jury left the courtroom.)

10                THE COURT:  All right.

11                Mr. West, I'm kind of surprised at you, the seasoned

12   practitioner that you are.  During the testimony of the witness

13   Herrera there was a question put to him about his medical care,

14   and he wanted to say that that was related to the lack of care

15   out there at that facility, but an objection was sustained.  And

16   so you clearly knew that was not to be coming in evidence.  And

17   not only did you mention it once, but you're going to mention it

18   twice?

19                MR. WEST:  I apologize.

20                THE COURT:  Of course, it's not relevant to anything to

21   begin with --

22                MR. WEST:  Sure.

23                THE COURT:  -- but it obviously is prejudicial, and

24   that's why you want to mention it.  So I'm very surprised at your

25   conduct.

1      MR. WEST:  And I apologize, because I -- I honestly,

2  until you reminded me, did not recall that you had done that.

3  But, you know, I mean, it certainly was part of my thinking of

4  what I was going to argue when I was preparing argument this

5  morning, but I just didn't remember you sustaining it.  I

6  apologize, sir.

7      THE COURT:  All right.  Okay, 1:30.

8      MR. FIGUEROA:  1:30.

9      (The Court recessed at 12:05 p.m., and reconvened at

10  1:30 p.m.)

11      THE COURT:  All right, we're ready for the jury.

12      (The jury entered the courtroom.)

13      THE COURT:  All right, be seated please.

14      Back on the record -- well, I guess our jury's there.

15  Are there 13 people sitting in there?

16      MR. WEST:  There are, sir.

17      THE COURT:  All right, so the jury's in the box.  We

18  have counsel and the defendant.

19      Go ahead, Mr. West.

20      MR. WEST:  Thank you, your Honor.

21      I'm just going to make a few -- few points, remarks,

22  things that I want to kind of clean up and make sure you

23  understand.  I'm not trying to misguide you or anything.

24  Apparently, when I was talking before about when everybody -- I

25  need that mike again.

1               When I was talking about Gaskin saying he didn't hear

2     the defendant yelling, I wasn't talking about the whole -- whole

3     time here.  I -- and I just want to repeat it so I'm clear.  When

4     the officers ran through here, this is about the time that Harmon

5     is saying get up against the fucking wall.  And what Gaskin had

6     told us, sure, he'd heard the -- you know, argument and stuff

7     back here where it all started, and he heard the arguing, you

8     know, the words going back and forth here in the hallway.  And

9     clearly, Mr. Cooper is contributing to that argument.  But it was

10    just at this point when these guys are coming around the corner,

11    it was only Harmon that was saying that he was yelling, and it

12    was both Gaskin and -- check my notes again.  And it was

13    Harrelson Shultz who also said she didn't hear the defendant

14    yelling in response to that.  So just to clarify that, because

15    clearly, you know, in the hallway here, you know, he's unhappy

16    about what's been going on.  And I'll come back to that in a

17    little bit, but I just wanted to clear that up.

18               And then also, you know, the injuries to Ms. Harmon, I

19    had talked about that briefly, and I just wanted to remind you

20    that when she went and got examined by Nurse Elie and she was

21    asked, you know, how much does it hurt on a scale of 1 to 10 and

22    she said zero.  All right, maybe that little bump, whatever.  But

23    it certainly is indicative that, you know, there wasn't any great

24    harm being intended or caused here.

25               A few other things.  Now, when Ms. Harmon testified,

1    and I'll -- this may be a little bit fragmented, but I'm going to

2    do it anyway.   When the confrontation is taking place between

3    Cooper, and Cranford, and Campbell she indicated that when

4    Cranford was thrown off of my client, that he went down the

5    hallway this way, okay?  And then you had two other witnesses

6    that said he went this way.   These are small things, and I know

7    Mr. Figueroa at the beginning said, look, people are going to

8    remember things differently, but you know, it's a lot farther

9    distance down to the end of this hallway to throw somebody than

10   it is right next to where you're -- you're at.   Okay.   Maybe a

11   little bit more exaggeration.   Maybe just a mistake.   I don't

12   know, but it's something I need to point out to you.

13           The next issue is, again, Harmon.   She told you that

14   she had Mr. Cooper sit down in a chair right here.   But when we

15   look at the photographs, and we look at -- the representation

16   was -- was made that this hallway is the same -- same position as

17   it was before.   There's no chairs here.   Okay?  Now, Mr. Martinez

18   came in and told you that he was told to sit on one of these

19   chairs.   And that's where all the chairs are.   And you remember

20   Elie was saying and Harmon was telling you that they wanted to

21   get him out of the building.   They wanted to get him out of the

22   area into the waiting room until it was clear they could move him

23   and get him out of here.   So it makes sense that he was back in

24   the waiting room just as all three of the inmates who testified

25   said is where things happened.   You know, the beginning of -- of

1    the end here, so to speak.

2            Then we have this information also from Mr. Ramos.

3    And, you know, you guys don't work in the criminal -- criminal

4    world, but you know, just think if you're at the -- you're at a

5    big office, and somebody says the boss or the manager harassed

6    me, sexual harassment, whatever.  Okay.  The boss was sexually

7    harassing me.  So bigger higher-ups in the company want to have

8    people interviewed.  Would they interview those witnesses in

9    front of the person who is the accuser?  Doesn't happen.  It's

10   completely inappropriate.  And Ramos throws in something here

11   that nobody else told us, that Cooper's throwing chairs around.

12   Well, where's the evidence of that?  You know, and if this chair

13   was out here in the hallway like Harmon says, well, you know, you

14   would think that somebody would have talked about how the chair

15   got in the way, or Cooper picked up the chair, or they had -- the

16   chair got thrown down the hall.  Something would have happened

17   with the chair to clear this area for everybody else to come in

18   and do what's going on.  So the only logical explanation is that

19   he went back to this room, and he was told to sit down, and he

20   did.  And then they removed him, and took him into this hallway.

21           The handcuffs.  I mean, Ms. Harmon said her standard

22   set of handcuffs didn't fit.  That's why she wanted to take it

23   off.  But when everything is said and done and Mr. Cooper's on

24   the floor here, Cranford gives his standard sized handcuffs to

25   another officer with which he is restrained.  Same handcuffs.

1    Two sets of standard handcuffs.  One fits, and one doesn't.  That

2    seems kind of wrong, doesn't it?  Because that can't happen.

3    They're the same size.

4            I want to talk a little bit about the defendant's

5    injuries.  You know that he was examined.  I mean, we've got him

6    being taken off into the -- the secured housing unit, you know,

7    on that gurney.  They're wheeling him out over there.  And they

8    put him in a cell, and then later on they come to examine him for

9    injuries.  I mean, this is what -- they need to document these

10   things, because who knows what's going to happen in the future.

11   You know, potential injuries occurred.  They document them.

12   That's what they're supposed to do, and they did.  And he was

13   examined by -- and I'm going to call her nurse Harrelson Shultz.

14   And what did she find?  She found a bruise on the back left

15   shoulder.  She found abrasion posterior on the -- on the left

16   arm.  So over here on the left side he apparently got some

17   bruising.  Perhaps that's where he was laid down on, you know,

18   the pavement there on the floor.  But then she clearly says that

19   he has redness and, quote, anterior part of neck.  Now, I don't

20   know why she wanted to move that down to the clavicle, but she

21   did.  But then she, of course, had to agree that what she wrote

22   in her initial report, that there's these red marks on this guy's

23   neck.

24            Well, the other thing you know is that that examination

25   took place approximately an hour -- an hour after this incident.

1   Took place in the hallway.  So that redness wasn't just casual.

2   It stayed there for at least an hour so it was noticeable to a

3   medical practitioner, and she recorded it.

4        Everything he did as he's going out on the gurney is an

5   act.  He was playing to the camera.  Really?  It's the first time

6   that anything's being recorded that he can make his story known

7   as to what happened.  There's no recording in this room.  Again,

8   if we had a camera here showing us what happened, we probably

9   wouldn't be bothering with you folks, because it would be pretty

10  evident what took place, and in what sequence it took place.  We

11  don't have that kind of evidence.  We have to rely on witnesses

12  speaking here.

13       But you know, when you -- here he's being wheeled out.

14  I mean, and he's -- I couldn't count how many times he said he

15  was choked, but it was quite a bit.  And it was consistent.  He

16  said it over, and over, and over, and over again.  They didn't

17  just say that.  There's bits and pieces, and you'll have this in

18  evidence.  You can listen to it, less than seven minutes long.

19  And yet he's yelling.  But do you see him try -- you know, he's

20  being taken out.  I guess there are a lot of guys that figure

21  he's not going to struggle at that point in time.  But he said a

22  man wearing a white shirt came around the corner.  Well, he's

23  standing right here.  This is the corner the guy comes around,

24  right?  That's where they came through.  He came around the

25  corner.  The man in the white shirt -- both of those guys that

1    came in were wearing white shirts.  You notice all the other

2    folks, except for the -- I think there were two lieutenants, but

3    when they took him out on the gurney, they all had blue shirts

4    on, okay, with the exception of Lieutenant Elie, who was the guy

5    with the glasses you'll see on that film.  Nurse Elie's husband.

6    And he basically said he was attacked.  He was facing the wall,

7    and he was attacked.  And son of a gun, if that isn't exactly --

8    now, Gaskin didn't say he was attacked, but Gaskin says that they

9    came and physically applied force while he was facing the wall.

10   That's pretty consistent.  Is that play acting, or is he trying

11   to get his story out?  Is he trying to -- when they are recording

12   him, to tell what happened?

13          Okay, I want to walk right through this thing now.

14   Waiting here for a while is Mr. Cooper along with maybe a dozen

15   or more other inmates waiting for medical attention.  They're

16   getting upset.  They're getting impatient.  They're made to wait.

17   They don't know why they're waiting, okay?  He finally gets his

18   turn, right?  He goes down here, and according to that exam sheet

19   he had multiple complaints.  And the doctor said, sorry, we don't

20   do multiple complaints.  We only do one complaint per visit.  If

21   you've got two complaints, you bring the second one back tomorrow

22   or next week, all right?  Not happy with that?  Doctor says get

23   out of here, you know.  Cooper -- is he happy about that?  No.

24   He went there for -- you know, for medical reasons.  So he goes

25   down the hallway, and he's grumbling, and he's upset.

1          He's confronted by Nurse Elie.  Nurse Elie tells him to

2   calm down.  Okay.  Maybe he keeps grumbling, but eventually he

3   ends up back in this waiting room.  And then Harrelson comes

4   in -- Harmon comes in, excuse me.  Harmon comes in, and she tells

5   him to sit down in the chair.  He complies.  Him and Elie get

6   into it again.  Harmon says the chair's out here.  We believe the

7   chair's in here.  But Elie comes back and confronts him again.

8   And Martinez says she was acting unprofessional.  She's stoking

9   the fire.  She's making matters worse.  She is not de-escalating

10  the situation.  Harmon did.  Harmon de-escalated.  You know, you

11  take this big guy, and you put him in a chair.  You're looking

12  down at him now.  He's not a threat in that chair, like he is

13  standing up.  He did what he was told.  He was in compliance.  He

14  followed the orders.  Maybe he didn't shut up, okay?  All right?

15  You know, I'm not saying he was silent, but sitting here.  Then

16  after the argument ensues again, and Elie hits her panic button

17  in that waiting room, just like Mr. Herrera-Davila said.  She was

18  standing right in front of me.  I saw her.  Okay?  Then they take

19  him out here.

20         Now, there's a question at this point in time as to

21  whether he's facing the wall, not facing the wall, but what we do

22  know is he is complying with their order to cuff up.  He's put

23  his hands behind his back.  He has provided his hands to put

24  handcuffs on him.  And then, you know, it appears he's eventually

25  up against the wall, because she asks him to turn around.  And he

1   gets upset, because this isn't the norm.  This isn't how you get

2   cuffed up.  You get both cuffs up.  You're not told to be turned

3   around with one cuff on your wrist, because ladies and gentlemen,

4   that is a weapon, or an accident, or a harm waiting to occur

5   should he choose to do so.  But what happens?  Harmon takes the

6   cuff off.  Is there anybody here that can imagine for a moment

7   that she could take that handcuff off if he didn't comply?  He

8   could just have stood there with one hand like this up against

9   her head, and it would have been -- you know.  It wouldn't

10  happen.  It just could never happen unless he complied.  And then

11  he complied.  And then she says face the fucking wall.  Gaskin

12  says he's facing the wall.  And at the same time this procedure

13  here is going on with Harmon, here's Elie at this door, the one

14  who has aggravated the situation, the one that has been

15  unprofessional, the one that does the alarm.  She's standing at

16  this door, and she makes a fraudulent statement:  Staff about to

17  be assaulted.

18          And the troops are coming hard now.  They're coming to

19  charge, and they're going to take down that assaulter.  And so

20  what do they do?  Physical assault.  Some people will tell you,

21  maybe the government will argue to you that you just are supposed

22  to take it.  Doesn't matter.  You're an inmate.  You're a

23  prisoner.  You've got no rights.  They want to assault you, too

24  bad.  Sue us.  But you can't touch us back.  Well, things happen

25  like that.  Things happen when people get under extremely

1    stressful situations.  He's angry about the medical.  He's angry
2    with the way the -- the nurse is treating him.  And he starts to
3    settle down, and she re-flames it.  She gets more angry, and he
4    goes down here.  And even though he's angry and given lip, he
5    submits to their authority.  And then they take the cuff off.
6    The next thing he knows, two guys are coming hard at him, and one
7    of them puts his arm around his neck.  They deny doing that.
8    Well, probably.  I mean, I don't know.  Maybe it never happened.
9    But throughout the entire sequence from there on forward,
10   everybody says we didn't put any arm on his neck.  Controlled his
11   arms.  Controlled his legs.  Nobody did anything to his neck.
12   And an hour later he's got this injury to his neck that hasn't
13   gone away.  Where did it come from?  Did he self-inflict it?  Was
14   he just acting?

15          Nurse Elie came in here and absolutely denied ever
16   making this statement while she's standing at that door, staff
17   about to be assaulted.  She didn't say that.  Never said that.
18   Campbell, the lieutenant who's coming, says I don't remember.
19   But Cranford -- Cranford says that's exactly what she said.
20   Staff about to be assaulted.  Hurry up.  Stop walking.  Run.
21   These guys were walking over to an unruly inmate.  Now they're
22   running to an assault.  Can anybody imagine a good thing
23   happening at that point in time?

24          There are essentially two defenses that we have here.
25   The first one is just simply based on reasonable doubt.  They

1   haven't proven the elements of their crime, because they read you

2   part of the elements of the crime but they forgot the other part.

3   They read to you the part about the act, okay?  You know, causing

4   injury.  The fact that the person works there, that kind of

5   stuff.  But there's a word in the first paragraph of those that

6   says forcible assault.  Okay?  So there's three elements.  The

7   first one says forcible assault.  Well, that has to be with

8   intent to harm.

9          MR. FIGUEROA:  Objection, your Honor.  That is not --

10  that is not the law.

11         THE COURT:  Yeah, I'll be telling them what the law is.

12         MR. WEST:  Well, maybe I misread it.  It says when one

13  person intentionally strikes another, or willfully attempts to

14  inflict injury on another, or makes a threat coupled with

15  apparent ability to inflict injury on another which causes a

16  reasonable apprehension of immediate bodily harm.

17         So there has to be a state of mind here along with the

18  act, okay?  Because if he is reacting under this high stress

19  situation to what he perceives as his life forces starting to

20  disappear because he's got this -- this choke hold on him --

21         MR. FIGUEROA:  Your Honor, may I object?  That --

22  that's not the law, and not in your instructions.

23         THE COURT:  Go ahead, Mr. West.

24         MR. WEST:  Thank you, sir.

25         Then it's a reflex action.  Fight and flight is the

1   symptom that they talk about.  You guys know about that.  Okay?

2   This is kind of common knowledge.  Something happens that

3   startles you, you react.  Okay?  You know, you're walking down

4   the -- down the trail.  You hear that rattlesnake.  You know, if

5   you're walking, you react.  You didn't think about that for a

6   second.  You never thought about jumping back, because if you

7   had, it might have been too late.  Your body tells you to move in

8   emergency situations.  It's a natural physiological event.

9           The second defense, and basically what that is, is they

10  didn't prove the case to you beyond a reasonable doubt.  They

11  didn't prove to you that he was -- wasn't just acting, you know,

12  in this flight or fight syndrome at the time that he was being

13  grabbed and assaulted by these officers.  Okay?  And I submit to

14  you because they're probably going to say, look, if they grab me,

15  you just can't resist.  That's all.  But think about what's going

16  on in their mind.  They're going in to protect some lady being

17  assaulted by this big brute.  They're not coming in here with

18  gentle hands.  They're coming in there with intent to, you know,

19  make this guy succumb any way they can.

20          The other thing is something that was touched on in --

21  in their closing, and that's this -- if there's -- if you believe

22  essentially, basically, what I'm telling you, then you've got to

23  acquit him, because he was justified to do what he did.  Conduct

24  is justified only if at the time of the crime charged, and that

25  is not when he's being taken down on the gurney.  That's not when

1    they're arguing in the waiting room.  That's just this action --

2    what does it take?  Ten seconds?  Fifteen seconds?  That's it.

3    You know, things happen real quick.  That he was under an

4    unlawful and present threat of death or serious bodily injury.

5    Well, I submit to you there is more than adequate evidence for

6    you -- circumstantial evidence, I agree, okay?  But the law says

7    circumstantial evidence is just as convincing as -- as direct

8    evidence if you think it makes sense, okay?

9            So I'm suggesting, and telling you that he's being

10   choked.  And we have two physical pieces of evidence about that.

11   One, the redness of his throat.  But two, Cranford says he

12   doesn't know how the tooth marks got on the back of his hand, was

13   never up around his head or his throat, but close your eyes and

14   visualize I've got to get this arm off of my throat.  I'm a big

15   man.  I'm strong.  I pull it off.  What's the natural direction

16   that hands are going to go?  Right by his mouth, which just

17   happened to be where his teeth are.  Because nobody suggested

18   anybody was trying to bite anybody, right?  There's nothing like

19   that going on.  And you know, in line with that, Cranford swore

20   under oath that he never, never went towards his head.

21           What did Gaskin tell you?  Now, the sequence doesn't

22   fit.  I submit to you my sequence is off if this is what I'm

23   telling you, but Gaskin said he went to his head.  Because Gaskin

24   had the left arm, Campbell had the right arm, and Cranford went

25   for his head.  Gaskin didn't pay attention to what he was doing

1    with his head.   Okay.   Maybe that head stuff happened before

2    Gaskin got involved.   And I submit to you that that would be part

3    of our justification.

4            The second part of this is did he recklessly place

5    himself in a situation where he would be forced to engage in

6    criminal conduct?  I mean, to be reckless, he's got to foresee

7    the risk.   He's got to foresee the idea that he goes over here

8    and stands against the wall, that he's going to place himself in

9    a position where he's going to have to assault somebody.   Really?

10   He's being compliant.   He's being -- he's being told what to do.

11   He was doing what he was told to do.   How can that be reckless?

12           The defendant had no legal alternative.   It was a

13   conscious act in the first place.   A legal alternative is when

14   you have a time, an opportunity to reflect and think about your

15   actions.   And in his circumstance in that brief moment he had no

16   time to reflect.   He reflexively acted, because he thought the

17   life force was leaving his body.

18           The last one is that -- the direct causal relationship

19   between the conduct and avoiding the harm.   Well, clearly they're

20   related.   If that's in fact what happened, he's pulling that arm

21   off his throat, then everything fits like a glove.

22           The jury has a duty to consider all the evidence that

23   came in.   You have to decide what you want to believe, and what

24   you don't want to believe.   But one of the basic principles is

25   that each and every one of you has to decide the facts for

1    yourself.  That doesn't mean you've got to be stubborn, and you

2    know, everybody said it was a blue car, and -- and you think

3    somebody said it was a green car, and you're just not -- doesn't

4    matter what anyone else said.  You're never going to agree that

5    they said it was a blue car.  Well, it may be kind of hardheaded.

6    But if you honestly believe it was the other color car and so

7    therefore the car in question wasn't involved, then you can't

8    give up those beliefs.  Okay?  You have to stick to your guns.

9    Each and every one of you have to decide.

10            Now, we call it deliberation.  So you go through and

11   you talk about all the facts.  You try to figure out what the

12   facts are, okay?  What do you believe, what don't you believe?

13   I'm telling you that the game's rigged here.  Okay?  They didn't

14   want anybody to know that this stuff started in the waiting room.

15   That's why they don't do any investigation of the people in the

16   waiting room.  Only the government agents keep him out in this

17   hallway.  They tell you the alarm is -- is bumped over there.

18   The eye witness says no.  She was standing right in front of me

19   when I saw her do that.  The same witness says I never told them

20   that the staff was about to be assaulted.  Yet their own witness

21   says that happens.  These are the things you consider when you're

22   considering credibility.  And then you take the stuff that's not

23   credible, you put it on the side of the table, you throw it in

24   the trash can, and you start looking at the credible evidence.

25   The medical evidence isn't going away.  That redness on his neck

1    is not going to disappear.

2            All I ask you at this time is that you just go back and

3    fairly go discuss this, think it through, use your conscience.

4    Think about the logic of this whole thing.  This giant of a man

5    caused a one-by-one centimeter injury when he threw somebody into

6    a window sill?  Is that really logical?  Is that really credible?

7    It's not.  It just isn't.  You would expect that if Adrian Cooper

8    wanted to commit mayhem and assault over there, that you'd be

9    talking about huge bruises.  You'd be talking about broken bones,

10   busted jaws, broken noses.  That would be consistent with him

11   intending to assault these people.  What happened here is

12   completely inconsistent with that.

13           So after you consider everything, I'd ask you find him

14   not guilty of all the charges.

15           Thank you.

16           THE COURT:  All right, Mr. Figueroa, are you going to

17   --

18           MR. FIGUEROA:  Yes.

19           THE COURT:  All right.

20           (Counsel conferred off the record.)

21           MR. FIGUEROA:  Good afternoon, ladies and gentlemen.

22   My name's Jesse Figueroa.  I'm introducing myself again.  And

23   this portion of trial, it's called rebuttal argument.  And this

24   gives us a chance to respond to whatever arguments Mr. West made

25   in his closing arguments.  So I'm going to try to go down as they

1   appeared in his arguments.

2           He talks about this photograph that he said there's no

3   chairs in the photograph.  And that's right, there is no chairs

4   in the photograph -- there are no chairs in the photograph.  That

5   photograph was admitted just to show the location of the hall and

6   the general area where things occurred.

7           MR. WEST:  And I'm going to object.  It was --

8           THE COURT:  Overruled.

9           MR. WEST:  -- qualified as the same condition.

10          THE COURT:  It was.  The jury knows that.

11          MR. WEST:  Thank you.

12          MR. FIGUEROA:  And ladies and gentlemen, if -- whether

13  or not there were chairs in that area at that time and if that

14  was important, then he should have asked that of the witnesses

15  and not ask you to speculate that from that picture.

16          Then he said it was inappropriate for Cranford to be

17  there when Ramos was interviewed.  Why?  I guess his argument is

18  that, well, Cranford is going to go ahead and influence Ramos to

19  say something that is untrue, to influence him to say something

20  that is going to help the prosecution.

21          So what did Ramos say?  Ramos said essentially the same

22  things that his two witnesses said, that he was in the waiting

23  room, that Cooper was angry, that there was a struggle.  And he

24  did say that a chair was thrown.  But do you really believe

25  Cranford told him to say that?  If Cranford wanted him to say

1    that, why didn't Cranford say that from the stand?  Why didn't

2    Cranford put something like that in his report?  I submit to you,

3    ladies and gentlemen, Cranford had no influence on what he said.

4           Then he talked about the handcuffs.  He said that Joan

5    Harmon was concerned because the handcuffs didn't fit.  I think

6    she said they were -- they didn't fit because they couldn't go

7    past one click, and she thought they could be compromised.  He

8    found fault with the fact that once Cooper was subdued, Cranford

9    gave his standard sized handcuffs to another person, and he finds

10   fault with that.  Well, this situation, ladies and gentlemen, was

11   completely different than the situation Joan was faced with.

12   Joan was by herself, a couple other female nurses in the hallway

13   with this giant man, and by the time Cranford gives his cuffs to

14   others, there's already eight people holding him down, and he's

15   going to be transferred to another cell.  He's under control.

16          Then he talked about the video telling his story.

17   Well, the video tells a story, ladies and gentlemen, after the

18   assaults.

19          He finds fault with the fact that you can't see

20   multiple complaints at the medical facility, as though Cooper was

21   blindsided by this.  But the testimony, ladies and gentlemen, is

22   that he had been to the facility before.  He knew what was going

23   on there.  He knew enough to go to the facility to get a

24   permit -- or an excuse so that he could get a lower bunk.  And

25   also the testimony, ladies and gentlemen, is that if it is a

1   non-emergency situation and somebody comes in complaining -- and

2   somebody comes in with a scalp injury, and a broken arm, and a

3   broken leg because of a fall, they will be treated for all those

4   injuries because it's one incident.

5          Then he says, well, the defendant was stressed, and

6   that's kind of the reason why he decided to assault three

7   officers.  Well, of course he's stressed.  He's in prison, ladies

8   and gentlemen.  He does not have a right to act out.  He's under

9   the control of the government, because he is in prison because

10  he's a criminal.

11         Then he says this is all a reflex action.  Ladies and

12  gentlemen, he's confusing intent, reflex -- he's trying to

13  confuse you.  A reflex, ladies and gentlemen, would be if

14  somebody hits my knee and my leg pops up, or if the lights change

15  here and my pupils dilated in response to the change in light.

16  This was not a reflex action, ladies and gentlemen.  He

17  intended -- he intended to throw those officers off.  And even if

18  it was a reflex action for one of them, do you believe that he

19  had it three times -- oops, that's a reflex.  I didn't mean to do

20  that.  Oops, here's another one.  I didn't mean to do that --

21  three times, ladies and gentlemen?  This was not a reflex action

22  on his part.  This was a conscious, intentional act to fight with

23  the cops, to fight with the officers because nobody tells him

24  what to do.

25         He wants you to believe, and he said as much, that the

1    officers and the nurses picked the fight with Cooper.  He wants

2    you to believe, more or less, that he was just minding his own

3    business when he was attacked.  And the facts, ladies and

4    gentlemen, prove otherwise.  The facts showed that he started

5    this by his anger, by his belligerence, by his intimidation.  The

6    facts show he was angry and belligerent on July 2nd when he first

7    encountered Nurse Holly Harrelson Shultz and got into an argument

8    with her over that lower bunk, and intimidated her into going and

9    contacting a lieutenant.

10           The facts show that he was angry and belligerent on

11   July 6th.  And this was testified to by Ramos-Gonzales, Diane

12   Elie, Joan Harmon, Clint Cranford, Curtis Campbell, Lani Maggie

13   Gonzales, Holly Harrelson Schultz, Dr. Gaskin, and even the

14   defense witnesses.  And it's even borne out, ladies and

15   gentlemen, by the video which shows that after the incident, he's

16   angry, he's yelling, and he's intimidating.  And you can see as

17   he's being wheeled out on that gurney just how his muscles were

18   rippling in his back.  He is an intimidating, strong man.

19           The facts show that he fought with the officers.

20   Again, that was witnessed by Carlos Ramon-Gonzales -- Carlos

21   Ramos-Gonzales, rather.  By Joan Harmon, again.  Clint, Curtis,

22   Lani, Holly, Dr. Gaskin.  And the fight was corroborated by the

23   defense's own witnesses.

24           Then he argues that his client was choked.  And -- and

25   as proof of that, he says there was some redness.  I submit to

1    you, ladies and gentlemen, if you get in a fight with eight big

2    officers who are trying to subdue you, you are going to

3    experience some kind of bruise, and some kind of redness.  And I

4    submit to you that's where that came from.

5           And then he said, well, proof that he was choked came

6    from Cranford, who said the marks on his hand were from the teeth

7    marks.  Well, Cranford didn't know where they came from, and the

8    doctor only said that it looked like teeth marks.  Cranford

9    doesn't even know how he got the other bruises to his arm that

10   you will see in one of the exhibits.

11          He was not choked.  The testimony of all who saw the

12   incident said he was not choked.  Surely, Joan didn't choke him,

13   unless you believe a person can be choked by having his thumb

14   squeezed.  Dentist Jeff Gaskin said he saw the defendant in a

15   headlock.  He didn't say he was being choked.  And as you know,

16   ladies and gentlemen, your common sense tells you there's a

17   difference between grabbing a person's head and choking him.

18   Gaskin said, and common sense tells you, that when a person is

19   being choked, he cannot talk, let alone yell the way Cooper was

20   doing.  In fact, Dr. Gaskin told you that the uniform sign for a

21   person being choked, perhaps on food, is to go like this, because

22   the person is unable to verbalize what is happening to him.  And

23   most importantly, ladies and gentlemen, if he was choked

24   accidently during this headlock, which he was not, this does not

25   justify his actions, because by the time Gaskin joined in and saw

1   the headlock, Cooper had already committed his assaults on these

2   officers.  He had already thrown off Cranford, rammed Campbell,

3   and rammed Holly Harmon (sic).

4          Then he says Elie started it.  Well, first of all,

5   Cooper's in prison.  He's in prison.  This is a dangerous place.

6   It's dangerous for everybody.  It's dangerous for law

7   enforcement.  It's dangerous for secretaries.  It's dangerous for

8   inmates.  It's dangerous for everybody.  He does not have a right

9   to yell at staff.  He does not have a right to intimidate them.

10  They have to control every situation for the safety of everybody

11  in there.  And the defendant's first witness, Martinez, said

12  that.  I admit this is not much of a prison with cabanas and

13  TV's, but it's still a prison.

14         Also, ladies and gentlemen, he's the one who started

15  the situation by yelling in the hall.  He cannot complain now

16  that his actions -- his actions caused people to react to him.

17         Mr. West argues that there are inconsistencies between

18  the witness' testimony and even between their testimony and their

19  reports.  I agree, ladies and gentlemen, there are

20  inconsistencies.  There are also inconsistencies, ladies and

21  gentlemen, between the testimony of the defense witnesses.  For

22  example, Herrera saw a nurse hit her alarm in the waiting room.

23  Martinez did not.  Mr. West would have you believe, if he applies

24  the same standard to inconsistencies from correction officers,

25  that his witnesses lied, and that all their testimony must be

1    disbelieved.

2           But I submit to you, ladies and gentlemen, that

3    inconsistencies about minor facts is what you would expect in a

4    situation like this.  This was a traumatic situation.  The people

5    that were involved were focused mainly on what was happening to

6    them.  That's the testimony of Mr. Gaskin.

7           Also, ladies and gentlemen, this happened over three

8    years ago.  I submit, ladies and gentlemen, that inconsistencies

9    over minor points such as was there an argument in the waiting

10   room shows the witnesses are telling the truth.  If a witnesses

11   came here -- all eight of my witnesses, and if their testimony

12   exactly mirrored the testimony of the people who testified before

13   them and who testified after them, I'd submit that there's a

14   strong indication that before trial they got together and they

15   arranged their testimony so that there was no leeway one way or

16   another, so that they were walking lock-step.  I submit, ladies

17   and gentlemen, that the fact that there are inconsistencies over

18   minor things that happened three years later after a traumatic

19   incident shows that they were telling the truth.

20           I submit, ladies and gentlemen, you would expect a

21   witness to remember that Cooper was angry and belligerent on

22   July 6th.  That's what's remembered by Ramos, Elie, Harmon,

23   Clint, Curtis, Lani, Holly, Gaskin, defense witnesses, and again,

24   the video shows that.  You would expect the witnesses to remember

25   that Cooper was in a fight with the officers, and that is what is

1    remembered by Gonzalez, Harmon, Clinton, Curtis, Lani Gonzalez,

2    Gaskin, and implication by implication from the other witnesses.

3                Then this is a weird one, ladies and gentlemen.  He

4    says Cooper was set up.  In a case like this in order for

5    inconsistencies to warrant an acquittal, you would have to find

6    the witnesses lied.  Cooper says he was set up, and this is all a

7    big cover up.  Really, ladies and gentlemen?  Really?  Why,

8    ladies and gentlemen?  Why would all these good people get

9    together, conspire in the dark, perhaps, at somebody's house to

10   get Mr. Cooper?  Who is Mr. Cooper that he deserves this type

11   of -- of conspirational treatment?  Have you heard that he's

12   somebody who's hated by them?

13               And ladies and gentlemen, the judge told you and will

14   tell you that you have to determine the credibility of the

15   witnesses.  Does anyone here, ladies and gentlemen, really

16   believe that Holly Harrelson Shultz is a liar?  Does anybody here

17   really believe that Lani Gonzalez is a liar, or Dr. Gaskin is a

18   liar?  I submit to you, ladies and gentlemen, the evidence shows

19   you that they told you the truth.

20               The defense spent a lot of time questioning about

21   matters that really are not important for your decision.  He

22   questioned about the proper procedure for cuffing an inmate.  He

23   questioned about Cooper's list of ailments, and other things.

24   The judge isn't going to instruct you, ladies and gentlemen, that

25   Cooper is entitled to attack staff, and to attack a secretary

1   because his free health care is not what he wants, or the wait

2   for his free health care is too long, or his wrists were too big

3   to accommodate the handcuffs.

4           Then he says he was playing with them.  He did not

5   seriously hurt them.  Well, good.  Good for the officers, and

6   good for him, because if these people had been seriously hurt, he

7   would be facing a lot more difficulty.  He would be facing more

8   serious charges than he is facing in court today.  It is no

9   defense, ladies and gentlemen, that somebody assaults an officer

10  and is just toying with them.

11          He says Joan only had a small bruise.  It didn't hurt

12  the next day.  Well, ladies and gentlemen, she is entitled to go

13  to work and to come home in exactly the same condition as she did

14  when she left for work in the morning.  She -- nobody is entitled

15  to injure her.  She was entitled to return without a bruise, and

16  without having experienced the pain she felt when she fought with

17  him.  It is no -- no defense to him that he didn't kill these

18  people, and it's no defense that Joan is a tough gal and said she

19  felt no pain the next day.

20          The judge will instruct you on reasonable doubt.

21  Mr. West talked about it.  Now, reasonable doubt, ladies and

22  gentlemen, is a concept that is so ingrained with us as Americans

23  that you know what it is.  And I think the judge cited this as an

24  example when you were being voir dired.  Instead of presenting

25  witnesses in this case, I'd have just made my opening statement

1    and sat down, and the judge would have instructed you on the law

2    and sent you back there to deliberate.  You would have said

3    what's going on with this guy?  There's no evidence here.  His

4    statement is not evidence.  And you wouldn't have convicted.  And

5    you'd have been right.  But I submit to you, ladies and

6    gentlemen, that if you go back into that jury room after hearing

7    these two days of trial, after listening to the judge's

8    instructions, after considering them and the facts of the case,

9    if you think that he is guilty, I submit I have proven him guilty

10   beyond a reasonable doubt.

11          The judge -- the instruction says that reasonable doubt

12   is based on reason and common sense, and not speculation.  And I

13   submit, ladies and gentlemen, that reason and common sense tells

14   you that he is guilty.

15          Mr. West also said the first rule is to interview all

16   the witnesses.  Well, I disagree with that.  I think the first

17   rule is to decide if a person is a witness.  The people in the

18   waiting room didn't see the assaults.  They weren't witnesses.

19          Secondly, they weren't going to tell the government

20   what they saw anyhow.  We're on the other side.  They would be

21   branded snitches.  That was the testimony of the defendant's

22   first witness, Mr. Martinez.  The best we can do, ladies and

23   gentlemen, is what we did do, to provide the names to the defense

24   so he can talk to them under different circumstances, which he

25   did, only to find out they really didn't see the fight, but one

1   saw an officer flying; only to find out what the others told you

2   was that Cooper was angry and combative; and only to find out

3   that there was a struggle.  And you know, I -- I'll -- we get

4   cases -- we don't stop investigating them.  Mr. West did not stop

5   investigating when he got the case.  That just starts the case.

6   So the investigation continues.  It's up to the lawyers to do a

7   lot of legwork themselves, and that's what was done in this case

8   by both parties.

9          Then he said Clint and Curtis were wrong in grabbing

10  Cooper.  I would suggest, ladies and gentlemen, they would be

11  derelict if they didn't.  They ran in there and they saw this

12  huge man in Joan Harmon's face yelling at her.  They had to do

13  something, ladies and gentlemen.  They did what they were

14  supposed to do.

15         Now, Mr. West talked about justification.  And the

16  first thing I would like to say about justification is that it's

17  not self-defense.  It's something different.  A good example of

18  justification is, for example, if a person is not permitted to

19  possess a firearm for some reason, he's got a felony, and then

20  one day he sees an armed intruder coming into his bedroom and he

21  grabs a gun to scare him off, that situation, his actions in

22  grabbing a gun are justified, and he would not be charged with,

23  say, being a felon in possession of a firearm.  And that's

24  because all the elements of the defense, as the judge will

25  instruct you, are met.  First of all, he was under an unlawful

1    and present threat of death or serious bodily injury.  Secondly,

2    he did not recklessly place himself in a situation where he would

3    be forced to engage in that conduct.  Thirdly, he had no

4    reasonable legal alternative, let's say he didn't have time to

5    call the police, or didn't have a phone.  And fourth, there was a

6    direct causal relationship between the act.

7               Now, that's not the case here.  Cooper placed himself

8    in the situation, ladies and gentlemen, by putting himself in a

9    force where it's reasonable to believe -- by putting himself in a

10   position where it's reasonable to believe that force would have

11   to be used.  He was arguing.  He was confronting.  He was

12   combative.  Mr. Martinez said that you don't do that.  And also,

13   he had a reasonable alternative to the use of force.  He could

14   have just stopped.  He could have just stopped and not waved his

15   hand wildly.  He could have submitted to Clint.  He could have

16   submitted to Campbell, and he did not.  So justification does not

17   apply.

18               There is another thing that I would like to say about

19   justification.  There are three crimes here.  There's an assault

20   with Clint Cranford as a victim.  There's an assault with Curtis

21   Campbell as a victim.  There's an assault with Joan Harmon as a

22   victim.  These assaults all involved different acts on the part

23   of Cooper.  Cooper threw Cranford off like a rag doll, he said.

24   He rammed Curtis into a window, and he pushed Joan.  The

25   justification defense has to apply to all three of these people

1    individually.  It's not a -- it's not a defense that applies once

2    to all of them.  The judge will instruct you the defendant's

3    conduct was justified only if at the time of the crime charged.

4    So if you're applying this defense, you have to look at all three

5    assaults.

6            Evidently, Mr. West is saying that he was choked.  In

7    order to find justification as a defense, you would have to find

8    either that all three of my victims had their hands around

9    Cooper's neck at the same time and he acted that way, or they

10   were waiting in line.  Once Cranford finished -- stopped choking

11   him, then Campbell started, then Harmon started.  Ladies and

12   gentlemen, that is nonsense.  That's not the facts here.  And

13   even in his video he says he was only choked by one person, if

14   you believe that.

15           Ladies and gentlemen, I submit that we've proven the

16   defendant guilty of all charges beyond a reasonable doubt.  He's

17   in prison.  He had to comply for the safety of the guards, the

18   employees, the inmates, and the security of the institution.  He

19   did not have a right to act this way.  The officers, the

20   secretaries, the nurses did everything they could to calm him

21   down.  He was just in a rage.

22           I'd ask you to convict.

23           Thank you.

24           THE COURT:  All right, ladies and gentlemen, it's now

25   my duty to instruct you on the law that applies to the case, and

1  to assist you I've given each one of you a copy of those

2  instructions.  And you can read along with me, or you can just

3  listen to the reading of the instructions.  I'm also going to let

4  you take that copy of the instructions back in the jury room with

5  you.

6          So I know -- I know you can read them, but I have to

7  make sure for the record that all jurors have heard the law that

8  applies to the case at least one time, and the only way I can

9  assure the record of that is to read them to you.  So if you'd

10  please heed the reading of the instructions.

11          It is your duty to weigh and to evaluate all the

12  evidence received in the case, and in that process to decide the

13  facts.

14          It is also your duty to apply the law as I give it to

15  you to the facts as you find them, whether you agree with the law

16  or not.

17          You must decide the case solely on the evidence and the

18  law, and must not be influenced by any personal likes or

19  dislikes, opinions, prejudices, or sympathy.  You will recall

20  that you took an oath promising to do so at the beginning of the

21  case.

22          You must follow all these instructions, and not single

23  out some and ignore others.  They are all equally important.

24          Please do not read into these instructions or into

25  anything I may have said or done any suggestion as to what

1   verdict you should return.  That is a matter entirely up to you.

2           The indictment is not evidence.  The defendant has

3   pleaded not guilty to the charges.  The defendant is presumed to

4   be innocent unless and until the government proves the defendant

5   guilty beyond a reasonable doubt.

6           In addition, the defendant does not have to testify or

7   present any evidence to prove innocence.  The government has the

8   burden of proving every element of the charges beyond a

9   reasonable doubt.

10          A defendant in a criminal case has a constitutional

11  right not to testify.  You may not draw any inference of any kind

12  from the fact that the defendant did not testify.

13          The next instruction is not applicable, so just skip

14  it.

15          The evidence you are to consider in deciding what the

16  facts are consists of, (1), the sworn testimony of any witness;

17  (2), the exhibits received in evidence; and (3), any facts to

18  which the parties have agreed.

19          In reaching your verdict, you may consider only the

20  testimony and exhibits received in evidence.  The following

21  things are not evidence, and you may not consider them in

22  deciding what the facts are:

23          (1), questions, statements, objections and arguments by

24  the lawyers are not evidence.  The lawyers are not witnesses.

25  Although you must consider a lawyer's questions to understand the

1    answers of a witness, the lawyers' questions are not evidence.

2          Similarly, what the lawyers have said in their opening

3    statements, closing arguments, and at other times is intended to

4    help you interpret the evidence, but it is not evidence.  If the

5    facts as you remember them differ from the way the lawyers state

6    them, your memory of them controls.

7          (2), any testimony that I have excluded, stricken, or

8    instructed you to disregard is not evidence.

9          In addition, some evidence may have been received only

10   for a limited purpose.  When I have instructed you to consider

11   certain evidence in a limited way, you must do.

12         (3), anything you may have seen or heard when the Court

13   was not in session is not evidence.  You are to decide the case

14   solely on the evidence received at the trial.

15         Evidence may be direct or circumstantial.  Direct

16   evidence is direct proof of a fact, such as testimony by a

17   witness about what that witness personally saw, or heard, or did.

18   Circumstantial evidence is indirect evidence; that is, it is

19   proof of one or more facts from which you can find another fact.

20         You are to consider both direct and circumstantial

21   evidence.  Either can be used to prove any fact.  The law makes

22   no distinction between the weight to be given to either direct or

23   circumstantial evidence.  It is for you to decide how much weight

24   to give to any evidence.

25         In deciding the facts in this case, you may have to

1  decide which testimony to believe, and which testimony not to

2  believe.  You may believe everything a witness says, or part of

3  it, or none of it.

4        In considering the testimony of any witness, you may

5  take into account, (1), the witness' opportunity and ability to

6  see, or hear, or know the things testified to; (2), the witness'

7  memory; (3), the witness' manner while testifying; (4), the

8  witness' interest in the outcome of the case, if any; (5), the

9  witness' bias or prejudice, if any; (6), whether other evidence

10 contradicted the witness' testimony; (7), the reasonableness of

11 the witness' testimony in light of all the evidence; and (8), any

12 other factors that bear on believability.

13       The weight of the evidence as to a fact does not

14 necessarily depend on the number of witnesses who testify.  What

15 is important is how believable the witness were, and how much

16 weight you think their testimony deserves.

17       You have heard evidence that Carlos Alberto

18 Ramos-Gonzalez, Jose Pablo Herrera-Davila, and Durell James

19 Martinez, witnesses, have been convicted of felonies.  You may

20 consider this evidence in deciding whether or not to believe

21 these witnesses, and how much weight to give to the testimony of

22 these witnesses.

23       You have heard evidence that the defendant has

24 previously been convicted of a crime.  You may consider that

25 evidence only as it may affect the defendant's believability as a

1  witness.  You may not consider a prior conviction as evidence of

2  guilt of the crime for which the defendant is now on trial.

3          You have heard testimony from persons who because of

4  education or experience were permitted to state opinions, and the

5  reasons for their opinions.  Such opinion testimony should be

6  judged like any other testimony.  You may accept it or reject it,

7  and give it as much weight as you think it deserves considering

8  the witness' education and experience, the reasons given for the

9  opinion, and all the other evidence in the case.

10         You have heard testimony that the defendant made a

11  statement.  It is for you to decide, (1), whether the defendant

12  made the statement, and (2), if so, how much weight to give to

13  it.  In making those decisions you should consider all the

14  evidence about the statement, including the circumstances under

15  which the defendant may have made it.

16         You are here only to determine whether the defendant is

17  guilty or not guilty of the charges in the indictment.  The

18  defendant is not on trial for any conduct or offense not charged

19  in the indictment.

20         A separate crime is charged against the defendant in

21  each count.  You must decide each count separately.  Your verdict

22  on one count should not control your verdict on any other count.

23         Proof beyond a reasonable doubt is proof that leaves

24  you firmly convinced the defendant is guilty.  It is not required

25  that the government prove guilt beyond all possible doubt.

1          A reasonable doubt is a doubt based upon reason and
2   common sense, and is not based purely on speculation.  It may
3   arise from a careful and impartial consideration of all the
4   evidence, or from lack of evidence.

5          If after a careful and impartial consideration of all
6   the evidence you are not convinced beyond a reasonable doubt that
7   the defendant is guilty, it is your duty to find the defendant
8   not guilty.  On the other hand, if after a careful and impartial
9   consideration of all the evidence you are convinced beyond a
10  reasonable doubt that the defendant is guilty, it is your duty to
11  find the defendant guilty.

12         The defendant is charged in Count 1 of the indictment
13  with assault on a federal officer in violation of Section 111(b)
14  of Title 18 of the United States Code.  In order for the
15  defendant to be found guilty of that charge, the government must
16  prove each of the following elements beyond a reasonable doubt:

17         First, the defendant forcibly assaulted Federal Bureau
18  of Prisons Special Investigative Technician Clint Lamar Cranford;
19  and second, the defendant did so while Clint Lamar Cranford was
20  engaged in or on account of his official duties; and third, the
21  defendant inflicted bodily injury.

22         The defendant is charged in Count 2 of the indictment
23  with assault on a federal officer in violation of Section 111(b)
24  of Title 18 of the United States Code.  In order for the
25  defendant to be found guilty of that charge, the government must

1    prove each of the following elements beyond a reasonable doubt:

2    First, the defendant forcibly assaulted Federal Bureau of Prisons

3    Lieutenant Curtis Kevin Campbell; and second, the defendant did

4    so while Lieutenant Campbell was engaged in or on account of his

5    official duties; and third, the defendant inflicted bodily

6    injury.

7            The defendant is charged in Count 3 of the indictment

8    with assault on a federal officer in violation of Section 111(b)

9    of Title 18 of the United States Code.  In order for the

10   defendant to be found guilty of that charge, the government must

11   prove each of the following elements beyond a reasonable doubt:

12   First, the defendant forcibly assaulted Federal Bureau of Prisons

13   Health Services Secretary Joan Rene Harmon; and second, the

14   defendant did so while Joan Rene Harmon was engaged in or on

15   account of her official duties; and third, the defendant

16   inflicted bodily injury.

17           There is a forcible assault when one person

18   intentionally strikes another, or willfully attempts to inflict

19   injury on another, or makes a threat coupled with an apparent

20   ability to inflict injury on another which causes a reasonable

21   apprehension of immediate bodily harm.

22           Bodily injury means any significant injury, for example

23   an injury that is painful and obvious, or is a type for which

24   medical attention ordinarily would be sought.

25           The defendant contends that his conduct was justified.

1    Justification legally excuses the crime charged.  The defendant

2    must prove justification by a preponderance of the evidence.

3            A preponderance of the evidence means that you must be

4    persuaded that the things the defendant seeks to prove are more

5    probably true than not true.

6            A defendant's conduct was justified only if at the time

7    of the crime charged, (1), the defendant was under an unlawful

8    and present threat of death or serious bodily injury; (2), the

9    defendant did not recklessly place himself in a situation where

10   he would be forced to engage in criminal conduct; (3), the

11   defendant had no reasonable legal alternative; and (4), there was

12   a direct causal relationship between the conduct, and avoiding

13   the threatened harm.  If you find that each of these things have

14   been proved by a preponderance of the evidence, you must find the

15   defendant not guilty.

16           Now, the punishment provided by law for this crime is

17   for the Court to decide.  You may not consider punishment in

18   deciding whether the government has proved its case against the

19   defendant beyond a reasonable doubt.

20           Because you must base your verdict only on the evidence

21   received in the case and on these instructions, I remind you that

22   you must not be exposed to any other information about the case,

23   or to the issues it involves.  Except for discussing the case

24   with your fellow jurors during your deliberations, do not

25   communicate with anyone in any way, and do not let anyone else

1    communicate with you in any way about the merits of the case, or

2    anything to do with it.  This includes discussing the case in

3    person, in writing, by phone or electronic means, via e-mail,

4    text messaging, or any internet chat room, blog, website, or

5    other feature.  This applies to communicating with your family

6    members, your employer, the media or press, and the people

7    involved in the trial.

8           If you are asked or approached in any way about your

9    jury service or anything about this case, you must respond that

10   you have been ordered not to discuss the matter and to report the

11   contact to the Court.

12          Do not read, watch, or listen to any news or media

13   accounts or commentary about the case, or anything to do with it.

14          Do not do any research, such as consulting

15   dictionaries, searching the internet, or using other reference

16   materials.  And do not make any investigation or in any other way

17   try to learn about the case on your own.

18          The law requires these restrictions to ensure the

19   parties have a fair trial based on the same evidence that each

20   party has had an opportunity to address.

21          When you begin your deliberations, elect one members of

22   the jury as your foreperson who will preside over the

23   deliberations, and speak for you here in court.  You will then

24   discuss the case with your fellow jurors to reach agreement, if

25   you can do so.

1          Your verdict, whether guilty or not guilty, must be

2     unanimous.  Each of you must decide the case for yourself, but

3     you should do so only after you have considered all the evidence,

4     discussed it fully with the other jurors, and listened to the

5     views of your fellow jurors.

6          Do not be afraid to change your opinion if the

7     discussion persuades you that you should, but do not come to a

8     decision simply because other jurors think it is right.

9          It is important that you attempt to reach a unanimous

10    verdict, but of course, only if each of you can do so after

11    having made your own conscientious decision.

12         Do not change an honest belief about the weight and

13    effect of the evidence simply to reach a verdict.

14         Some of you have taken notes during the trial.  Whether

15    or not you took notes, you should rely on your own memory of what

16    was said.  Notes are only to assist your memory.  You must not be

17    overly influenced by your notes, or those of your fellow jurors.

18         Now, a verdict form has been prepared for you.  After

19    you have reached unanimous agreement on a verdict, your

20    foreperson should complete the verdict form according to your

21    deliberations, sign and date it, and advise the bailiff that you

22    are ready to return to the courtroom.

23         And by way of example, on the last page of your packet

24    is a sample form of verdict.  It's just for our discussion

25    purposes only.  A separate original form of verdict will be sent

1   into the jury room, and it's that separate form of verdict that

2   will be executed by the foreperson.  I just wanted you to see

3   one.

4          If you'll look at it with me, omitting the heading and

5   the caption it reads:  We the jury find the defendant, Adrian

6   Cooper, and then there's blank, and that's entitled Count 1, as

7   charged in Count 1 of the indictment, paren, assault on federal

8   Bureau of Prisons Special Investigative Services Technician Clint

9   Lamar Cranford.

10         Now, if the jury should reach a unanimous verdict, if

11  that verdict is not guilty, then the foreperson and the

12  foreperson only would write the words not guilty in that blank.

13  If the unanimous verdict of the jury is that the defendant is

14  guilty, then the foreperson and the foreperson only would write

15  the word guilty in that blank.  That is true with all three

16  counts that are set forth there.

17         Then once the verdict has been executed in that manner,

18  the foreperson and the foreperson only would sign and date the

19  verdict at the bottom where provided.

20         If it becomes necessary during your deliberations to

21  communicate with me, you may send a note through the bailiff

22  signed by any one or more of you.  No member of the jury should

23  ever attempt to communicate with me except by a signed writing,

24  and I will respond to the jury concerning the case only in

25  writing, or here in open court.

1        If you send out a question, I will consult with the

2    lawyers before answering it, which may take some time.  You may

3    continue your deliberations while waiting for the answer to any

4    questions.

5        Remember that you are not to tell anyone, including me,

6    how the jury stands numerically or otherwise on any question

7    submitted to you, including the question of the guilt of the

8    defendant, until after you have been -- have reached a unanimous

9    verdict, or have been discharged.

10        Counsel, are there any corrections or additions to the

11    reading of the instructions?

12        MR. FIGUEROA:  I have none, your Honor.

13        MR. WEST:  No, your Honor.

14        THE COURT:  All right.

15        All right, ladies and gentlemen, when you go in the

16    jury room, you can take that copy of the instructions with you.

17    Also, you may take any notes that you took during the trial.

18    Once you're in the jury room, then all the exhibits that were

19    actually admitted in evidence will be sent into the jury room,

20    and also there'll be a form of verdict sent into the jury room.

21        All right, I will swear the bailiff.

22        Do you solemnly swear or affirm that you will keep this

23    jury in a private excluded place, and that you will allow no

24    person to communicate with them on any topic whatsoever, nor will

25    you communicate with them except to inquire as to their comfort,

| | |
|---|---|
| 1 | or as to whether they have arrived at a verdict, and thereafter |
| 2 | that you will escort them into this courtroom? |
| 3 | THE CLERK:  I do. |
| 4 | THE COURT:  All right.  Now, I have a matter that I |
| 5 | don't like doing.  I can only send 12 jurors in to deliberate on |
| 6 | a verdict.  So juror number 31, you're an alternate juror. |
| 7 | And what -- I'm going to treat you separately, if I |
| 8 | may.  I'm going to -- I can't release you from the admonition, |
| 9 | because we may still need you.  Anything can happen during |
| 10 | deliberations.  I might -- I might lose a juror.  One of them |
| 11 | might jump out the window or something, and I would need your |
| 12 | services, and you would replace that juror.  If that should |
| 13 | occur, then the jury would have to start deliberations all over |
| 14 | again.  So I can't release you from the admonition, meaning -- I |
| 15 | can let you go but I can't release you from the admonition, which |
| 16 | means not to talk to anybody about the case, and don't do any |
| 17 | research or anything.  The way we'll do this is since I don't |
| 18 | want to hold you up is that I'm going to release you to go with |
| 19 | Cathy back in the jury room, and she'll take a telephone number |
| 20 | from you, a number where you can be reached in the event we need |
| 21 | your services so that we can call and ask you to come down here. |
| 22 | Now, we'll call you either way.  If this jury reaches a verdict, |
| 23 | we'll call you, and then you'll be released from the admonition. |
| 24 | I don't want you to think that you wasted your time |
| 25 | because you're not going to be deliberating.  The services of an |

1    alternate are extremely important, because had I lost one of

2    these first 12 jurors to illness or something, you would have

3    taken their place.  If I didn't have you, then we'd have to quit

4    and start all over again with another juror, see?  So sometimes

5    that happens.  And so you didn't waste your time.  I appreciate

6    your service and your time and attention that you committed to

7    the case.

8              All right, so I'm going to release you, though, now to

9    go with Cathy, and I'll have the other jurors remain for a

10   moment.

11             Counsel, if you could approach while Cathy's doing

12   that.

13                         BENCHES CONFERENCE

14             THE COURT:  I don't really have anything.  It's just

15   this awkward moment of time where everybody just sits here and

16   looks at each other.

17             MR. WEST:  I have.

18             THE COURT:  Okay.

19             MR. WEST:  You probably shouldn't have read this.  Can

20   we pull it --

21             THE COURT:  Oh, no, that one?  No, we talked about --

22             MR. WEST:  Yeah, we said there weren't any experts.

23             THE COURT:  I decided to leave it in because of --

24             MR. WEST:  I decided to pull it, because there weren't

25   any actual experts.

```
 1            THE COURT:  Gaskin.

 2            MR. WEST:  He didn't really qualify as an expert,

 3   though.

 4            THE COURT:  He was qualified as a dentist.

 5            MR. WEST:  What was his general expertise?

 6            THE COURT:  Didn't we talk about that?

 7            MR. WEST:  Didn't we agree to pull it?

 8            THE COURT:  I know we talked about the statement of the

 9   defendant.  That was kind of iffy.  No, I intended to read it.

10            MR. WEST:  Okay, good.

11            THE COURT:  All right.  The concern I had -- I didn't

12   read it, but 4.4 is also in their packet, and that's where the

13   defendant does testify.

14            MR. WEST:  Yeah.

15            THE COURT:  That wasn't --

16            MS. ROLLEY:  It wasn't taken out?

17            THE COURT:  It wasn't decided yet.

18            MS. ROLLEY:  Because I had a reaction --

19            THE COURT:  I didn't read it, though.

20            MS. ROLLEY:  No.  It's still in the packet.

21            MR. WEST:  It's in the packet.

22            THE COURT:  Give Cathy -- where's your office?

23            MR. WEST:  About four or five blocks away, but I'll

24   stick around here a while.  She'll have my cellphone.

25            THE COURT:  Give her a cellphone number where you can
```

1   be reached, all of you, but also check with her on the exhibits

2   that go into the jury room, make sure we don't have any slip-ups

3   there.

4            MR. FIGUEROA:  Do we let the big chart in?

5            THE COURT:  That was for illustrative purposes only.

6            MR. WEST:  They're exactly the same.  The smaller one

7   is exactly the same.

8            THE COURT:  Actually, it's easier to see, so if you

9   don't care --

10           MR. WEST:  I'd just as soon it goes back.  I think it's

11  easier.

12           MS. ROLLEY:  Right.

13           (The Court and clerk conferred off the record.)

14           THE COURT:  You have hard copies of all those

15  photographs that --

16           MS. ROLLEY:  Yes, we do.  Not the video.

17           THE COURT:  Oh, the video itself.  Other than that,

18  there are hard copies of all the exhibits?

19           MR. WEST:  Yeah.

20           THE COURT:  So I probably should say something to them

21  about the video.  Why don't we just wait and see if we get a

22  question.  They may want to know whether there is a white shirt

23  or something.  Just wait until they ask.

24           MS. ROLLEY:  The hard disk goes back.  It's been

25  admitted.

1      THE COURT:  Well, is there anything confusing about
2  that?

3      MR. WEST:  You don't have a TV with a DVD thing?

4      THE CLERK:  I think it's the format.

5      THE COURT:  I'll hold that disk from going back because
6  I'm afraid they'll play around with it.  But I'll say something
7  to them.  If they want to see that, then we have to make those
8  arrangements.

9      MR. WEST:  Yeah, I think you should.  Thank you, sir.

10     (The bench conference was concluded.)

11     THE COURT:  All right, ladies and gentlemen, I'm going
12  to put you in the custody of the bailiff at this time.  There's
13  one exhibit -- there's a CD that has the video on it.  That --
14  that won't go back to you because you won't have anything to play
15  it on.  If there's -- if for any reason you want to see it, then
16  I'll make arrangements to show it to you, but that's -- that's
17  the only one that won't go back there.  And then that big
18  chart -- what happened to it?

19     MS. ROLLEY:  It's right in front of you.

20     THE COURT:  Okay.  That will be going back there as
21  well.

22     All right, I'm going to put you in charge of the
23  bailiff at this time, and excuse you.  Thank you.

24     (The jury left the courtroom.)

25     THE COURT:  All right, anything else?

1          MR. FIGUEROA:  I have nothing.

2          MR. WEST:  Yeah, I thought you were going to send the

3    video back with them.  If they wanted to, we could play it.

4          THE COURT:  I'm afraid somebody has a laptop back there

5    that -- you know.

6          MR. WEST:  Okay.

7          THE COURT:  Then they'd get on their laptop, and they'd

8    go into Google, and stuff like that so --

9          MR. WEST:  That's fine.

10          THE COURT:  All right.  So as you were.  Recess,

11    waiting for this verdict.

12          Thank you.

13          MR. WEST:  Yes, sir.  Thank you.

14          (The Court recessed at 2:51 p.m., and reconvened on May

15    25, 2012.)

16

17

18

19

20

21

22

23

24

25

1              **C E R T I F I C A T E**

2          I, Mary A. Riley, do hereby certify that I

3     stenographically reported the foregoing proceedings to the best

4     of my skill and ability, and that the same was transcribed by me

5     via computer-aided transcription, and that the foregoing pages of

6     typewritten matter are a true, correct and complete transcript of

7     all the proceedings had, as set forth in the title page hereto.

8          Dated this 26th day of July, 2012.

9

10                                        s/ Mary A. Riley

11                                 United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25